### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

MICHAEL M. GORDON and MICHAEL J. ROMANO,[1]

      Plaintiffs,

v.

TODD BLANCHE, *in his official capacity as the Acting Attorney General of the United States*,

  950 Pennsylvania Avenue, NW
  Washington, D.C. 20530;

STANLEY E. WOODWARD, Jr., *in his official capacity as the Associate Attorney of the United States*,

  950 Pennsylvania Avenue, NW
  Washington, D.C. 20530;

SCOTT BESSENT, *in his official capacity as Secretary of the United States Department of Treasury*,

  1500 Pennsylvania Avenue, NW
  Washington, D.C. 20220;

FRANK J. BISIGNANO, *in his official capacity as the Chief Executive Officer of the Internal Revenue Service*,

  1111 Constitution Avenue, NW
  Washington, D.C. 20224;

THE UNITED STATES DEPARTMENT OF JUSTICE,

  950 Pennsylvania Avenue, NW
  Washington, D.C. 20530;

THE UNITED STATES DEPARTMENT OF THE TREASURY,

</td><td>

Civil Action No. _____

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

</td></tr>
</table>

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiffs' residential addresses are being filed under seal with the Court in a separate Notice of Filing.

1

> 1500 Pennsylvania Avenue, NW
> Washington, D.C. 20220; and
>
> THE INTERNAL REVENUE SERVICE,
>
> 1111 Constitution Avenue, NW
> Washington, D.C. 20224,
>
> Defendants.

## INTRODUCTION

1. For years, President Donald Trump has praised those who stormed the Capitol on January 6, 2021.

2. In one of his first acts on his very first day in office, President Trump pardoned approximately 1,500 January 6 insurrectionists.

3. And, since then, President Trump and those around him have repeatedly advocated for compensating the insurrectionists for the supposed harms they suffered as a result of their allegedly unfair and politically-biased prosecutions.

4. After many months of promises, President Trump and Defendants finally came up with a plan to compensate the insurrectionists. And, it is one of the most brazen and corrupt misuses of taxpayer funds in American history.

5. Earlier this year, President Trump effectively sued himself, alleging stale and spurious claims against the Internal Revenue Service and the Department of the Treasury—two Executive branch offices he controls—based on the leak of his tax returns more than six years ago.

6. Unsurprisingly, President Trump worked out a settlement with himself. And, as part of that settlement, President Trump's Attorney General is obligated to create the so-called "Anti-Weaponization Fund," which will make payments and issue apologies to those who claim they have been harmed by the "weaponization" of the justice system by "Democrat elected officials,

political and career federal employees, contractors, and agents."

7. Already, the January 6 insurrectionists are hailing the creation of the Fund, stating that all of them are likely to receive compensation.

8. The Anti-Weaponization Fund is illegal several times over. It contravenes the statutory authorities that govern the payment of money to settle legal claims against the United States. It also wholly intrudes on Congress's power of the purse and eviscerates the separation of powers between the Legislative and Executive branches of government.

9. The opaqueness of the Anti-Weaponization Fund, and its process for paying out claims, also do not comply with the statutory requirements that actions taken by Executive branch agencies be the product of reasoned decisionmaking.

10. Worse still, the creation of the Anti-Weaponization Fund constitutes an explicit representation, from the federal government, that the men and women who prosecuted the January 6 insurrectionists did so for impure and political reasons. Such baseless and false accusations have harmed and will harm Plaintiffs.

11. Plaintiffs are two individuals who prosecuted January 6 insurrectionists. They went to work each day with one objective: to do justice. Every day, they took seriously the great responsibility that comes with being a federal prosecutor.

12. The creation of the Anti-Weaponization Fund—along with its assertion that Plaintiffs acted for improper purposes—besmirches the professional reputations Plaintiffs diligently sought to foster as responsible prosecutors. The Fund, therefore, causes them severe, and ongoing harm.

13. These acts are unlawful and injure Plaintiffs, and the Court should declare the creation and funding of the Anti-Weaponization Fund illegal and enjoin Defendants from taking

any further action to establish it.

**PARTIES**

14.    Plaintiff Michael M. Gordon is a former prosecutor at the Department of Justice ("DOJ"). Plaintiff Gordon started his career at the DOJ as an Assistant United States Attorney in the United States Attorney's Office for the Middle District of Florida. In the wake of the January 6, 2021 attack on the Capitol, he became a Senior Trial Counsel in the Capitol Siege Section of the United States Attorney's Office for the District of Columbia, the DOJ unit responsible for prosecuting cases stemming from the January 6 attack. He worked in the Capitol Siege Section from November 2021 to December 2023. As discussed more fully below, he was removed from federal service in June 2025 because of his work at the Capitol Siege Section.

15.    Plaintiff Michael J. Romano was a prosecutor at the DOJ for almost eighteen years. He was hired as an Honors Attorney in the Criminal Section of the Tax Division in 2007. He worked at the Tax Division until 2014 when he joined the United States Attorney's Office for the District of Columbia. After spending five years at the United States Attorney's Office, Plaintiff Romano joined the Public Integrity Section of the DOJ in 2019. Shortly after the January 6 Capitol riot, Plaintiff Romano joined the section of the United States Attorney's Office for the District of Columbia that eventually became the Capitol Siege Section. He worked at the Capitol Siege Section for five years until its dissolution, eventually becoming a Deputy Chief of the Section.

16.    Defendant Todd Blanche is the Acting Attorney General of the United States and the head of the United States Department of Justice. He is sued in his official capacity.

17.    Defendant Stanley E. Woodward, Jr., is the Associate Attorney General of the United States. He is sued in his official capacity.

18.    Defendant Scott Bessent is the Secretary of the United States Department of the

Treasury. He is sued in his official capacity.

19.     Defendant Frank J. Bisignano is the Chief Executive Officer of the Internal Revenue Service. He is sued in his official capacity.

20.     Defendant United States Department of Justice is the federal executive department responsible for the enforcement of the law.

21.      Defendant United States Department of the Treasury ("Treasury") is the federal executive department responsible for managing federal finances, collecting taxes, producing currency, and ensuring the financial security of the United States.

22.     Defendant Internal Revenue Service ("IRS") is a bureau of Treasury responsible for collecting federal taxes and enforcing the United States' tax laws.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution, the Administrative Procedure Act ("APA"), and other federal statutes. Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C § 702.

24.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705, 706.

25.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are officers of the United States sued in their official capacities as well as agencies and Departments of the United States headquartered in this District. Moreover, a substantial part of the events giving rise to the claims occurred in this District.

## FACTS

A.    **President Trump Foments an Insurrection on January 6, 2021.**

26.    After losing the 2020 election to Joseph R. Biden, President Donald J. Trump sought to cling to power. He attempted to induce "state officials to ignore true vote counts; to manufacture fraudulent slates of presidential electors . . . [and] to force Justice Department officials and his own Vice President . . . to act in contravention of their oaths."[2]

27.    And, most egregiously, President Trump "direct[ed] an angry mob to the United States Capitol [on January 6, 2021] to obstruct the congressional certification of the presidential election and then leverage[d] rioters' violence to further delay [the certification]."[3]

28.    President Trump's fomentation of the January 6 insurrection began well before the certification date. For example, on December 13, 2020, he tweeted to his millions of followers: "Swing States that have found massive VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes as complete & correct without committing a severely punishable crime."[4]

29.    On December 19, 2020, he again tweeted: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6. Be there, will be wild!"[5]

30.    Similarly, on December 26, President Trump tweeted: "If a Democrat Presidential Candidate had an Election Rigged & Stolen, with proof of such acts at a level never seen before,

---

[2] DOJ, Special Counsel Jack Smith, *Final Report on the Special Counsel's Investigations and Prosecutions*, at 2-3 (Jan. 7, 2025), https://perma.cc/9WA9-DSUM.
[3] *Id.* at 3.
[4] *Anderson v. Griswold*, 543 P.3d 283, 330-31 (Colo. 2023), *reversed by Trump v. Anderson*, 543 P.3d 283 (2024).
[5] *Id.*

6

the Democrat Senators would consider it an act of war, and fight to the death. Mitch [McConnell] & the Republicans do NOTHING, just want to let it pass. NO FIGHT!"[6]

31.     Then, on January 1, 2021, President Trump retweeted a tweet from an organizer of the January 6 March for Trump. The organizer's tweet stated: "The calvary [sic] is coming, Mr. President! January 6|Washington, D.C."[7] President Trump stated: "A great honor."[8]

32.     Finally, on January 6, 2021, President Trump gave a speech in which he exhorted his supporters to engage in violence. During the speech, he proclaimed:

   a.   "We will never give up, we will never concede. It doesn't happen. You don't concede when there's theft involved."[9]

   b.   "Republicans are constantly fighting like a boxer with his hands tied behind his back. It's like a boxer. And we want to be nice. We want to be so respectful of everybody, including bad people. And we're going to have to fight much harder."[10]

   c.   "[W]e're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. Because you'll never take back our country with weakness. You have to show strength and you have to be strong."[11]

   d.   "[Y]ou can't vote on fraud. And fraud breaks up everything, doesn't it? When you catch somebody in a fraud, you're allowed to go by very different rules."[12]

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Transcript of Trump's speech at rally before US Capitol riot*, AP (Jan. 13, 2021), https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27.
[10] *Id.*
[11] *Id.*
[12] *Id.*

    e.   "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore."[13]

33.    His supporters followed President Trump's directions. Shortly after he finished his speech, an angry mob overwhelmed a line of law enforcement officers guarding the Capitol grounds and stormed up to the terrace of the Capitol.

