## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL M. GORDON** and **MICHAEL J. ROMANO,** | |
| Plaintiffs, | |
| v. | Case No. 1:26-cv-01907-RJL |
| **TODD BLANCHE**, *in his official capacity as Acting Attorney General of the United States*, **STANLEY E. WOODWARD, JR.**, *in his official capacity as the Associate Attorney General of the United States*, **SCOTT BESSENT**, *in his official capacity as Secretary of the Treasury of the United States*, **FRANK BISIGNANO**, *in his official capacity as the Chief Executive Officer of the Internal Revenue Service*, **THE UNITED STATES DEPARTMENT OF JUSTICE**, **THE UNITED STATES DEPARTMENT OF THE TREASURY**, and **THE INTERNAL REVENUE SERVICE**, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

Introduction ......................................................................................................... 1

Background ......................................................................................................... 5

Legal Standard ................................................................................................... 12

Argument ........................................................................................................... 13

    I.      PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE ................................. 13

    A.  Plaintiffs' Claims Are Not Ripe For Adjudication ............................ 13

    B.  This Case Is Moot.............................................................................. 17

    C.  Plaintiffs Lack Standing..................................................................... 18

    II.     PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF
        ACTION ........................................................................................... 23

    A.  Plaintiffs' APA Claims Must Fail Because There Has Been No Final
        Agency Action................................................................................... 23

    B.  Plaintiffs' APA Claims Each Fail Individually ................................. 27

       i.    *In Excess of Statutory Authority – 5 U.S.C. § 706(2)(A), (C)*................. 27
       ii.   *Failure to Follow Notice-and-Comment – 5 U.S.C. § 706(2)(D)*............ 27
       iii.  *Separation of Powers – 5 U.S.C. § 706(2)(B)* ....................................... 28
       iv.  *First Amendment and Equal Protection – 5 U.S.C. § 706(2)(B)* ........... 28
       v.   *Appointments Clause – 5 U.S.C. § 706(2)(B)* ....................................... 29
       vi.  *Fourteenth Amendment - Insurrection – 5 U.S.C. § 706(2)(B)* .............. 30
       vii.  *Arbitrary-and-Capricious – 5 U.S.C. § 706(2)(A)* ................................. 30

    C.  Plaintiffs *Ultra Vires* and Declaratory Judgment Claims Fail ....................... 31

Conclusion ......................................................................................................... 32

## INTRODUCTION

Defendants respectfully move this Court to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiffs cannot establish subject-matter jurisdiction and, in any event, fail to state a claim upon which relief can be granted. This dispute concerns an Anti-Weaponization Fund ("Fund") that has never been set up and is not going forward. As such, Plaintiffs' claims are not justiciable and ought to be dismissed.

Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution is thus "an essential limit" on judicial power. *Id.* at 700. "It ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non*-Article III sense. *Id.* After all, "[f]ederal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is even more inappropriate where challengers have already received "the precise relief that [they] requested," rendering a case "moot." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here. The United States thus moves to dismiss this civil action on justiciability (and other) grounds— not because the Fund will continue (it will not)—but to protect the Executive's

institutional interests in the proper application of Article III limitations on judicial review.

On May 18, 2026, the Department of Justice announced through a Settlement Agreement, *see* Errata Complaint, ECF No. 7-1 at ¶ 97, n. 57 (attached as Exhibit A), the establishment of "The Anti-Weaponization Fund," which would provide a systematic process to hear and redress certain claims alleging use of the levers of government power to target individuals, groups, and entities for improper and unlawful reasons. The Acting Attorney General issued a corresponding Order the same day. *See* Errata Complaint, ECF No. 7-1 at ¶ 107, n. 66 (attached as Exhibit B). The Settlement Agreement and Order garnered significant attention and provoked widespread debate about the weaponization of government, whether and how any claims process should function, and past settlements reached by other administrations. But when Plaintiffs filed this case, no money had been transferred to the Fund, nor was there any claims-processing mechanism in place. That has not changed: no money has been transferred to the Fund. And no mechanisms are in place for formally submitting, receiving, processing, granting, or denying claims. None of the five contemplated "Members" who would establish and administer such procedures for the Fund have even been selected. Even before, and certainly after, Plaintiffs filed this case, the political process continued to play out.