34.    From there, the mob smashed windows and made their way inside the Capitol, forcing Members of Congress, journalists, and even the Vice President, to flee for their lives.

35.    The rioters chanted "hang Mike Pence" and "where's Nancy [Pelosi]."

36.    And, both inside and outside the Capitol, the rioters committed violence against police officers, including physically assaulting them and attacking them with tasers.

37.    Indeed, during the insurrection on January 6, more than 100 law enforcement officers were injured and one law enforcement officer, Brian Sicknick, was fatally injured.

38.    Multiple courts have described the events on January 6, 2021 as an insurrection.[14]

39.    Nevertheless, despite the efforts of President Trump and his army of insurrectionists, Congress certified the fact that the people of the United States had elected President Biden on the morning of January 7, 2021, and President Biden assumed office later that month, on January 20, 2021.

**B.    Plaintiffs Investigate and Prosecute the January 6 Insurrectionists.**

40.    Almost immediately after President Trump left office, the DOJ initiated an investigation of the events at the Capitol.

---

[13] *Id.*

[14] *See, e.g., Anderson*, 543 P.3d at 330-31; *State v. Griffin*, No. D-101-CV-2022-00473, 2022 WL 4295619, at *17-*18 (N.M. Dist. Ct. Sept. 6, 2022).

41.    Specifically, the United States Attorney's Office for the District of Columbia created the Capitol Siege Section to investigate and prosecute the insurrectionists who stormed the Capitol.

42.    Plaintiff Gordon joined the Capitol Siege Section in September 2021 and became the Senior Trial Counsel.

43.    While there, he prosecuted more than three dozen individuals who participated in the January 6 insurrection.[15] These individuals included Richard Barnett, an Arkansas man who put his feet on a desk in Speaker Nancy Pelosi's office during the riot[16] and brought an electric stun weapon and brandished it at an officer.

44.    Plaintiff Gordon also prosecuted Eric Munchel, a Tennessee man who brought stolen zip ties and a stun weapon into the Senate gallery.[17]

45.    Similarly, Plaintiff Romano also personally handled numerous cases during his time at the Capitol Siege Section.

46.    This included the case of Cody Mattice and James Mault. Mattice stormed the Capitol on January 6 and recorded himself saying "[w]e're going to fuck some shit up. It's about to be nuts . . . . We're getting up front and we're taking this shit."[18]

---

[15] Michael Kunzelman, *Prosecutor who handles high-profile Capitol riot cases sues government over his firing*, AP (Jul. 24, 2025), https://apnews.com/article/capitol-riot-michael-gordon-prosecutor-fired-lawsuit-d7eac55266e6f63c096232d4b2a48b3e.

[16] *See United States v. Barnett*, No. 1:21-cr-00038 (D.D.C. Jan. 29, 2021).

[17] *See United States v. Munchel*, No. 1:21-cr-00118 (D.D.C. Feb. 12, 2021).

[18] *Statement of Michael J. Romano Before the Select Subcommittee to Investigate Remaining Questions Surrounding January 6, 2021* (Jan. 14, 2026), https://www.congress.gov/119/meeting/house/118824/witnesses/HHRG-119-QJ00-Wstate-RomanoM-20260114.pdf (last viewed May 30, 2026).

47.    Mault was recorded talking to law enforcement at the Capitol and telling them: "We had your guys' back when you were under attack . . . . your jobs will be here . . . after we kick the shit out of [Members of Congress]."[19]

48.    Plaintiff Romano also prosecuted Landon Copeland, who fought with police officers on the West Plaza of the Capitol;[20] Mark Ponder who attacked multiple officers with a pole;[21] and Aaron Mostofsky, who stole a riot shield and a police vest.[22]

49.    Eventually, Plaintiff Romano became a Deputy Chief of the Capitol Siege Section. In that role, he oversaw "hundreds of prosecutions of Capitol rioters."[23]

50.    As a supervisor, Plaintiff Romano had approximately six to ten attorneys in the Capitol Siege Section reporting directly to him.

51.    After becoming a Deputy Chief, Plaintiff Romano was also the grand jury coordinator of the Capitol Siege Section. In that role, he reviewed almost every indictment presented to the grand jury by attorneys in the Capitol Siege Section to ensure that the charges therein were supported by the facts and the evidence. As such, Plaintiff Romano signed almost every indictment brought by the Capitol Siege Section.

52.    Plaintiff Romano also oversaw a portfolio of trials. As a trial supervisor, Plaintiff Romano was in court with the prosecution team of trial attorneys. He reviewed their pleadings and their filings, and discussed strategy with the members of the trial team.

---

[19] *Id.*
[20] *See United States v. Copeland*, No. 1:21-cr-00570 (D.D.C. Sept. 10, 2021).
[21] *See United States v. Ponder*, No. 1:21-cr-00259 (D.D.C. Mar. 26, 2021).
[22] *See United States v. Mostofsky*, No. 21-cr-138-JEB (D.D.C. Jan. 27, 2022).
[23] *See supra* note 18.

53.     Plaintiff Romano's trial supervision duties also included mooting the trial teams' opening statements to, among other things, ensure that the trial teams' arguments did not unfairly characterize or seek to punish any of the January 6 defendants for their political views.

54.     In total, the Capitol Siege Section, of which Plaintiffs Gordon and Romano were part, indicted approximately 1,500 individuals, most of whom pled guilty.

55.     The charges brought against the insurrectionists, and for which they were found guilty, included serious crimes, such as assaulting law enforcement officers, seditious conspiracy, obstruction of Congressional proceedings, theft and destruction of government property, and unlawful entry into restricted federal buildings.

## C.     President Trump and Others Characterize Plaintiffs' Actions as Politicizing the Justice System.

56.     Since leaving office in 2021, President Trump and his allies have publicly, and repeatedly, claimed that Plaintiffs' prosecutions of the January 6 insurrectionists were politically motivated.

57.     For example, in September 2021, President Trump issued the following statement through his political organization:

> Our hearts and minds are with the people being persecuted so unfairly relating to the January 6th protest concerning the Rigged Presidential Election. In addition to everything else, it has proven conclusively that we are a two-tiered system of justice. In the end, however, JUSTICE WILL PREVAIL![24]

---

[24] John Wagner, *Trump expresses solidarity with rioters arrested in Jan. 6 attack ahead of planned rally*, Wash. Post (Sept. 16, 2021), https://www.washingtonpost.com/politics/trump-expresses-solidarity-with-rioters-arrested-for-jan-6-attack-ahead-of-planned-rally/2021/09/16/8e14579c-1719-11ec-a5e5-ceecb895922f_story.html.

58.     On the first anniversary of the January 6 attack, now-Vice President JD Vance referred to the January 6 defendants as "political prisoners" and stated that their captivity "is an assault on democracy."[25]

59.     On December 6, 2022, President Trump recorded a video for a fundraising event hosted by the Patriot Freedom Project, a group that was supporting the families of those prosecuted for their actions on January 6. In the video President Trump stated: "People have been treated unconstitutionally, in my opinion, and very, very unfairly, and we're going to get to the bottom of it . . . . It's the weaponization of the Department of Justice, and we can't let this happen in our country."[26]

60.     Similarly, on March 7, 2023, President Trump posted the following on Truth Social, a social media application where he has millions of followers:



61.     During his 2024 campaign for President, President Trump stopped referring to the insurrectionists as "prisoners" and began to liken them to political "hostages." For example, at a

---

[25] @JDVance, X (Jan. 6, 2022), https://x.com/JDVance/status/1479163416363384834.
[26] John Wagner, *Trump expresses solidarity with Jan. 6 rioters who stormed the Capitol*, Wash. Post. (Dec. 2, 2022), https://www.washingtonpost.com/national-security/2022/12/02/trump-jan-6-rioters-capitol/.

campaign rally in November 2023, he stated: "I call them the J6 hostages, not prisoners. I call them the hostages, what's happened. And it's a shame."[27]

62.     On the third anniversary of the January 6 attack, President Trump stated: "They ought to release the J6 hostages . . . . I call them hostages. Some people call them prisoners. I call them hostages."[28]

63.     Indeed, in January 2024, President Trump referred to the January 6 insurrectionists as hostages in campaign speeches five times.[29] In March 2024, he gave four speeches in which he referred to the insurrectionists as hostages.[30]

64.     President Trump also repeatedly promised that, if he became President again, he would pardon the January 6 insurrectionists, in part, because of Plaintiffs' alleged unfair treatment of them.

65.     President Trump first floated this idea as early as January 2022 when he stated: "If I run and I win, we will treat those people from January 6 fairly . . . . We will treat them fairly, and if it requires pardons, we will give them pardons because they are being treated so unfairly."[31]

---

[27] Jake Traylor, *Trump calls people charged and convicted for Jan. 6 riots 'hostages'*, NBC News (Nov. 3, 2023), https://www.nbcnews.com/meet-the-press/meetthepressblog/trump-calls-people-charged-convicted-jan-6-riots-hostages-rcna123617/.

[28] Galen Bacharier, *Trump calls for release of Jan. 6 rioters, falsely describes Capitol attack as 'peaceful,'* USA Today (Jan. 7, 2024), https://www.usatoday.com/story/news/politics/elections/2024/01/07/donald-trump-release-jan-6-hostages/72140634007/

[29] Marianne LeVine, Isaac Arnsdorf, & Clara Ence Morse, *Trump escalates solidarity with Jan. 6 rioters as his own trials close in*, Wash. Post (Mar. 23, 2024), https://www.washingtonpost.com/elections/2024/03/23/trump-jan-6-rioters-rhetoric-campaign/.