On June 2, 2026, the day the Plaintiffs filed this action, the Acting Attorney General told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." House Appropriations Committee, Oversight

Hearing – Department of Justice, at 40:30-42:50 ("House Oversight Hearing"). Based on those comments, along with the briefs and representations of counsel for the government, this Court denied an application for a Temporary Restraining Order and a motion for a Preliminary Injunction in a related matter. *See Citizens for Resp. and Ethics in Wash. v. Dep't of Justice,* Case No. 1:26-cv-1789 ("*CREW*"), Minute Entry (June 10, 2026) (denying motion for Temporary Restraining Order), Doc. 20–21 (June 23, 2026) (denying motion for Preliminary Injunction for lack of subject matter jurisdiction).

Subsequent events underscore even further that the Fund will not move forward, reaffirming the correctness of this Court's mootness analysis in the *CREW* matter. On July 15, 2026, Acting Attorney General Blanche testified under oath at his Senate Confirmation hearing that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States ("Nomination Hearing"), at 1:26:42–:49. When pressed further, he emphasized, "The settlement fund is just not moving forward. There's no modification. It never started. No money went from the Treasury to any other account. There's no commissioners. It's not moving forward." *Id.* at 1:27:12–:22. Later in the same hearing he reiterated, "I'm under oath today, and I've said it's dead repeatedly." *Id.* at 2:30:44-:53.

Finally, on August 2, 2026, Acting Attorney General Blanche issued another Order that stated, "The Attorney General's May 18, 2026 Order establishing the Anti-

Weaponization Fund ("Fund") is rescinded and shall have no force or effect." Ex. C. The Order reaffirmed the Department's prior representations that "the Fund is not operative. No Members were appointed; no funds were transferred; no process for receiving claims was established; no claims were paid." *Id.*

In addition to Plaintiffs' claims being nonjusticiable, Plaintiffs lack standing to bring the claims they assert. Plaintiffs cannot show any "injury in fact that is concrete, particularized, and actual or imminent," let alone an injury that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because courts are not "general complaint bureaus," a "federal taxpayer" does not have standing just because the taxpayer thinks that a "federal expenditure" is unlawful. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). Yet that is the essence of Plaintiffs' allegations here: generalized grievances about a planned government action with which they have a policy disagreement. ECF No. 7-1 at ¶ 4. The problem, for the Plaintiffs, is that the "comfort and joy" of a favorable judgment because they believe "the United States Treasury is not cheated … or that the Nation's laws are faithfully enforced" is "not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Plaintiffs also allege the Fund will cause them to suffer reputational harm because they are former prosecutors in the now-defunct "Capitol Siege Section," and the Fund will "perpetuate the lie that Plaintiffs failed to uphold their ethical obligations." ECF No. 7-1 at ¶ 140. But the challenged actions themselves—the

4

Settlement Agreement and the Order—do not reference January 6 or the Capitol Siege Section, meaning any claimed injury is speculative and not cognizable under Article III. *See* Ex. A; Ex. B.

Plaintiffs' final theory of harm is that the establishment of the Anti-Weaponization Fund will provoke third parties to engage in hostile, violent, or even criminal actions against them. ECF No. 7-1 at ¶¶ 153–157. Again, the idea that *future* relief from the Fund could somehow *indirectly* finance or incentivize *future* criminal activity due to the *future* choices of third parties is the precise type of "unadorned speculation" that cannot establish standing. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976). Plus, courts should never "presume illegal activities on the part of actors not before the[m]." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994).

Because mootness, standing, and ripeness are all fatal to Plaintiffs' Complaint, there is no need to reach the substance of their claims. But to be clear, Plaintiffs' claims also fail on the merits. Plaintiffs raise a slew of APA claims despite dispositive concessions in their own complaint that there is no final agency action. In any event, each legal theory they raise—statutory, constitutional or otherwise—is facially untenable, which also dooms their remaining non-APA claims.

For those reasons, the Court should grant the motion to dismiss in its entirety.

## BACKGROUND

In anticipation of the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. Littlejohn leaked President Trump's tax returns (and the tax data of his sons Donald J. Trump,

Jr. and Eric Trump, as well as the Trump Organization, LLC) to the New York Times in 2019. The New York Times began to publish stories about the returns in September 2020. Separately, Littlejohn stole tax data for thousands of wealthy individuals and shared that information with another media company.

Pursuant to 26 U.S.C. § 7213(a)(1), the unauthorized disclosure of tax return information is a felony. Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* Judgment at 35, *United States v. Littlejohn*, 1:23-cr-343 (D.D.C.) (Jan. 31, 2024) (sentencing Defendant to "Sixty (60) Months" of incarceration), *aff'd* Case No. 24-3019, 2026 WL 2065951 (D.C. Cir., July 17, 2026); *see also* U.S. Department of Justice, *Former IRS Contractor Sentenced for Disclosing Tax Return Information to News Organizations* (Jan. 29, 2024) *available at* https://www.justice.gov/archives/opa/pr/former-irs-contractor-sentenced-disclosing-tax-return-information-news-organizations.