[30] *Id.*

[31] Tyler Pager, *Trump suggests that if he is reelected, he will pardon Jan. 6 Capitol rioters*, Wash Post (Jan. 30, 2022), https://www.washingtonpost.com/politics/2022/01/29/trump-jan6-protesters/.

66.     In September 2022, he stated that he would issue "full pardons with an apology to many."[32]

67.     The promise to pardon the insurrectionists soon became a key part of President Trump's campaign. For example, at his first campaign rally on March 25, 2023, President Trump stated that when he becomes President again "the thugs and criminals who are corrupting our justice system will be defeated, discredited and totally disgraced."

68.     On March 11, 2024, in the middle of the 2024 campaign, he posted the following on Truth Social:



69.     And, shortly after winning the 2024 election, President Trump stated that he would pardon the insurrectionists on his first day in office. He justified such action by saying "[t]he system's a very corrupt system."[33]

**D. President Trump Pardons the Insurrectionists and Retaliates Against the Capitol Siege Section Prosecutors.**

---

[32] Mariana Alfaro, *Trump vows pardons, government apology to Capitol rioters if elected*, Wash. Post (Sept 1, 2022), https://www.washingtonpost.com/national-security/2022/09/01/trump-jan-6-rioters-pardon/.

[33] Ryan J. Reilly, *Trump will 'most likely' pardon Capitol rioters on day one and says Jan. 6 committee members should be jailed*, NBC News (Dec. 8, 2024), https://www.nbcnews.com/politics/donald-trump/trump-will-likely-pardon-capitol-rioters-day-1-says-jan-6-committee-me-rcna183275/.

70.    Upon taking office, President Trump made good on his promise to pardon the insurrectionists.

71.    On January 20, 2025, his first day back in office, President Trump issued a proclamation containing pardons for the approximately 1,500 insurrectionists. The proclamation stated that the pardons were necessary to end a "grave national injustice that has been perpetuated upon the American people over the last four years and begins a process of national reconciliation."[34]

72.    President Trump's initial executive actions also went beyond the pardons. For example, the same day, he issued an Executive Order titled "Ending the Weaponization of the Federal Government."[35]

73.    The Executive Order stated: "The American people have witnessed the previous administration engage in a systematic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies."[36]

74.    It also explicitly identified the prosecution of the January 6 insurrectionists as an example in which "[t]he prior administration and allies throughout the country engaged in an unprecedented, third-world weaponization of prosecutorial power to upend the democratic process."[37]

---

[34] *Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events At Or Near the United States Capitol on January 6, 2021* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/.
[35] Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 20, 2025).
[36] *Id.* at 8235.
[37] *Id.*

75.     The Executive Order directed the Attorney General to "take appropriate action to review the activities of all departments and agencies exercising civil or criminal enforcement authority of the United States" and identify instances in which such enforcement authority had been allegedly weaponized for political purposes.[38]

76.     Upon her confirmation by the Senate, then-Attorney General Pam Bondi fulfilled the mandates of the Executive Order. Specifically, on February 5, 2025, she issued a Memorandum to all DOJ employees announcing the creation of the "Weaponization Working Group."[39]

77.     The Weaponization Working Group was specifically tasked with examining, among other things, "[t]he pursuit of improper investigative tactics and unethical prosecutions relating to events at or near the United States Capitol on January 6, 2021."[40]

78.     Eventually, Ed Martin was appointed as the head of the Weaponization Working Group.[41] The appointment was notable because Mr. Martin had previously represented January 6 insurrectionists as defense counsel. And, immediately prior to becoming the head of the Weaponization Working Group, Mr. Martin was the interim United States Attorney for the District of Columbia, where he demoted and fired many of the prosecutors who were part of the Capitol Siege Section.[42]

---

[38] *Id.*

[39] DOJ, Office of the Attorney General, *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl.

[40] *Id.* at 2.

[41] *See* DOJ, Staff Profile: Edward R. Martin Jr., https://www.justice.gov/pardon/staff-profile/pardon-attorney-edward-r-martin-jr.

[42] Andy Kroll & Jeremy Kohler, *Defending Jan. 6 Rioters, Investigating Democrats: How Ed Martin Is Weaponizing the DOJ for Trump*, ProPublic (Apr. 28, 2025), https://www.propublica.org/article/who-is-ed-martin-career-dc-us-attorney.

16

79.     As if the Weaponization Working Group's purpose to invalidate and smear the work of Plaintiffs and their colleagues were not clear enough, shortly after Mr. Martin was appointed as the head of the group a newly pardoned, former insurrectionist, Jared Wise, was named as an adviser to the group.[43]

80.     On the day of the insurrection, Mr. Wise entered the Capitol, called police officers attempting to defend the Capitol "Nazi[s]" and "the Gestapo," and repeatedly urged other rioters to "kill" the officers.[44]

81.     The Administration has continued to explicitly identify the prosecution of the January 6 insurrectionists as "weaponization" of the justice system. For instance, the official White House website page regarding January 6 states that "[o]n his first day back in office, January 20, 2025, President Trump issued sweeping blanket pardons and commutations for nearly 1,600 patriotic Americans prosecuted for their presence at the Capitol—many mere trespassers or peaceful protesters treated as insurrectionists by a weaponized Biden DOJ."[45] The website accuses "the Democrats" of "weaponizing federal agencies to hunt down dissenters," and refers to the prosecutions "as unprecedented and diabolical weaponization of federal law enforcement against Trump supporters."[46]

82.     Similarly, only days ago, when a journalist pointed out on X, formerly known as Twitter, that the DOJ had scrubbed its website of content referencing the prosecution of the insurrectionists, the DOJ responded as follows:

---

[43] Tom Dreisbach, *Video shows Department of Justice official urging Jan. 6 rioters to 'kill' cops*, NPR (Aug. 7, 2025), https://www.npr.org/2025/08/07/nx-s1-5493197/doj-trump-jan-6-defendant-jared-wise-capitol-riot.

[44] Statement of Facts (Apr. 12, 2023), available at https://www.justice.gov/usao-dc/press-release/file/1585991/dl.

[45] The White House, *01.06.2021*, https://www.whitehouse.gov/j6/ (last viewed May 31, 2026).

[46] *Id.*

17

**DOJ Rapid Response** ✔ 🏛️
@DOJRR47 · Follow

Nothing "quiet" about it.

We are proud to reverse the DOJ's weaponization under the Biden administration. We will do everything in our power to make whole those who were persecuted for political purposes. This includes stripping DOJ's website of partisan propaganda.

**E.      President Trump Files a Baseless Lawsuit Against Himself, Settles It, and Creates the "Anti-Weaponization Fund" to Compensate the January 6 Insurrectionists.**

83.      Those connected to the current administration have also repeatedly discussed the idea of pardoning the insurrectionists, portraying them as victims of political lawfare.

84.      For example, on May 16, 2025, Mr. Martin stated: "We should do it, we shouldn't be afraid . . . You're damn right I want to pay J6ers. If you got wronged by the government, then you should be made right. That's America."[47]

85.      Defendants eventually found a way to accomplish this goal.

86.      In January 2026, President Trump, his sons, and the Trump Organization sued the IRS and Treasury in the Southern District of Florida, seeking $10 billion in damages stemming from the disclosure of their tax returns by an IRS contractor, named Charles Littlejohn, who worked for the private company Booz Allen Hamilton (the "Florida Suit").[48]

87.      The Florida Suit was extraordinary—the sitting United States President sued executive agencies and departments that he controlled and sought an outrageously large sum.

---

[47] Benny Johnson, *Diddy Trial BOMBSHELL: Hillary Clinton, Obama Named by 'Sex Slave' | Trump Torches Comey Kill Threat*, at 43:40 YouTube (May 16, 2025), https://www.youtube.com/live/PdR6nldD9-g?t=2500s.
[48] Compl., ECF No. 1, *Trump v. IRS*, No.1:26-cv-20609 (S.D. Fla. Jan. 29, 2026).

18

88.     The Florida Suit was also legally spurious in several ways. For example, it was untimely—both statutes under which the plaintiffs brought suit contain a two-year statute of limitations, but the plaintiffs filed more than two years after Mr. Littlejohn pled guilty in open court to federal criminal charges related to the leaks of the plaintiffs' tax information.[49]

89.     Indeed, President Trump's personal lawyer appeared at Mr. Littlejohn's plea hearing and specifically identified President Trump as a victim of Mr. Littlejohn's crimes, thereby indicating that President Trump was well aware of Mr. Littlejohn's actions, at the latest, on that date.[50] Nevertheless, the plaintiffs filed suit in January 2026, more than two years after the plea hearing.

90.     The suit also named the wrong defendants. Because Mr. Littlejohn was an IRS contractor, the plaintiffs had no basis to proceed against the government entities named as defendants because the statutory provision identified by the plaintiffs only provides a cause of action for conduct by government employees.[51]

91.     Despite these obvious infirmities, and others, no DOJ attorney ever entered an appearance in the Florida Suit. Rather, shortly after filing suit, the plaintiffs notified the Court that the parties were engaging in settlement discussions.[52]

---

[49] *See* 26 U.S.C. § 7431(d); 5 U.S.C. § 552a(g)(1)(5).

[50] *See* Tr. of Plea Hr'g, ECF No. 13, *United States v. Littlejohn*, No. 1:23-cr-00343 (D.D.C. Oct. 23, 2023).