The federal tax code also provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States. 26 U.S.C. § 7431(a)(1). And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency." 5 U.S.C. § 552a(e)(10), (g)(1).

6

In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States unsuccessfully moved to dismiss the tax code claim on the ground that Littlejohn was not technically an employee of the United States (despite his contractor label). *See Griffin*, ECF No. 108 at 4–7. The court contemplated summary judgment proceedings, and potentially a trial, on that question. *See id.* at 10. Although the court held that the victim did not adequately allege damages under the Privacy Act, the court appeared to assume the Act would otherwise apply. *See id.* at 9–10. Ultimately, the victim settled with the United States for a formal apology.[1]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida. *See* Complaint at 1, *President Donald J. Trump, et al. v. Internal Revenue Serv.*, 1:26-cv-20609 (Jan. 29, 2026). They asserted claims under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. § 552a(e)(10). *See id.* In the Settlement Agreement, counsel for plaintiffs indicated that they intended to amend their complaint to add a putative class claim. Ex. A at 1. President Trump had also submitted Federal Tort Claims Act ("FTCA") administrative claims for relief alleging an unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. *See id.*

---

[1] *The IRS Apologizes to Ken Griffin*, WALL STREET JOURNAL (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b 1917.

Because President Trump is the Chief Executive, his lawsuits against the United States presented unique challenges. At the same time, Presidents do not forfeit their personal legal rights merely because they are President. Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims without the United States having to give the plaintiffs "monetary payment or damages of any kind," as memorialized by the Settlement Agreement dated May 18, 2026. *Id.* Instead, the plaintiffs would "receive a formal apology." *Id.* The plaintiffs waived all claims that could have been asserted in connection with the litigation and administrative claims process. *Id.* at 2. And the United States agreed to establish "a systematic process to hear and redress claims of others who state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

The Settlement Agreement states that the Attorney General, within 30 days of the settlement, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." *Id.* "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its

8

discretion," while "taking reasonable steps to protect private personal and financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." *Id.* at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "[t]o be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." *Id.* at 3. In evaluating claims, the Fund would "consider the totality of the circumstances," including:

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.

9

e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.

f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.

g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4. The Settlement Agreement clarifies that it does not "impose on Defendants . . . any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes." *Id.* at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. *See* Ex. B. The order stated that the United States would "provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $ 1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days." *Id.* at 1. The order also clarified that Fund Members would serve on a volunteer basis. *Id.* And it noted that previous cases have been settled on similar terms. *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)).[2]

---

[2] The *Keepseagle* settlement "created a Compensation Fund . . . of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds despite not having submitted claims. *Id.* at 310. The Obama administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

Following this announcement, the political process continued to unfold. In the ensuing weeks, the Department, through its official pages, in its court filings, in its representations to courts, and through the testimony of the Acting Attorney General before a Committee of the House of Representatives stated that "we are not moving forward with the Fund, period." House Oversight Hearing, at 40:30-42:50. Thereafter, the Acting Attorney General testified, under oath, to the Senate Judiciary Committee in his confirmation hearing to be Attorney General of the United States of America, that "there is no weaponization fund. The weaponization fund is dead, it's not moving forward" and "I am under oath today and I've said it's dead repeatedly." Nomination Hearing at 1:26:42–:49, 2:30:44–47.

In addition to the developments through the political process, the judicial process also brought new developments. Relying on the Acting Attorney General's testimony to the House Committee and the representations of counsel in its papers and in open court, this Court denied a motion for a temporary restraining order and preliminary injunction in the related matter of *CREW*. Case No. 1:26-cv-1789. Across the river, another court gave less credence to the same representations and entered a preliminary injunction on June 12, enjoining any further action relating to the Fund. ECF No. 18; *see Floyd v. U.S. Dep't of Justice*, 1:26-cv-1933 (E.D. Va. June 12, 2026) (ECF No. 85 Order Granting Motion for Preliminary Injunction).

Finally, on August 2, 2026, the Acting Attorney General formally rescinded the May Order, establishing the Fund, through a second written order that stated the May Order "is rescinded and shall have no force or effect." Ex. C.