[51] 26 U.S.C. § 7431(a)(1).

[52] *See* Parties' Consent Mot. for a 90 Day Extension and Incorporated Memorandum of Law, ECF No. 40, at 2, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Apr. 17, 2026).

92.     The Court, however, was skeptical. It issued an order stating that "it [was] unclear" whether the parties were "sufficiently adverse to each other so as to satisfy Article III's case or controversy requirement."[53]

93.     The Court also cited statements made by President Trump to the press about the Florida Suit in which the President stated: "I'm supposed to work out a settlement with myself," and "I'll tell them to pay me, but I'll give 100% of the money to charity."[54]

94.     As such, the Court ordered the parties to brief whether there was, in fact, a "Case" or "Controversy" under Article III. It also appointed amici to address the Article III issue, and amici did so.

95.     But just two days before the parties submitted such briefing, President Trump in fact "work[ed] out a settlement with [him]self."

96.     On May 18, 2026, the plaintiffs voluntarily dismissed the Florida Suit with prejudice.[55] As the Court noted in its order closing the case after the parties' voluntary dismissal, the parties did not file any settlement or record of settlement with the Court.[56]

---

[53] *Trump v. IRS*, No. 1:26-cv-20609, 2026 WL 1145973, at *2 (S.D. Fla. Apr. 24, 2026) (noting President Trump "is the sitting president and his named adversaries are entities whose decisions are subject to his direction").

[54] *Id.* at *2, n.3.

[55] *See* Plaintiffs' Notice of Voluntary Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), ECF No. 52, at 2, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 18, 2026) ("Upon the filing of this Notice, no judicial analysis is appropriate, and any subsequent order purporting to dismiss all claims . . . [would be] a nullity." (citation and internal quotation marks omitted)).

[56] Order Closing Case, ECF No. 62, at 2, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 18, 2026).

97.     However, the parties had, in fact, agreed to the terms of a settlement. Shortly after the plaintiffs filed the dismissal, the DOJ publicly announced a Settlement Agreement, which was also dated May 18, 2026, and signed by Defendants Woodward and Bisignano.[57]

98.     The Settlement Agreement provided that President Trump would dismiss the Florida Suit as well as two administrative complaints he had filed in 2023 and 2024 under the Federal Tort Claims Act ("FTCA"), in exchange for, among other things, the creation of "the Anti-Weaponization Fund" by the DOJ. Astonishingly, DOJ also released a second settlement agreement on May 19, 2026, that conferred broad immunity from government enforcement actions to President Trump and the other plaintiffs.

99.     Subsequent to the Settlement Agreement, a group of former federal judges filed a non-party motion urging the Court to re-open the case because the collusion between the parties effectuated a fraud upon the Court.[58]

100.     On May 29, 2026, the Court issued an order, pursuant to its authority under Federal Rule of Civil Procedure 11, requiring the plaintiffs to brief "(1) the charges of collusion and whether the [p]arties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the [p]arties; and (3) the question of whether the case should be reopened because the Court was a 'victim of a fraud.'"[59] That briefing is still pending.

---

[57]     *Trump v. IRS* Settlement Agreement, available at https://www.justice.gov/opa/media/1441201/dl?inline [hereinafter "Settlement Agreement"].
[58] *See* Mot. to Reopen Case, ECF No. 63, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 27, 2026).
[59] Order, ECF No. 65, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 29, 2026).

F.     The Details of the Anti-Weaponization Fund.

101.    The Anti-Weaponization Fund created by the Settlement Agreement will "provide a systematic process to hear and redress claims" of those who "state that they incurred harm from Lawfare and Weaponization."[60]

102.    And, the Settlement Agreement defines "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons."[61]

103.    It is clear that the Anti-Weaponization Fund is intended to compensate the January 6 insurrectionists. In the public statement announcing the Fund, Defendant Blanche hearkened back to the "weaponization" language used to characterize the prosecution of the January 6 insurrectionists. He stated: "[t]he machinery of government should never be weaponized against any American, and it is this Department's intention to make right the wrongs that were previously done while ensuring this never happens again."[62]

104.    When asked whether the taxpayer money should go to the January 6 insurrectionists, President Trump explained: "This is reimbursing people that were horribly treated, horribly treated. . . . They have been weaponized. They have been, in some cases, imprisoned wrongly. They paid legal fees that they didn't have [to pay]. They have gone bankrupt. Their lives have been destroyed."[63]

---

[60] Settlement Agreement, at ¶ II.C.
[61] *Id.*
[62] DOJ Press Release, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund.
[63] Ali Rogin & Doug Adams, *DOJ creates $1.8 billion fund that could compensate 'targeted' Trump allies*, PBS News (May 18, 2026), https://www.pbs.org/newshour/show/doj-creates-1-8-billion-fund-that-could-compensate-targeted-trump-allies.

105.　　And, perhaps most tellingly, the January 6 insurrectionists themselves started to stake their claims to Fund money almost immediately after it was announced. For example, Enrique Tarrio, the leader of the Proud Boys who was sentenced to 22 years for seditious conspiracy stemming from the January 6 insurrection, stated that he would apply to the fund and that he believed he could receive $2 million to $5 million.[64]

106.　　Jenny Cudd, another individual who was prosecuted for her role in the insurrection, stated: "all J6ers will apply for restitution" and noted that news of the Anti-Weaponization Fund was "all over Twitter [and their] group chats."[65]

107.　　The Settlement Agreement obligated the Acting Attorney General—Defendant Blanche—to create the Anti-Weaponization Fund. Contemporaneous to the Settlement Agreement Defendant Blanche also issued an Order creating the Fund.[66]

---

[64] Dan Rosenzweig-Ziff, *'I'm not greedy': January 6 rioters and Trump allies eye $1.8 billion 'weaponization' fund*, Reuters (May 21, 2026), https://www.reuters.com/legal/government/im-not-greedy-january-6-rioters-trump-allies-eye-18-billion-weaponization-fund-2026-05-20/.

[65] Gabe Kaminsky, *Trump's $1.7+ billion fund sparks rush to capitalize: "All J6ers will apply,"* CBS News (May 19, 2026), https://www.cbsnews.com/news/trump-anti-weaponization-fund-january-6-capitol-riot/.

[66] *See* Order (May 18, 2026), https://www.justice.gov/opa/media/1441086/dl. Moreover, the day after the Settlement Agreement was announced and Defendant Blanche issued the Order creating the Fund, the DOJ released an addendum to the Settlement Agreement—signed by Defendant Blanche—in which the United States agreed to drop all pending and future claims against "any of the Plaintiffs or related or affiliated individuals (including, without limitation, family or others filing jointly), or parties including trusts, parent, sister, or related companies, affiliates, and subsidiaries, by reason of, with respect to, in connection with, or which arise out of (1) any matters that were raised or could have been raised in the Case or the Pending Agency Claims; (2) Lawfare and/or Weaponization; or (3) any matters currently pending or that could be pending (including tax returns filed before the Effective Date) before Defendants or other agencies or departments." *See* Addendum (May 19, 2026), https://www.justice.gov/opa/media/1441216/dl. According to public reporting, the waiver of these claims "frees the president from a potential adverse ruling that could have cost him more than $100 million" in tax liabilities. *See* Russ Buettner, *With Trump's Deal, a Possible $100 Million I.R.S Penalty Melts Away*, N.Y. Times (May 19, 2026), https://www.nytimes.com/2026/05/19/us/politics/trump-settlement-irs.html.

108.    The Order provided that "[w]ithin 60 days . . . the United States shall provide [Treasury] with all necessary forms and documentation to direct a payment of $1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund."[67]

109.    The sum of $1,776,000,000 is obviously contrived, and itself invokes a rallying cry by the January 6 insurrectionists, who referred to the insurrection as "a new 1776."[68]

110.    The Order invoked 31 U.S.C. § 3104, the Judgment Fund statute, as the statutory basis for the Anti-Weaponization Fund.[69] It explained that the Judgment Fund provides a "permanent appropriation for the payment of settlements against the United States," where "(1) the payment is not otherwise provided for; (2) the Secretary of the Treasury has certified the payment; and (3) the judgment is payable under one of several specified statutory provisions."[70]

111.    As to the third condition, the Order identified 28 U.S.C. § 2414, the Settlement Authority Statute, which provides for the payment of "final" judgments rendered against the United States, including "compromise" settlements for the "defense of imminent litigation . . . ."[71]

112.    In addition to the details provided in the Order, the Settlement Agreement outlines the composition of the fund and the process for submitting and considering claims. Specifically, the Settlement Agreement provides that the Fund will consist of five members, who will serve for the life of the Fund or until December 1, 2028, whichever comes first.[72]

---

[67] Order, at ¶ C.
[68] *See* Marc Fisher, *et al.*, *The four-hour insurrection*, Wash. Post (Jan. 7, 2021), https://www.washingtonpost.com/graphics/2021/politics/trump-insurrection-capitol/ (quoting January 6 insurrectionists as stating, for example, "[a] new 1776 has just begun" during the insurrection).
[69] Order, at ¶ G.
[70] *Id.*
[71] *Id.*
[72] Settlement Agreement, at ¶ IV.B.