## LEGAL STANDARD

Defendants move to dismiss this action under Rules 12(b)(1) and 12(b)(6). "Rule 12(b)(1) permits a party to challenge the Court's jurisdiction, whereas Rule 12(b)(6) permits a party to challenge the sufficiency of the Complaint." *Bailey v. Bureau of Prisons*, 133 F. Supp. 3d 50, 53 (D.D.C. 2015) (Leon, J.). "When a defendant files a motion to dismiss a complaint for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Id.* at 54 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "In considering a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court is not confined to the letter of the complaint and may 'consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case.'" *Id.* (quoting *Scolaro v. District of Columbia Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C.2000)). This is tied to the Court's "independent obligation to ensure [a] case falls within the bounds of Article III of the Constitution." *CREW*, Doc. 20 at 5 (citing *TikTok Inc. v. Garland*, 122 F.4th 930, 947 (D.C. Cir. 2024)).

On a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bailey*, 133 F. Supp. 3d at 54 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although the plaintiff must be given every favorable inference that may be drawn from the factual allegations, the Court need not accept as true 'a legal conclusion couched as a factual allegation,' or inferences that are entirely unsupported by the facts pled in the

12

complaint." *Id.* at 53–54 (quoting *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 193 (D.C. Cir. 2006)). And while "the plausibility standard is not akin to a probability requirement … the facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level." *Id.* at 54 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)) (internal quotations omitted). "Thus, to suffice, a complaint must offer in support of its allegations more than mere 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.*; *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

Under Article III, federal courts can exercise jurisdiction over only "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. "The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). This Court has already evaluated the justiciability of a nearly identical claim in a related matter and—correctly—concluded that the Court lacks jurisdiction to hear challenges to the Anti-Weaponization Fund "because the case is moot or, in the alternative, not ripe." *CREW*, Doc. 20 at 2.

### A. Plaintiffs' Claims Are Not Ripe For Adjudication

One part of that "justiciability doctrine"—which independently resolves this matter—is "ripeness." *Nat'l Park Hosp. Ass'n v. Dep't of Interior,* 538 U.S. 803, 807–08 (2003). The ripeness doctrine is not a mere speed bump; it is a doctrine "drawn both from Article III limitations on judicial power and from prudential reasons for

13

refusing to exercise jurisdiction." *Id.* at 808 (quoting *Reno v. Cath. Social Servs., Inc.*, 509 U.S. 43, 57, n.18 (1993)). For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.*

The Supreme Court has specifically stated that ripeness is lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). "Dismissal for lack of ripeness is appropriate where '(n)othing in the record shows that appellants have suffered any injury thus far, and the law's future effect remains wholly speculative.'" *Metzenbaum v. FERC*, 675 F.2d 1282, 1290 (D.C. Cir. 1982) (quoting *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589 (1972)). Or, as the Fourth Circuit has put it: "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Virginia Dep't. of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)).

The test for ripeness requires courts to assess "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park*, 538 U.S. at 808; *accord CREW*, Doc. 20. at 12 (quoting *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015)). Plaintiffs have the "burden of proving ripeness, and [their] allegations are not entitled to presumptive truthfulness." *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017) (citing *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

14

When evaluating whether a case is fit for judicial decision, courts consider "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's decision is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463–64 (D.C. Cir. 2006). As discussed, *infra*, there is no final agency action or decision. But there are also not any concrete facts that allow the Court to rule on a purely legal dispute.

There has been (and will be) no concrete action. No Members were appointed. No claims procedures were established. No claims were formally submitted, received, adjudicated, granted, or denied, and no claimant has received money. Furthermore, the Acting Attorney General's statements to Congress—and now written recission of the Order—only underscore that all of these events will not occur as Plaintiffs anticipate and in fact, they will not "occur at all." *Texas*, 523 U.S. at 300. Thus, Plaintiff's dubious assumptions about how the Fund might have operated, who it might have compensated, and the injuries these things may have caused, are precisely the type of speculative harm the Supreme Court has routinely found are unripe. And for good reason. As a constitutional doctrine, ripeness is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park*, 538 U.S. at 807–08 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). "Just as the constitutional standing requirement for Article III jurisdiction

15

bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury. As the Supreme Court stated in *Whitmore v. Arkansas*, '[a]llegations of possible future injury do not satisfy the requirements of Art. III.'" *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (internal citation omitted).

There is also no hardship to Plaintiffs from this Court withholding consideration of its claims. The bare existence of the Settlement Agreement and corresponding Order—that has now been rescinded—has no "direct effect on the[ir] day-to-day." *Texas*, 523 U.S. at 301. And Plaintiffs cannot rely on "abstraction[s]" unless their "primary conduct is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* By contrast, requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiffs' claims, would cause the parties significant hardship. It would also cause this Court hardship. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, Fed. Practice and Procedure § 3532.1 (3d ed. April 2026 update). This Court, in the related *CREW* matter, correctly noted, "postponing review imposes no cognizable hardship on [Plaintiff]." Doc. 20 at 14. The events that have transpired since the Court published that opinion have only reiterated that there will be no hardship to any party by postponing judicial review because the complained-of action is no longer occurring.