113.   The members are appointed by the Attorney General, though one member must be chosen in consultation with Congressional leadership. [73]

114.   Members can resign, or the President can remove them without cause, but replacements must be appointed by the Attorney General.[74]

115.   The Settlement Agreement also grants the Fund the power to issue apologies and monetary relief, as well as to receive and request evidence from or in consultation with other federal agencies.[75]

116.   The Anti-Weaponization Fund's Members will determine the procedures for "submitting, receiving, processing, and granting or denying claims," but they are not required to make those procedures public.[76]

117.   The Settlement Agreement also states that there shall be no judicial review of claims, offers, or determinations made by the Fund, but claimants may seek judicial or other relief outside the Fund if their claims to the Fund are denied.[77]

118.   Lastly, the parties agreed that the Settlement Agreement is enforceable and challengeable "solely by Plaintiffs, Defendants, and the United States."[78]

**G.  Plaintiffs Are Harmed by the Settlement Agreement and the Anti-Weaponization Fund.**

119.   Plaintiffs have been, and will continue to be, harmed by the Settlement Agreement and the Anti-Weaponization Fund.

---

[73] *Id.*
[74] *Id.*
[75] *Id.* at ¶¶ IV.C. & IV.D.
[76] *Id.* at ¶ IV.C.
[77] *Id.*  at ¶ VI.B.
[78] *Id.* at ¶ V.A.

120. As detailed above, for years, President Trump and his allies have publicly, and baselessly, stated that the prosecution of the January 6 insurrectionists was the result of political bias and a "weaponization" of the justice system.

121. Now, Defendants have illegally created the Anti-Weaponization Fund to pay the January 6 insurrectionists for the alleged harms they incurred.

122. Moreover, it is well-known to the public that Plaintiffs were part of the Capitol Siege Section that prosecuted the January 6 insurrectionists.

123. Discussion of Plaintiffs' work with the Capitol Siege Section is in the public domain. For instance, after Plaintiff Gordon was wrongfully terminated by the DOJ, a Member of the United States House of Representatives, Kathy Castor, issued a public statement urging the DOJ to reinstate him.[79] The statement explicitly identified Plaintiff Gordon's work prosecuting January 6 insurrectionists.[80]

124. Numerous public news articles also identify Plaintiff Gordon as, for example, a prosecutor "who prosecuted cases against some of the most notorious Jan. 6 rioters."[81] Plaintiff Gordon's law firm biography, which is publicly available online, details his work as the Senior Trial Counsel in the Capitol Siege Section.[82]

---

[79] *See* Congressmember Kathy Castor July 8, 2025 Letter to Attorney General Pam Bondi, *Re: End Political Retribution Against Assistant U.S. Attorney to Ensure Prosecution of Florida Fraudster and Justice for Victims*, available at https://castor.house.gov/uploadedfiles/7.8.25_final_letter_to_ag_bondi_re_michael_gordon.pdf.
[80] *Id.* at 2.
[81] *See, e.g.*, Victoria Bisset, *Fired prosecutor who handles Capitol riot cases sues government*, Wash. Post (Jul. 25, 2025), https://www.washingtonpost.com/politics/2025/07/25/michael-gordon-jan-6-prosecutor-lawsuit/; David Thomas, *Ex-DOJ employees sue Bondi for wrongful termination* (Jul. 25, 2025), https://www.reuters.com/legal/government/ex-doj-employees-sue-bondi-wrongful-termination-2025-07-25/.
[82] *See* Mike Gordon, *Kelly Uustal*, https://kelleyuustal.com/attorney-bio/mike-gordon/ (last viewed May 30, 2026).

26

125.    Similarly, Plaintiff Romano has submitted testimony Congress twice this year, discussing his role as a Deputy Chief of the Capital Siege Section.[83] Public news articles have also identified Plaintiff Romano as, for example, "a supervisor on the team that . . . prosecut[ed] more than 1,500 people charged in the attack on the U.S. Capitol."[84]

126.    And, as discussed above, Plaintiff Romano's work with the Capitol Siege Section is publicly available and publicly known. For example, as a trial supervisor, Plaintiff Romano was frequently in court with teams of attorneys from the Capitol Siege Section. Plaintiff Romano's publicly available biography describes his work in the Section.[85]

127.    Thus, by branding the prosecution of the January 6 insurrectionists as "lawfare" and "weaponization" of the justice system, Defendants are publicly asserting those same baseless allegations against Plaintiffs.

128.    And, Defendants' false and baseless allegations that Plaintiffs used their official powers as government law enforcement officers to target specific entities and individuals for political purposes causes Plaintiffs significant, and ongoing, reputational harm.

129.    The Justice Manual requires DOJ employees, like Plaintiffs, to act "in the best interests of the American people."[86] That is because "public service is a public trust," and

---

[83] *See supra* note 18; *Statement of Michael J. Romano Before the Senate Committee on the Judiciary Hearing on Arctic Frost Investigation* (Feb. 10, 2026), https://www.judiciary.senate.gov/imo/media/doc/9a8e5b2f-aea0-248d-ef60-3f03b8eb8a2c/2026-02-10_Testimony_Romano.pdf.

[84] Alanna Durkin Richer, *Former Jan. 6 prosecutor warns Trump's pardons could encourage future political violence*, AP (Apr. 28, 2025), https://apnews.com/article/january-6-prosecutor-capitol-riot-donald-trump-7873c132a6cc8f59ed9ca3c9004234ff.

[85] *See* Michael Romano, *Lichten & Liss-Riordan, P.C.*, https://llrlaw.com/michael-romano/ (last viewed May 30, 2026).

[86] JM § 1.4010 (citing 5 C.F.R. § 2635.101).

compliance with the strict ethics and responsibility rules imposed on DOJ attorneys "supports the credibility of and faith in government decisions and promotes the common good."[87]

130.    The professional responsibilities imposed on federal criminal prosecutors are even more stringent. Prosecutors represent the United States as a sovereign and, therefore, as the Supreme Court has explained, prosecutors' interest is not winning the case but rather ensuring "that justice [is] done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

131.    For these reasons, the Principles of Federal Prosecution outline policies and practices for prosecutors to ensure that they "contribute to the fair, evenhanded administration of the federal criminal laws."[88]

132.    One of those policies specifically states that prosecutors, like Plaintiffs, may not prosecute or take action against individual or entities based on their "political association."[89]

133.    The same provision further states that "federal prosecutors and agents may never make a decision regarding an investigation or prosecution . . . for the purpose of giving an advantage or disadvantage to any candidate or political party."[90]

134.    While the Principles identify rules that DOJ prosecutors, like Plaintiffs, must follow, "the success of [the federal prosecutorial system], must rely ultimately on the character, integrity, sensitivity, and competence of those men and women who are selected to represent the public interest in the federal criminal justice process."[91]

135.    As federal prosecutors for decades, Plaintiffs embodied, and continue to embody, the ideals identified in the Principles and the Justice Manual. They exercised their duties and

---

[87] *Id.*
[88] JM § 9-27.001.
[89] JM § 9-27.260.
[90] *Id.*
[91] JM § 9-27.001.

responsibilities as prosecutors fairly and faithfully, and sought to administer justice in each case. In so doing, they built strong reputations as fair-minded and responsible lawyers, who put the public good above themselves and their own interests, as all prosecutors should and are required to do.

136.    Plaintiffs specifically sought to uphold the Principles in their work at the Capitol Siege Section. Because of the volume of people under investigation and the potential perception that their work might be politically motivated, Plaintiffs took painstaking steps to ensure that the Courts and the public knew that the Capitol Siege Section's prosecutions were not tainted by political bias. They, therefore, held themselves to the highest standards of professional responsibility and sought to ensure that each defendant prosecuted by the Capitol Siege Section received the due process and fairness to which they were entitled under the Constitution.

137.    Defendants' outrageous, false, and damning accusations that Plaintiffs, as "career federal employees [,] . . . target[ed] individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons," contradicts the very essence of Plaintiffs' character, and harms the professional reputation they tirelessly spent years building.

138.    The harm caused to Plaintiffs by the existence of the Settlement Agreement (and the statements therein), and the creation of the Anti-Weaponization Fund, is ongoing.

139.    The Settlement Agreement is an official, binding declaration by the United States government—in a publicly available, and widely circulated legal document—that Plaintiffs acted in violation of their ethical duties as prosecutors. If not vacated, the Settlement Agreement itself presents an ongoing harm to Plaintiffs' reputation.

140.    Worse yet, the Anti-Weaponization Fund created by the Settlement Agreement is explicitly designed to perpetuate the lie that Plaintiffs failed to uphold their ethical obligations.

Individuals and entities can seek relief from the Fund by claiming that they were harmed by Plaintiffs' alleged weaponization of the justice system. Thus, each time an individual or entity seeks relief from the Fund, the lies about Plaintiffs' actions, and the harm flowing from those lies, will be repeated and amplified.

141.    Similarly, Plaintiffs will continue to be harmed each time the United States agrees to pay money under the Fund. Arguably worse, the Fund has the unprecedented authority to issue apologies on behalf of the government of the United States. Such payments and apologies, and any accompanying justifications issued by the Fund, constitute additional false statements and accusations by Defendants that Plaintiffs failed to uphold their obligations as prosecutors and committed misconduct.

142.    And, already, preparations are being made to receive claims and make payments from the Anti-Weaponization Fund. The Settlement Agreement states that the Fund will remain open until December 1, 2028. Moreover, at least one person has publicly announced that he submitted a claim to the Fund.[92]

143.    As explained above, the January 6 insurrectionists prosecuted by Plaintiffs have applied, and will assuredly continue to apply, to the Fund.