Ultimately, it is Plaintiffs' burden to establish jurisdiction, and they have not done so here.

### B. This Case Is Moot

This is the rare case that is simultaneously premature *and* already moot. T his Court's mootness analysis in *CREW* is correct and compels dismissal here. This case does not present a "Case" or "Controversy," because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). And while it is true that "the initial burden of proving mootness lies with the party claiming it," *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d. 512, 516 (D.C. Cir. 2019), the Acting Attorney General's testimony to Congress make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already*, 568 U.S. at 91 (quotation omitted). And that is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Id.* Because "the court is not empowered to decide moot questions," *People of State of Cal. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), this case should be dismissed in its entirety.

This Court previously—and correctly—applied the presumption of regularity to the Acting Attorney General's public statements and representations of Counsel. *See CREW*, Doc. 20 at 1. Since that time the Acting Attorney General has further reiterated his comments, under oath, at the Senate Judiciary Committee Hearing to consider his nomination to become Attorney General. Nomination Hearing at 1:26:42–1:27:22 (Testifying that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward . . . The settlement fund is just not moving forward there's no modification it's just it never

17

started no money went from the Treasury to any other account there's no commissioners it's not moving forward."). And now he has formally rescinded the Order, ending once and for all any debate about whether the Fund would (or could) continue. Ex. C. Based on these statements and actions, the challenged conduct can "not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Accordingly, this case is moot and should be dismissed.

### C. Plaintiffs Lack Standing

Finally, under a traditional standing analysis, this case fails to present an Article III Case or Controversy. Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *All. for Hippocratic Med.,* 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). For the same reason, "taxpayer standing" does not exist just because a plaintiff "challenges [a] Government expenditure." *Hein*, 551 U.S. at 593. "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of government wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). Standing doctrine also "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a

18

realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. "[T]he standing requirement means that the federal courts may never need to decide some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *All. For Hippocratic Med.*, 602 U.S. at 380 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

The first requirement, "injury in fact," requires an injury that is "real and not abstract," and "particularized" to "the plaintiff in a personal and individual way" (rather than a "generalized grievance"). *All. for Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). For a concrete harm to exist, an alleged injury must have a "close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted). "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Intangible harms are concrete only

19

if they have a sufficient historical pedigree "as providing a basis for lawsuits in American courts." *Id.*

To establish causation, a plaintiff must show that his alleged "injury likely was caused or likely will be caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. When a plaintiff does not challenge government action "that require[s] or forbid[s] some action by the plaintiff," causation "is ordinarily substantially more difficult to establish." *Id.* (internal quotation marks omitted). That is partly because "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). "The causation requirement precludes speculative links" where "downstream injury to plaintiffs" is not "sufficiently predictable," as well as "attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

To establish redressability, a plaintiff must show "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. at 103. Such relief must benefit the plaintiff "as opposed to the citizenry at large" or the "undifferentiated public interest." *Id.* at 106, 107. "[A]lthough a suitor may derive great comfort and joy" from a favorable judgment because they would believe "the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable

20

Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107.

As those principles make clear, Plaintiffs flunk the standing inquiry at every step. For the same reasons this case is moot, Plaintiffs cannot establish injury in fact, causation, or redressability. As ideological objectors to a proposed program that could have resulted in government expenditures, Plaintiffs are no different from the many litigants who have unsuccessfully sought to invoke taxpayer standing. Plaintiffs have no individualized interests distinct from "the interests of the public at large." *Hein*, 551 U.S. at 600; *see generally* ECF No. 7-1 (challenging the "funding of" the program and accusing the program of being a "misuse" of taxpayer funds).