144.    The ongoing reputational harm caused by Defendants' actions has, and will continue to have, serious professional and personal consequences for Plaintiffs. In this case, the past is prologue. Plaintiffs have experienced similar consequences in the past as a result of

---

[92] Garret Haake & Raquel Coronell Uribe, *Longtime Trump ally Michael Caputo files first known claim for 'anti-weaponization' fund,* NBC News (May 19, 2026), https://www.nbcnews.com/politics/trump-administration/michael-caputo-files-first-known-claim-anti-weaponization-fund-rcna346030.

Defendants' attacks, and the institution of the Anti-Weaponization Fund will only further harm Plaintiffs.

145.   Indeed, Plaintiffs have already experienced harm as the result of the President's exercise of his clemency power to pardon individuals, the issuance of an executive order describing the prosecutions as weaponization, and the DOJ's creation of a task force on weaponization; the creation of the Anti-Weaponization Fund will bring more, and further, concrete steps that will sharpen the harm felt by Plaintiffs. Imminent actions by Defendants—including paying out money to insurrectionists and issuing formal apologies—will visit additional and more acute harms on Plaintiffs beyond what they have already experienced.

146.   For example, both Plaintiffs have already experienced adverse professional consequences as a result of the yearslong campaign by Defendants and their allies to brand their work as the result of political bias. Plaintiff Gordon was fired by the DOJ as a result. Plaintiff Romano "knew on January 20th, when the pardons were announced, that [he] needed to find his way out" of the DOJ.

147.   Plaintiff Romano's intuition became even more acute after January 20, 2025, as the Administration began to retaliate against career prosecutors. On January 27, the DOJ fired members of Special Counsel Jack Smith's team.[93] Then, on January 31, the DOJ fired term Assistant United States Attorneys who worked at the Capitol Siege Section.[94] This mass firing was accompanied by a memo from Emil Bove, then the Deputy Attorney General, which stated

---

[93] Alexander Mallin, *DOJ fires member of special counsel Jack Smith's team who prosecuted Trump*, ABC News (Jan. 27, 2025), https://abcnews.com/Politics/doj-fires-members-special-counsel-jack-smiths-team/story?id=118155822.

[94] Evan Perez, Josh Campbell, Hannah Rabinowitz, *Trump DOJ demands list of thousands of FBI agents, others who worked on Jan. 6 and Trump investigations for possible firing*, CNN (Jan. 31, 2025), https://www.cnn.com/2025/01/31/politics/fbi-agents-who-investigated-january-6-fired/index.html.

that he would "not tolerate subversive personnel actions by the previous Administration."[95] Finally, on February 5, then-Attorney General Pam Bondi issued the order creating the "Weaponization Working Group," which specifically identified the January 6 prosecutions as an area for investigations.

148.   Plaintiff Romano himself was also targeted for his work at the Capitol Siege Section. Ed Martin sought to demote Plaintiff Romano to the misdemeanor section of the United States Attorney's Office for the District of Columbia.[96] Ed Martin did not, however, have the authority to demote Plaintiff Romano because Plaintiff Romano worked at the Public Integrity Section at the time.

149.   As a result of this pressure and fear of retaliation, Plaintiff Romano resigned in March 2025.[97]

150.   Plaintiff Gordon, however, sought to stay at the DOJ. But, on June 27, 2025, he was fired for his work at the Capitol Siege Section prosecuting January 6 insurrectionists. That day, he received a memorandum addressed directly to him from Attorney General Pam Bondi stating that he had been removed from federal service effective immediately. The memorandum did not contain any justification for Plaintiff Gordon's removal other than a reference to the President's powers under Article II.

151.   Two other federal prosecutors who worked in the Capitol Siege Section were removed from federal service the same day Plaintiff Gordon was removed. The coordination of the terminations suggest that Plaintiff Gordon was removed as retaliation for his work prosecuting

---

[95] *Id.*

[96] Kyle Cheney & Josh Gerstein, *DOJ demotes top prosecutors of Jan. 6 defendants, Trump allies*, Politico (Feb. 28, 2025), https://www.politico.com/news/2025/02/28/doj-demotions-prosecutors-trump-00206762.

[97] Richer, *supra* note 85.

January 6 insurrectionists. The creation of the Anti-Weaponization Fund now provides an additional official imprimatur that Plaintiff Gordon was fired because of work at the Capitol Siege Section—which Defendants characterize as improper "weaponization."

152.    Defendants' bias accusations have also significantly affected Plaintiffs' future job prospects. For example, the reputational harm caused by the accusations that they "weaponized" the justice system as federal prosecutors affects Plaintiffs' future professional endeavors.

153.    The reputational harm caused by Defendants' weaponization accusations has also had significant consequences for Plaintiffs' personal security. Plaintiff Romano has been the target of January 6 insurrectionists and their supporters online. For example, in one instance, insurrectionists and their supporters took Plaintiff Romano's LinkedIn photo and edited it so that it read "Domestic Enemy."

154.    In another instance, a supporter of the January 6 insurrectionists posted on X, where she has approximately 910,000 followers, and asked people to name their January 6 prosecutor. Upon information and belief, Plaintiff Romano's name appeared in the responses, given his role at the Capitol Siege Section.

155.    Indeed, that same January 6 supporter has publicly noted, and criticized, Plaintiff Romano's work as politically motivated on several occasions, most recently after his appearance before the Senate in February 2026.

156.    As a result of risks to his security, Plaintiff Gordon had to take measures to remove his address and personal identifying information from the public domain.

157.    Thus, Plaintiffs have incurred significant professional, personal, and economic repercussions as a result of the yearslong effort to label their actions as the result of political bias. The Settlement Agreement and the Anti-Weaponization Fund have now lent the credibility of the

33

United States federal government to those baseless accusations and authorize claimants to seek monetary relief based on the accusations. Such actions will, therefore, make it extremely likely that Plaintiffs will experience harms similar to those they have experienced in the past.

## CAUSES OF ACTION

**Count I: Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
**Contrary to Law**
**(Against All Defendants)**

158.   The DOJ, Treasury, and the IRS are all agencies subject to the APA.

159.   The APA authorizes judicial review of final agency action. 5 U.S.C. § 704.

160.   Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

161.   Here, the Settlement Agreement authorizing the creation of the Anti-Weaponization Fund and the Order creating and funding the Anti-Weaponization Fund are final agency action subject to review under the APA.

162.   Specifically, the creation and funding of the Anti-Weaponization Fund via the Settlement Agreement and the Order is the consummation of Defendants' decisionmaking process because they establish the Fund. Indeed, the Order creating the Fund explicitly funnels money to the Fund, stating "[w]ithin 60 days . . . the United States shall provide [Treasury] with all necessary forms and documentation to direct a payment of $1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund." Order, at ¶ C.

163.   The creation and funding of the Anti-Weaponization Fund via the Settlement Agreement and the Order also determine rights and obligations and have legal consequences because they establish a conclusive and non-reviewable legal process by which individuals and entities have the right to pursue claims against the United States. Moreover, the creation of the

34

Anti-Weaponization Fund establishes obligations because it transfers $1,776,000,000 from the Judgment Fund for payment of claims.

164. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

165. Here, for multiple reasons, the creation and funding of the Anti-Weaponization Fund is not in accordance with numerous laws.

166. The DOJ and Treasury's authority to enter compromise settlements and pay monies based on those compromise settlements is bounded by statute.

167. Specifically, 31 U.S.C. § 1304(c), the Judgment Fund statute, states that such settlements may only be paid where "(1) payment is not otherwise provided for, (2) payment is certified by the Secretary of the Treasury, and (3) the judgment award or settlement is payable," under other enumerated statutory provisions.

168. As to the third condition, here, Defendants have relied on 28 U.S.C. § 2414, which provides that the Attorney General may pay "compromise settlements . . . for defense of imminent litigation."

169. The regulations interpreting these provisions explain that Treasury's authority to certify settlement payments pursuant to the Judgment Fund reaches only "awards or settlements [that] are final," 31 C.F.R. § 256.1(b)(1), and "settlement of claims arising under actual or imminent litigation," 31 C.F.R. § 256.1(a). Neither of these conditions is met here.

170. First, the "award or settlement" authorizing the creation of, and the subsequent Order funding, the Anti-Weaponization Fund is not final where the Court in the Florida Suit has reopened the case to determine whether, among other things, the parties have committed a fraud on the court and there was ever a live case or controversy in the first place.

171. Second, the obviously collusive nature of the Florida Suit means that it is not "actual or imminent litigation" for which the Judgment Fund can be used.

172. According to the Government Accountability Office, the Judgment Fund and § 2414 require a "genuine disagreement or impasse" and "a legitimate dispute over either liability or amount." U.S. Gov't Accountability Off., GAO-08-978SP, 3 *Principles of Federal Appropriations Law* 14-35 (3d ed. 2008).

173. The Office of Legal Counsel has also concluded that a settlement is "payable from the Judgment Fund" if, but only if, the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached." Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. OLC 98, 103 (1989). A collusive lawsuit over which the Court never had jurisdiction in the first place is not a "genuine disagreement" or "legitimate dispute." *See, e.g.*, *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (the judicial power extends only to "the right to determine actual controversies arising between adverse litigants"); *S. Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*, 145 U.S. 300, 301 (1892) (refusing to "determine a controversy" in "an agreed case gotten up by collusion").

174. Put differently, the Florida Suit did not, and does not, constitute "actual or imminent litigation." Therefore, it could not, and cannot, give rise to any "legitimate dispute over either liability or amount," and could not cause a court to enter "a money judgment, had no settlement been reached." *See* 28 U.S.C. § 2414. Thus, the settlement agreement creating the Fund was not authorized under the Judgment Fund Statute and § 2414.