Plaintiffs unsuccessfully attempt to frame themselves as more than mere ideological objectors. They allege that "Defendants' . . . allegations that Plaintiffs used their official powers as government law enforcement officers to target specific entities and individuals for political purposes" causes them reputational harm, and that the Settlement Agreement "is an official, binding declaration by the United States . . . that Plaintiffs acted in violation of their ethical duties as prosecutors," which "presents an ongoing harm to Plaintiffs' reputation." ECF 7-1 at ¶¶ 128, 139; *see also id.* at ¶ 140 ("[T]he Settlement Agreement is explicitly designed to perpetuate the lie that Plaintiffs failed to uphold their ethical obligations."). These allegations raise no Article III injury, because "a plaintiff who has been subject to injurious conduct of one kind" does not "possess by virtue of that injury the necessary stake in litigating conduct of another kind … to which he has not been subject." *Blum v. Yaretsky*, 457

21

U.S. 991, 999 (1982). Plaintiffs' causes of action challenge the Settlement Agreement and the Order. Those documents do not mention January 6 at all, much less Plaintiffs. Thus, any allegation of reputational harm flowing from the (nonexistent) Fund is not grounded in the Settlement Agreement or Order and is necessarily speculative. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976) ("unadorned speculation" cannot establish standing). At best, Plaintiffs allege an interest undifferentiated from that of any other (former) federal government attorney who disagrees with the Anti-Weaponization Fund on policy grounds.

The final harm Plaintiffs allege is that the "weaponization accusations ha[ve] … had significant consequences for Plaintiffs' personal security," including one Plaintiff being "target[ed by] January 6 insurrectionists and their supporters online." ECF No. 7-1 at ¶ 153. But the challenged documents do not accuse Plaintiffs of anything. As with their alleged reputational injury, Plaintiffs' Complaint speculates about who the Fund would pay, what those third parties would do with the money, and what role such payments could even have in causing imminent bodily harm. The alleged harm does not flow specifically from the agency actions being challenged here. *All. for Hippocratic Med.*, 602 U.S. at 383 (holding "plaintiffs … cannot rely on speculation about the unfettered choices made by independent actors not before the courts." (internal quotations omitted)). And, as stated above, courts should avoid "presum[ing] illegal activities on the part of actors not before the[m]." *Tel. & Data Sys.*, 19 F.3d at 48.

22

With no real injury for this Court to redress, there is little doubt what Plaintiffs are actually seeking: the "psychic satisfaction" of a "favorable judgment." *Steel Co.*, 523 U.S. at 107. But federal courts do not "exercise general legal oversight of the … Executive Branch[.]" *TransUnion*, 594 U.S. at 423–24.

## II.   PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION

Given all of those justiciability issues, the Court has ample ground on which to dismiss the complaint on the basis of Rule 12(b)(1) alone and it need not reach the substance of the pleadings. That said, Plaintiffs also fail to allege facts that state a cognizable claim for which relief can be granted under the standard of Rule 12(b)(6).

### A.  Plaintiffs' APA Claims Must Fail Because There Has Been No Final Agency Action

The Administrative Procedure Act ("APA") contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the *consummation* of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added). Agency action is nonfinal, and thus not subject to judicial review under the APA, when it "does not itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp v. Secretary*

*of Housing and Urban Development*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying Order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiffs.

Plaintiffs claim that the "Settlement Agreement Authorizing the Creation of the Anti-Weaponization Fund," along with "the Order creating and funding the Anti-Weaponization Fund," when cobbled together, amount to "final agency action." ECF No. 7-1 at ¶ 161; *see also id.* at ¶ 162. But under the Settlement Agreement's own terms, there is no Fund without Members. Ex. A at 2, § IV.B. (determining that the Fund "shall consist of five Members" to be named by the Attorney General at a later date). But now the Order is rescinded, and the Rescinding Order confirms (again) that no Members were appointed, and no funds were transferred, and no claims were paid. Ex. C. And even if funds had gone into the Fund, such funding alone would not have affected Plaintiffs' rights in any meaningful way. *See DRG Funding*, 76 F.3d at 1214. Until a final agency action were to occur that awarded funding to the actors that they claim want retribution or retaliation against them, their claims are self-defeating. But all of this is academic because nothing has happened, or will happen, with the Fund.

24

Plaintiffs also claim that the "Settlement Agreement and the Order" are "final agency action" because they "establish a conclusive and non-reviewable legal process by which individuals and entities have the right to pursue claims against the United States." ECF No. 7-1 at ¶ 163. But the Settlement Agreement says the opposite: "The Anti-Weaponization Fund *shall have the power to determine its own* procedures for submitting, receiving, processing, and granting or denying claims." Ex. A at 2, § IV.C (emphasis added). And elsewhere, Plaintiffs concede that "Defendants *have not* identified any process or procedures by which the Anti-Weaponization Fund will pay out claims." ECF No. 7-1 at ¶ 218 (emphasis added).