175. The creation and funding of the Anti-Weaponization Fund independently violates § 2414 and 31 C.F.R. § 256.1 for other reasons as well.

176.    First, beyond the plaintiffs in the Florida Suit, the Anti-Weaponization Fund appropriates money for the issuance of payments from the Judgment Fund to numerous future claimants who themselves have not brought, and will not bring, "imminent litigation or suits" against the United States. *Id.*; 31 C.F.R. § 256.1(a).

177.    Second, the Judgment Fund is only available for "compromise agreements negotiated by the" DOJ. 31 C.F.R. § 256.1(a). Under the Settlement Agreement and the Order creating the Anti-Weaponization Fund, however, individual claimants will submit claims for payment of Judgment Fund money for which *the members of the Anti-Weaponization Fund, not the DOJ*, will determine whether, and how much, payment is appropriate.

178.    Third, claimants are able to receive payments from the Anti-Weaponization Fund without first obtaining a judgment against, or entering a settlement with, the United States. *Id.*

179.    Finally, the Anti-Weaponization Fund is wholly unrelated to the underlying claims and allegations in the Florida Suit. Section 2414 authorizes compromises settlements of claims brought against the United States.

180.    Here, in the Florida Suit, President Trump, his two sons, and the Trump organization alleged that the government unlawfully disclosed their tax return information. They settled those claims via the Settlement Agreement, which authorized the creation of the Anti-Weaponization Fund.

181.    But, the Anti-Weaponization Fund is intended to pay unknown claims of unidentified third parties who have no relation to the underlying claims in the Florida Suit. Thus, the Anti-Weaponization Fund is not a "compromise settlement" of the Florida Suit and Defendants cannot invoke the Judgment Fund and § 2414 to justify its creation and funding, as they have sought to do.

182. Finally, for all the reasons set forth in Count III, below, the creation of the Anti-Weaponization Fund is unconstitutional and, therefore, not in accordance with the law. Specifically, as detailed in Count III, the Anti-Weaponization Fund violates the separation of powers, the Spending Clause, the Appropriations Clause, the Appointments Clause, the First Amendment, the equal protection clause as applied to the federal government through the Fifth Amendment, and the Fourteenth Amendment.

183. The creation of the Anti-Weaponization Fund is, therefore, not in accordance with numerous laws and thus should be held unlawful and set aside.

### Count II: Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(C)
### In Excess of Statutory Authority
### (Against All Defendants)

184. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

185. As explained above, the DOJ, Treasury, and the IRS are "agenc[ies]" as that term is defined in the APA and the creation and funding of the Anti-Weaponization Fund via the Settlement Agreement and the Order creating the Anti-Weaponization Fund were "final agency action" for purposes of the statute.

186. The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

187. "An agency . . . literally has no power to act—including under its regulations— unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up).

188. Because no statutory provision, including 31 U.S.C. § 1304 or 28 U.S.C. § 2414, authorizes Defendants to create the Anti-Weaponization Fund, Defendants acted "in excess" of

their "statutory jurisdiction [and] authority," within the meaning of 5 U.S.C. § 706(2)(C), by certifying such a settlement and creating the Fund.

189.    The creation of the Anti-Weaponization fund is in excess of statutory authority and thus should be held unlawful and set aside.

### Count III: Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(B)
### Contrary to Constitutional Right
### (Against All Defendants)

190.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

191.    As explained above, the DOJ, Treasury, and the IRS are "agenc[ies]" as that term is defined in the APA and the creation and funding of the Anti-Weaponization via the Settlement Agreement and the Order creating the Anti-Weaponization Fund were "final agency action" for purposes of the statute.

192.    Under the APA, the Court must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

193.    The creation and funding of the Anti-Weaponization Fund is contrary to numerous "constitutional right[s], power[s], privilege[s], [and] immunit[ies]." *Id.*

194.    First, the creation and funding of the Anti-Weaponization Fund violates the separation of powers. Article I, Section I of the Constitution vests "[a]ll legislative Powers . . . in [the] Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1. Because the "Framers viewed the legislative power as a special threat to individual liberty, . . . they divided that power to ensure that differences of opinion and the jarring of parties would promote deliberation and circumspection and check excesses in the majority." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (internal quotation marks omitted).

39

195. Thus, Congress has the exclusive authority under Article I of the Constitution to create and fund agencies, delegate power to those agencies, and set the rules for their operation. *See, e.g.*, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010) ("Congress has plenary control over the salary, duties, and even existence of executive offices."). Conversely, the Executive Branch and its agencies cannot exercise legislative power—they only have the powers conferred on them by the Constitution and federal statutes. *See A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 537-38 (1935) (the Executive Branch cannot exercise "legislative power").

196. And, Congress has the exclusive power of the purse. *See Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) ("[S]imply . . . no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."); *see also* U.S. Const. art. I, § 8, cl. 1; *id.* § 9, cl. 7.

197. The creation and funding of the Anti-Weaponization Fund violates the separation of powers because Defendants have created, in effect, a new federal agency designed exercise powers to which the Constitution does not grant them.

198. The creation and funding of the Anti-Weaponization Fund also violates the Spending Clause and the Appropriations Clause of the Constitution. The Spending Clause grants Congress the "Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequences of Appropriations made by Law." *Id.* § 9, cl. 7.

199. Here, Defendants have wholly usurped Congress's power of the purse. They have taken money appropriated under the Judgment Fund and used it for purposes that go beyond the

40

statutorily authorized and permitted use of that money. They have bypassed Congressional authority to create a fund for the payment of claims against the United States without Congressional accountability and oversight. Such use of a Congressional appropriation outside and beyond the limited statutory purposes enumerated for the appropriation runs afoul of the Constitution. *See Cincinnati Soap Co.*, 301 U.S. at 321 ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress.").

200.    The creation and funding of the Anti-Weaponization Fund also violates the Appointments Clause. Under the Appointments Clause, only Congress has the power to create an office. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 128-29 (1926). Here, however, Defendants— all Executive Branch agencies and officials—have done precisely what the Framers forbade. Without any Congressional authorization, they have created an Anti-Weaponization Fund and five extremely powerful new officers, who can dole out extraordinary sums and issue apologies on behalf of the United States.

201.    Moreover, the Appointments Clause requires the President to obtain "the Advice and Consent of the Senate" when appointing "Officers of the United States." U.S. Const. art. I, § 2, cl. 2.

202.    Individuals exercising "significant authority pursuant to the laws of the United States" and "occupy[ing] a continuing position established by law" constitute officers. *See Lucia v. SEC*, 585 U.S. 237, 245 (2018) (cleaned up). And, while "Congress [may] dispense with joint appointment . . . for inferior officers," *United States v. Anthrex, Inc.*, 594 U.S. 1, 12 (2021) (cleaned up), principal officers must be appointed with the advice and consent of the Senate, *Lucia*, 585 U.S. at 244 n.3. Principal officers have the power "to render a final decision on behalf

41

of the United States without any . . . review by their nominal superior or any other principal officer in the Executive Branch." *Id.* at 14 (cleaned up).

203.    Here, the Settlement Agreement and the Anti-Weaponization Fund provide for the Attorney General, rather than the President, to appoint the Fund's members, and provides no Senate confirmation. This is impermissible because the members are principal officers, where they have the power to make "final decisions" as to claims for payment against the United States without any resort to an "appeal, arbitration, or judicial review" of their decisions. *See* Settlement Agreement, at ¶ VI.B.

204.    Moreover, the creation and funding of the Anti-Weaponization Fund violates the First Amendment. The First Amendment protects "freedom of speech," and "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const., amend. I. The First Amendment, therefore, prohibits the government from "punish[ing] or suppress[ing] views that [it] disfavors." *Nat'l Rifle Assoc. v. Vullo*, 602 U.S. 175, 180 (2024). That includes "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *United States v. Am. Library Assoc., Inc.*, 539 U.S. 194, 210 (2003).

205.    Here, the creation and funding of the Anti-Weaponization Fund does just that. By its terms, it is only available to those who were purportedly harmed as a result of the weaponization of the justice system by "Democrat" administrations. Settlement Agreement, at ¶ II.C. Thus, the Anti-Weaponization Fund is not viewpoint neutral but, instead, doles out benefits based on the claimant's viewpoint and whether the claimant was allegedly harmed by Democratic or Republican "weaponization."

206.    The creation and funding of the Anti-Weaponization Fund also violates the constitutional guarantee of equal protection. The Fourteenth Amendment's equal protection guarantee applies to the federal government via the Fifth Amendment due process clause. *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

207.    And, the equal protection principles require "all persons similarly situated [to] be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Here, the Anti-Weaponization Fund does not treat everyone alike—as explained above, by its terms, it is not available to those who claim they have been harmed as a result of the weaponization of the justice system by Republican administrations. But, there is simply no difference between an individual harmed by the conduct of a Democrat administration and one harmed by the conduct of a Republican administration. Thus, the Anti-Weaponization Fund fails under any level of constitutional scrutiny. *See id.* at 447 ("[A] bare desire to harm a politically unpopular group . . . [is] not [a] legitimate state interest[].").

208.    Finally, the creation and funding of the Anti-Weaponization Fund violates the Fourteenth Amendment. That provision provides that "neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States." U.S. Const. amend. XIV, § 4.

209.    The Anti-Weaponization Fund violates the Fourteenth Amendment because it "assumes or pays" debts "incurred in aid of insurrection." As explained above, numerous courts have concluded that the events on January 6, 2021, were an insurrection. And, the Anti-Weaponization Fund is intended to pay the debts incurred by the insurrectionists for their actions in, for example, legal fees and other obligations. For example, President Trump explicitly stated, "This is reimbursing people that were horribly treated, horribly treated. . . . They have been

43

weaponized. They have been, in some cases, imprisoned wrongly. They paid legal fees that they didn't have [to pay]. They have gone bankrupt. Their lives have been destroyed." *See supra* note 63.