On their face, the Settlement Agreement and Order contemplate "the contingency of future administrative action" before any Fund can even exist. *DRG Funding*, 76 F.3d at 1214. Plaintiffs' own allegations appear to acknowledge that "further action" is required to "establish" the fund. ECF No. 7-1 at ¶ 13; *see also id.* at ¶ 170 (conceding that the Settlement Agreement itself "is not final"). So at best, the Settlement Agreement and Order are the *conception* of—not the "consummation of"—an agency process. *Hawkes Co.*, 578 U.S. at 597; *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1273 (D.C. Cir. 2018) (concluding that challenged agency action was not "final" where challengers could not show that "much, if any, of the claimed consequences for [them] could properly be attributed" to the action).

The best comparator here is APA review in agency grant-making decisions. In that context, courts have consistently held that an agency does not take final action in the grant context until it completes review of an application and decides whether

25

to award or disburse funds. *See Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007) (finding that the "district court's decision is unassailable"); *see also Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 831 (11th Cir. 2026) ("The *agency* has taken no action to fund the project. Even congressional appropriation of funds for a project will not allow challengers to an agency's use of those funds to obtain relief 'until the [agency] has reviewed a grant application and decided to disburse the funds.'" (quoting *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)); *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430–32 (2d Cir. 2015) (considering HUD's rejection of county's proposals and decision to withhold allocated funds was final because it made a definitive funding determination); *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, 179 F.4th 169, 183 (3d Cir. 2026) (NPS's decision to remove exhibits was not final agency action because it did not alter obligations).

Indeed, the scope of APA review for spending decisions is so narrow that agency decisions to *terminate* funding are not even subject to APA review, but are instead governed by the Tucker Act subject to the exclusive jurisdiction of the Court of Federal Claims. *Vera Institute of Justice v. U.S. Dep't of Justice*, 805 F. Supp. 3d 12, 26 (D.D.C. 2025) (Mehta, J.).

### B. Plaintiffs' APA Claims Each Fail Individually.

#### i.   In Excess of Statutory Authority – 5 U.S.C. § 706(2)(A), (C)

Plaintiffs seek an order "setting aside" the Settlement Agreement and Order under 5 U.S.C. § 706(2)(A), (C) because, they allege, those actions were not authorized by statute. *See* ECF No. 7-1, Count I at ¶¶ 158–83. But Plaintiffs' allegation that the Fund would have been illegal because it would have "pa[id] unknown claims of unidentified third parties who have no relation to the underlying claims," ECF No. 7-1 at ¶ 181, is contradicted by the text of the Settlement Agreement. According to the Agreement, the Fund would only have granted relief to claimants "asserting at least one legal claim" and "[t]he strength of the claim" would have been relevant to the Fund's assessment. *Id.* at 3. Plaintiffs appear to miss that basic point entirely. This theory also ignores the historical precedent of *Keepseagle*.

#### ii.   Failure to Follow Notice-and-Comment – 5 U.S.C. § 706(2)(D)

Next, the complaint claims that "[t]he creation and funding of the Anti-Weaponization Fund was a rulemaking subject to the notice and comment requirement." ECF 7-1 at ¶ 225. This sort of conclusory legal allegation that mirrors the elements of a claim is insufficient to survive a Rule 12(b)(6) motion.[3] Additionally, this theory ignores that the order contemplated a temporary, single fund, did not create any generally applicable policy, and cited similar historical examples. Approving Plaintiff's theory would also have problematic and unpredictable

---

[3] Plaintiffs cannot "amend [their] Complaint by including new allegations in [their] [o]pposition." *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 166 (D.D.C. 2003). Still, Defendants reserve the right to make any and all arguments relating to why notice and comment rulemaking is not required in their reply brief.

27

consequences going forward. Requiring notice-and-comment challenges to settlement agreements would drain significant administrative, court, and party resources

### iii.   Separation of Powers – 5 U.S.C. § 706(2)(B)

Plaintiffs claim the "creation and funding of the Anti-Weaponization Fund violates the separation of powers because Defendants have created, in effect, a new federal agency designed exercise powers to which [sic] the Constitution does not grant them." ECF No. 7-1 at ¶ 197. But there is no agency and there will be no agency— there are no people, no processes, and no funding, nor will there be.

And the Department of Justice has previously provided for claims administration processes using third-party adjudicators. *See, eg.*, *Keepseagle v. Vilsack*, 815 F.3d 28, 30 (D.C. Cir. 2016). No one suggested the *Keepseagle* adjudicators comprised an "agency." So it would be especially odd to treat the similar and hypothetical Fund as one.