210. Accordingly, Defendants' actions in creating the fund are contrary to constitutional right and should be set aside.

**Count IV: Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(Against All Defendants)**

211. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

212. As explained above, the DOJ, Treasury, and the IRS are "agenc[ies]" as that term is defined in the APA and the creation and funding of the Anti-Weaponization via the Settlement Agreement and the Order creating the Anti-Weaponization Fund were "final agency action" for purposes of the statute.

213. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

214. The Settlement Agreement and the creation and funding of the Anti-Weaponization Fund were arbitrary and capricious for several reasons.

215. First, these actions are contrary to applicable law, regulations, and constitutional provisions, rendering them arbitrary and capricious under § 706(2)(A).

216. Second, there was no reasoned basis for the Settlement Agreement. Defendants did not evaluate the strength of the plaintiffs' claims in the Florida Suit, and provided no rationale for the compromise settlement and the creation of the Anti-Weaponization Fund therein. Moreover, as explained above, the Anti-Weaponization Fund is not in any way related to the claims in the Florida Suit and is not even intended to compensate the plaintiffs in the Florida Suit. In fact, the

Settlement Agreement itself states that the plaintiffs in the Florida Suit "received no economic benefit from this Settlement Agreement." Settlement Agreement, at ¶¶ III.A, IV.A.

217.    Third, the creation of the Fund is contrary to DOJ's own policy prohibiting settlement agreements that involve monetary awards to third parties "that were neither victims nor parties" to the suit.  Mem. from the Att'y Gen. to All Dep't Emps., *Reinstating the Prohibition on Improper Third-Party Settlements* (Feb. 5, 2025).

218.    Fourth, Defendants have not identified any process or procedures by which the Anti-Weaponization Fund will pay out claims. There are no safeguards on the payment of money from the Fund because the Settlement Agreement specifically provides that "there shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by [t]he Anti-Weaponization Fund." *See* Agreement, at ¶ VI.B. Even worse, the Anti-Weaponization Fund is given authority "to determine its own procedures" without requiring that those procedures be made public or allowing an opportunity for notice and comment.  And, the Settlement Agreement and the Order creating the Anti-Weaponization Fund leave open the possibility that awards made by the Fund will not be made public. The public disclosure of payment is typically required under the Judgment Fund and DOJ policy that settlement agreements not be confidential.  *See* 28 C.F.R. § 50.23.

219.    Fifth, Defendants failed to consider how taxpayer dollars may be used to harm Plaintiffs and others. For example, the Fund does not prohibit individuals who committed acts of violence against law enforcement on January 6, 2021, from seeking an award.

220.    For these reasons, the creation and funding of the Anti-Weaponization Fund is arbitrary and capricious and thus should be held unlawful and set aside.

**Count V: Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(D)**
**Violation of Notice and Comment Procedures**

45

**(Against All Defendants)**

221. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

222. As explained above, the DOJ, Treasury, and the IRS are "agenc[ies]" as that term is defined in the APA and the creation and funding of the Anti-Weaponization via the Settlement Agreement and the Order creating the Anti-Weaponization Fund were "final agency action" for purposes of the statute.

223. The APA requires courts to "hold unlawful and set aside agency action" that they find to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

224. Agencies must proceed through the notice and comment process before engaging in rulemaking. *See* 5 U.S.C. § 553. They must, among other requirements, publish a notice of proposed rulemaking in the Federal Register and provide interested persons an opportunity to comment.

225. The creation and funding of the Anti-Weaponization Fund was a rulemaking subject to the notice and comment requirement. Defendants did not, however, engage in the notice and comment process.

226. If Defendants had conducted the notice and comment process, Plaintiffs would have submitted comments opposing the Anti-Weaponization Fund's creation and funding, including but not limited to, the many legal defects identified above and the unreviewable process (or lack thereof) by which the Fund issues awards and apologies. Indeed, because the Fund directly harms Plaintiffs' reputations, Plaintiffs have a particularly strong interest in commenting on the Fund.

227. But, Plaintiffs have been deprived of their right to participate in the rulemaking process because Defendants ignored the law and forewent the notice and comment requirements.

228. For these reasons, the creation and funding of the Anti-Weaponization Fund violated procedures required by law and, thus, should be held unlawful and set aside.

## Count VI: Violation of the Appropriations Clause
### (Against All Defendants)

229. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

230. This Court has the inherent equitable authority to enjoin Executive Branch actions that are contrary to the Constitution. *Free Enterprise Fund*, 561 U.S. at 491 n.2; *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015).

231. The Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequences of Appropriations made by Law." *Id.* § 9, cl. 7.

232. The creation and funding of the Anti-Weaponization Fund violates the Appropriations Clause because Defendants are spending money from the Treasury without any Congressional authorization and thereby usurping Congress's power of the purse. *See Cincinnati Soap Co.*, 301 U.S. at 321

233. Defendants' violation of the Appropriations Clause inflicts ongoing harm on Plaintiffs.

## Count VII: Violation of Appointments Clause
### (Against All Defendants)

234. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

235. The Appointments Clause vests the creation of Executive offices in Congress. But, here, Defendants have wholly created such an office via the Anti-Weaponization Fund.

236. Furthermore, the Appointments Clause requires that principal officers be appointed by the President with the advice and consent of the Senate. The members of the Anti-Weaponization Fund, who constitute such principal officers, are, however, appointed by the Attorney General without the advice and consent of the Senate.

47

237. Defendants' violation of the Appointments Clause inflicts ongoing harm on Plaintiffs.

## Count VIII: Violation of the Separation of Powers
## (Against All Defendants)

238. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

239. The creation and funding of the Anti-Weaponization Fund violates the separation of powers because Defendants have created a new federal executive agency, unaccountable to Congress, and given the agency the authority to spend vast sums of money without any Congressional appropriation.

240. Defendants' violation of the separation of powers inflicts ongoing harm on Plaintiffs.

## Count IX: Ultra Vires Action
## (Against All Defendants)

241. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

242. Plaintiffs have a non-statutory right of action to challenge a federal official's ultra vires violations of, or actions in excess of their authority under, federal statutes when an official's ultra vires actions are a "clear departure" from a "statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

243. Defendants' actions in creating and funding the Anti-Weaponization Fund through the Settlement Agreement and the Order creating the Fund are ultra vires. There is no lawful authority of any kind authorizing these actions.

244. And, Defendants' actions are contrary to law and constitutional right, and are arbitrary and capricious, as set forth above. "[E]xercising immense power without any grant of statutory authority whatsoever" is "the sort of extreme legal error that can sustain a claim for ultra

48

vires review." *New Mexico v. Musk*, --- F.Supp.3d ----, 2026 WL 799635, at *13 (D.D.C. Mar. 23, 2026) (cleaned up).

245.    Defendants' ultra vires actions inflict ongoing harm on Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare unlawful the creation and funding of the Anti-Weaponization Fund as a violation of the Constitution, the APA, and ultra vires;

B.    Vacate and set aside the creation and funding of the Anti-Weaponization Fund as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A); otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), in excess of statutory jurisdiction, authority, or limitations or short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of procedure required by law under 5 U.S.C. § 702(2)(D);

C.    Stay the creation and funding of the Anti-Weaponization Fund during the pendency of this lawsuit under 5 U.S.C. § 705;

D.    Preliminarily and permanently enjoin Defendants, their officers, employees, and agents from taking any action to create and fund the Anti-Weaponization Fund;

E.    Award Plaintiffs their costs, reasonable attorney's fees and other disbursements deemed appropriate; and

F.    Award such additional relief as the interests of justice may require.

49

Dated: June 1, 2026                              Respectfully submitted,


                                                  /s/ Timothy J. Heaphy

Timothy J. Heaphy (DC Bar #444881)
theaphy@hshw.com
Fiona Carroll (DC Bar #90009677)
fcarroll@hshw.com
Lindsay Hemminger (DC Bar # 90017880)
lhemminger@hshw.com
**HEAPHY, SMITH, HARBACH & WINDOM LLP**
1701 Pennsylvania Ave
Suite 200
Washington, DC 20006

Matthew J. Platkin*
mplatkin@platkinllp.com
Angela Cai*
acai@platkinllp.com
Ravi Ramanathan*
rramanathan@platkinllp.com
Aaron E. Haier*
ahaier@platkinllp.com
Conor Bradley*
cbradley@platkinllp.com
**PLATKIN LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Tel: (973) 561-1951

Norman L. Eisen (D.C. Bar #435051)
Norman@democracydefenders.org
Lindsay W. Zimliki (D.C. Bar #475890)
Lindsay@democracydefenders.org
Jacob Kovacs-Goodman (D.C. Bar #90032363)
Jacob@democracydefenders.org
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958

50

Nathaniel A.G. Zelinsky (DC Bar #1724093)
nzelinsky@washingtonlitigationgroup.org
Kyle R. Freeny (DC Bar #1684764)
kfreeny@washingtonlitigationgroup.org
James I. Pearce (DC Bar #90042280)
jpearce@washingtonlitigationgroup.org
**WASHINGTON LITIGATION GROUP**
1717 K Street, NW, Suite 1120
Washington, DC 20006
Tel: 202-521-8750

*\*Pro hac vice motions forthcoming*