### iv.   First Amendment and Equal Protection – 5 U.S.C. § 706(2)(B)

Plaintiffs' allegation that the Fund "doles out benefits based on the claimant's viewpoint," ECF No. 7-1 at ¶ 205, does not make sense. To be clear, the Fund does not exist. In any event, Plaintiffs' own complaint refers to Acting Attorney General Blanche's statement that "[t]he machinery of government should never be weaponized against *any* American," *id.* at ¶ 103 (emphasis added), and elsewhere Plaintiffs concede they have no knowledge of any future claimants' identities or the nature of their claims, *id.* at ¶ 181. And on its face, the Settlement Agreement contemplates the submission of claims by putative victims of Lawfare and

28

Weaponization without regard to a claimant's speech or viewpoint. Likewise, the allegation that the Fund's payouts would have turned on "whether the claimant was allegedly harmed by Democratic or Republican 'weaponization,'" *id.* at ¶ 205, misreads the plain language of the Agreement, which covers both Republican and Democrat administrations, *see* Ex. A at II.C, V.C.

And even if the Fund were limited to remedying Democratic weaponization of government, there would be no First Amendment or Equal Protection problem. The government is free to "selectively fund a program," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), so long as the government does not "seek to leverage funding to regulate speech outside the contours of the program." *Agency for Int'l Dev. V. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). There is no apparent way that the Fund's (hypothetical) members could have regulated speech, and any allegation that claimants would be treated differently based on viewpoint is bare speculation.

v.    *Appointments Clause – 5 U.S.C. § 706(2)(B)*

There can be no Appointments Clause claim without an appointment, and here there has no appointment. Nor would any Members of the (nonexistent) Fund have been "officers," because they exercise limited, temporary authority to administer a Settlement Agreement. *See Freytag v. Comm'r*, 501 U.S. 868, 881 (1991) (distinguishing adjudicators who work "on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute").

29

### vi.    Fourteenth Amendment - Insurrection – 5 U.S.C. § 706(2)(B)

Plaintiffs raise a premature, speculative, and hyperbolic Fourteenth Amendment Insurrection challenge alleging that the nonexistent Fund "assumes or pays" debts "incurred in aid of insurrection." ECF No. 7-1 at ¶¶ 208–209; *see* U.S. Const. amend. XIV, § 4. But as explained, they have conceded that the identity of any future claimant is unknown. ECF No. 7-1 at ¶ 181. And they refer only to a news article reporting about the creation of a "fund that *could* compensate 'targeted' Trump allies." *Id.* at ¶¶ 104 n.63, 209. Needless to say, being a "Trump ally" does not make one an "insurrectionist." And in any event, allegations of a "sheer possibility" of unlawful conduct are not enough to survive Rule 12(b)(6). *Iqbal*, 556 U.S. at 678.

### vii.    Arbitrary-and-Capricious – 5 U.S.C. § 706(2)(A)

Plaintiffs appear to assume that the settlement of a litigation contemplating the establishment of a claims process is subject to arbitrary-and-capricious review. ECF No. 7-1 at ¶¶ 211–220. Even if that were true, Plaintiffs' allegation that "there was no reasoned basis for the Settlement Agreement" is belied by the Agreement's text, which explicitly states it was intended to address "conduct . . . representative of the sustained use of the levers of government power . . . in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." Ex. A at 1. It is also belied by their own allegations, which recognize that avoiding "prosecution … against individual[s] or entities based on their 'political association'" helps further "the fair, evenhanded administration of the federal criminal laws." ECF No. 7-1 at ¶¶ 131–132.

30

## C. Plaintiffs' Non-APA Claims Fail

Plaintiffs also include non-APA claims for declaratory and injunctive relief alleging that the Settlement Agreement and accompanying Order are *ultra vires* and violate the Appropriations Clause, the Appointments Clause, and the separation of powers. ECF No. 7-1 at ¶¶ 229–245. To the extent the Appropriations, separation of powers, and *ultra vires* claims rely on arguments that the Fund is not authorized by Congress, those claims fail because parties "may not bring a freestanding constitutional claim" raising those theories "if the underlying alleged violation and claimed authority are statutory." *Global Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025).

These claims independently fail for reasons extensively discussed above. No money has been, nor will be, transferred for use by the Fund, so there is no illegal appropriation. Members are not Officers under Article II, but even if they were, no Members have been selected, meaning there is no appointment. There is no new agency that could violate the separation of powers because there simply is no Fund. And this all shows there is no *ultra vires* act.

31

## CONCLUSION

For the reasons stated above, the Court should dismiss this case with prejudice, pursuant to Rule 12(b)(1) and 12(b)(6).


Date: August 3, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*


*/s/* ANDREW J. BLOCK
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

32

## Certificate of Service

I hereby certify that on August 3, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block