**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL M. GORDON, *et al.*,

Plaintiffs,

v.

TODD BLANCHE, *et al.*,

Defendants.

Civil Action No. 26-cv-01907-RJL

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 1

I. The January 6, 2021 Insurrection and Plaintiffs' Public Service to Uphold the Rule of Law. ..... 1

II. President Trump's $10 Billion Lawsuit Against Himself, the Resulting Settlement Agreement, and the Anti-Weaponization Fund. ..... 2

III. The Instant Litigation, Other Related Cases, and Defendants' Inconsistent Representations Regarding the Status of the Anti-Weaponization Fund. ..... 7

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. The Case is Justiciable. ..... 11

A. Plaintiffs Have Standing. ..... 12

B. The Case is Not Moot. ..... 17

C. The Case is Ripe. ..... 23

II. Plaintiffs Have Plausibly Alleged Claims Under the APA. ..... 25

A. The Creation of the Anti-Weaponization Fund Constitutes Final Agency Action. ..... 25

B. The Creation of the Anti-Weaponization Fund is Not in Accordance With, and in Excess of, Defendants' Statutory Authority. ..... 28

C. The Creation of the Anti-Weaponization Fund is Not in Accordance With, and Contrary to, Several Constitutional Provisions. ..... 31

1. The Spending and Appropriations Clauses ..... 31

2. The Appointments Clause ..... 32

3. The Separation of Powers ..... 35

4. The First Amendment ..... 36

5. The Fifth Amendment ..... 39

6. The Fourteenth Amendment ..... 39

D. The Creation of the Anti-Weaponization Fund Was Arbitrary and Capricious ..... 40

E. Defendants Did Not Follow the APA's Notice and Comment Requirements. .......... 41

III. Plaintiffs Have Plausibly Alleged Freestanding Constitutional and Ultra Vires Claims. . 43

CONCLUSION ........................................................................................................................ 45

## INTRODUCTION

This case is about Defendants' brazen attempt to use the pretext of litigation between President Trump and his own government to funnel billions of dollars to individuals who stormed the Capitol and committed numerous, violent crimes against the United States on January 6, 2021. Defendants barely argue otherwise. And they fail to defend the legality of their actions on numerous grounds. Instead, they rely on threshold justiciability doctrines to argue that this Court cannot review their actions. But even Defendants' justiciability arguments fail—Plaintiffs have standing, the case is not moot, and the case is ripe for review. Thus, this Court should deny Defendants' motion to dismiss.

## STATEMENT OF FACTS

### I. The January 6, 2021 Insurrection and Plaintiffs' Public Service to Uphold the Rule of Law.

After he lost the November 3, 2020 election, President Trump engaged in a well-documented campaign to pressure different States to alter their election results. *See* Complaint, ECF No. 1 ¶26 & n.2 [hereinafter "Compl."]. President Trump's attempt to cling to power via lies about the 2020 election came to a head on January 6, 2021. Compl. ¶32. That day, Vice President Mike Pence presided over a joint session of Congress to certify the results of the election. *Id.* ¶27. Before the legislative session, President Trump gave a speech on the White House Ellipse, in which he urged the gathered crowd to "fight," called his election loss a "fraud," and likened his loss to a "theft," among other incendiary language. *Id.* ¶32. The crowd, and others, then marched to the Capitol where they overwhelmed the security surrounding the building. *Id.* ¶¶33-39. During the ensuing violence, the crowd chanted "hang Mike Pence," injured more than 100 law enforcement officers, and killed one law enforcement officer, Brian Sicknick. *Id.* Lawmakers, and the Vice President, fled for their lives. *Id.* ¶34.

After the insurrection attempt was quelled, the Department of Justice ("DOJ") created the Capitol Siege Section within the United States Attorney's Office for the District of Columbia to investigate and prosecute the crimes committed at the Capitol. *Id.* ¶¶40-41. The crimes prosecuted by the Capitol Siege Section included assault of law enforcement officers, seditious conspiracy, obstruction of Congressional proceedings, theft and destruction of government property, and unlawful entry into restricted federal buildings. *Id.* ¶55.

Plaintiffs Michael Gordon and Michael Romano, career prosecutors who have served their country with distinction, collectively worked on hundreds of these cases as members of the Capitol Siege Section. *Id.* ¶¶42-54. Mr. Gordon served as a Senior Trial Counsel at the Capitol Siege Section. *Id.* ¶42. He prosecuted more than three dozen individuals who participated in the January 6 insurrection. *Id.* ¶43. Mr. Romano served the DOJ for eighteen years, including as a Deputy Chief of the Capitol Siege Section. *Id.* ¶15. He supervised hundreds of January 6 prosecutions, including overseeing many grand jury presentments and trials. *Id.* ¶¶49, 51-52. The fact that Plaintiffs are former members of the Capitol Siege Section is well known to the public. *Id.* ¶¶122-26. For example, numerous public news articles identify Plaintiffs as prosecutors in cases involving the January 6 insurrectionists, and Mr. Romano has submitted testimony to Congress twice this year regarding the prosecution of the insurrectionists. *Id.*

## II. President Trump's $10 Billion Lawsuit Against Himself, the Resulting Settlement Agreement, and the Anti-Weaponization Fund.

President Trump—and, following his lead, many of his allies—refer to Plaintiffs' professional work in applying duly enacted criminal statutes to the January 6 insurrectionists' actions as "lawfare" or "weaponization" of the law. *See* Compl. ¶¶56-69. For instance, now-Vice President J.D. Vance referred to the insurrectionists as "political prisoners" whose detention was "an assault on democracy." *Id.* ¶58. During the 2024 Presidential election campaign, President

Trump repeatedly referred to the January 6 insurrectionists who had been prosecuted and convicted as "hostages." *Id.* ¶61. President Trump also promised to pardon and commute the sentences of the insurrectionists if he won the 2024 election. *Id.* ¶¶64-69. On his first day back in office, President Trump made good on those promises. *Id.* ¶71. In addition, the President and those close to him have repeatedly discussed compensating the insurrectionists for the alleged wrongs they endured, "portraying them as victims of political lawfare." *Id.* ¶¶83-84.

The President found a mechanism to compensate the insurrectionists when he, his sons, and the Trump Organization (collectively, the "Trump plaintiffs") sued the Internal Revenue Service ("IRS") and the Department of Treasury ("Treasury") in the Southern District of Florida seeking $10 billion in damages based on the leak of their tax return information by Charles Littlejohn, an IRS contractor who worked for Booz Allen Hamilton. Compl., *Trump v. IRS*, No. 1:26-cv-20609, ECF No. 1 (S.D. Fla. Jan. 29, 2026);[1] *see also* Compl. ¶86. President Trump's case against his own government had serious infirmities from the start. First, both provisions under which the Trump plaintiffs brought suit contain a two-year statute of limitations, *see* 26 U.S.C. § 7431(d) & 5 U.S.C. § 552a(g)(1)(5), but the Trump plaintiffs nevertheless waited until January 2026 to sue the government, more than two years after Mr. Littlejohn pled guilty to criminal charges related to the leaks at a public plea hearing attended by President Trump's own personal lawyer, *see* Tr. of Oct. 12, 2023, Plea Hr'g, *United States v. Littlejohn*, No. 1:23-cr-00343, ECF No. 13 (D.D.C. Oct. 23, 2023)*; see also* Compl. ¶¶86-89.

The Trump plaintiffs also did not have a cause of action against the federal government

[1] The Court may take judicial notice of public records from other legal proceedings. *Covad Commc'ns Co. v. Bell Atlantic Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005); *see also Arrington v. Fed. Pub. Defender for D.C.*, 75 F. Supp. 3d 340, 345 (D.D.C. 2014) ("A court may take judicial notice of public records from other proceedings." (cleaned up)).

because Mr. Littlejohn was not a "government employee" when he leaked their information. *Compare* 26 U.S.C. § 7431(a)(1) (providing a cause of action for leaks by "any officer or employee of the United States"), *with* § 7431(a)(2) (providing a cause of action for leaks by "any person who is not an officer or employee of the United States"); *see also* Compl. ¶90. Notably, the government *had* raised these and similar arguments in prior suits involving Mr. Littlejohn's leaks. *See, e.g.*, United States' Mot. to Dismiss, *Griffin v. IRS*, No. 1:22-cv-24023, ECF No. 58, at 6-12 (S.D. Fla. Nov. 27, 2023) (arguing that Mr. Littlejohn was not a government employee).

Nevertheless, the government did not even enter an appearance in the district court where President Trump's suit was pending. Compl. ¶91. Partly because of the government's inaction, the court ordered the parties and court-appointed amici to brief whether the parties were sufficiently adverse for purposes of Article III's case or controversy requirement. *See* Orders, *Trump v. IRS*, No. 1:26-cv-20609, ECF Nos. 41 & 43 (S.D. Fla. Apr. 24 & 29, 2026);*see also* Compl. ¶¶92-94. On May 18, two days before the deadline to respond to the court, the Trump plaintiffs voluntarily dismissed their suit with prejudice, Notice of Voluntary Dismissal, *Trump v. IRS*, No. 1:26-cv-20609, ECF No. 52 (S.D. Fla. May 18, 2026), and the court closed the case, Order Closing Case, *Trump v. IRS*, No.1:26-cv-20609, ECF No. 62 (S.D. Fla. May 18, 2026); *see also* Compl. ¶96. Notably, the Trump plaintiffs' notice neither referenced nor included a settlement agreement. Compl. ¶96.

But on that same day, May 18, the DOJ publicly announced a settlement with President Trump, his sons, and the Trump Organization. *Id.* ¶97; *see* Exhibit A to Def.'s Mot. to Dismiss, ECF No. 36-2 (hereinafter the "Settlement Agreement"). The Settlement Agreement was signed by Defendants Stanley E. Woodward, Jr. and Frank J. Bisignano. Settlement Agreement at 8-9. As part of the Settlement Agreement, the then-Acting Attorney General—Defendant Todd Blanche—

agreed to, among other things, create the "Anti-Weaponization Fund" to "provide a systematic process to hear and redress claims of others who, like [the Trump plaintiffs] state that they incurred harm from similar Lawfare and Weaponization." *Id.* ¶III.C. The Settlement Agreement further defines "Lawfare" and "Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *Id.* ¶II.C.

Also on May 18, Defendant Blanche issued an Order creating the Anti-Weaponization Fund. Compl. ¶107; *see* Exhibit B to Def.'s Mot. to Dismiss, ECF No. 36-3 (hereinafter the "Order"). The Order states: "[w]ithin 60 days . . . , the United States shall provide [Treasury] with all necessary forms and documentation to direct a payment of $1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund." *Id.* ¶C. As the statutory basis for the creation of the Fund, the Order cites 31 U.S.C. § 1304, the Judgment Fund statute, and 28 U.S.C. § 2414, the compromise settlements statute.[2] *Id.* ¶G.

It is no secret that the Anti-Weaponization Fund was intended to compensate the January 6 insurrectionists. Prior statements by President Trump likening the prosecution of the January 6 insurrectionists to the "weaponization" of the justice system make this clear. *See, e.g.*, Compl.

[2] Since the Settlement Agreement was announced and the Order was issued, thirty-five former federal judges moved to reopen the case in the Southern District of Florida, arguing that the parties there had perpetuated a fraud upon the court. *See* Mot. to Reopen, *Trump v. IRS*, No. 1:26-cv-20609, ECF No. 63 (S.D. Fla. May 27, 2026). Upon consideration of the motion, the court concluded that the case had been instituted "for an improper purpose—to gain the imprimatur of judicial legitimacy for a 'settlement' that had no viable basis in law or fact." *See generally Trump v. IRS*, *Trump v. IRS*, No. 1:26-cv-20609, --- F. Supp. 3d ----, 2026 WL 2015525 (S.D. Fla. Jul. 13, 2026). As a result, it issued various sanctions against the litigants and their counsel. *Id.* The plaintiffs, their counsel, and the government have sought to appeal the court's order to the Eleventh Circuit.

¶¶56-84 (outlining the prior statements by President Trump and those around him). So do his statements after the Fund was created. *See id.* ¶¶101-06. For example, on June 2, 2026, President Trump stated: "[T]hese were many great people. And I gave them pardons. I'm very proud to have given them pardons. And I think they should be reimbursed for a crooked government."[3] This statement, in no uncertain terms, makes clear that the beneficiaries of the Fund are the same individuals that President Trump pardoned: the January 6 insurrectionists. On another occasion, when asked about the Fund by a reporter, President Trump again alluded to the riot at the Capitol stating, these "[p]eople that were very successful, that wanted to go to a rally or an event and ended up spending the rest of their lives in horror."[4]

That the Anti-Weaponization Fund is intended to compensate the insurrectionists is also obvious to elected officials. For instance, Senator Thom Tillis criticized the Fund, stating, in part: "While I never disagreed that the Biden Administration pursued a number of vindictive prosecutions related to January 6, the criminals who assaulted police officers and defiled our nation's Capitol are not 'great American patriots' who are 'victims of government abuse.' Anyone who attacked law enforcement should still be in prison, not getting a check from the federal government."[5] Finally, the January 6 defendants know the Fund was intended to compensate them.

---

[3] Ex. A, Sarah Ferris *et al.*, *Senate GOP to face major test on Trump's 'anti-weaponization' fund with immigration vote*, CNN (Jun. 3, 2026), https://www.cnn.com/2026/06/03/politics/anti-weaponization-fund-trump. Unless otherwise stated herein, all Exhibits cited in this memorandum are attached to the Declaration of Conor Bradley. The Court may consider such material outside the pleadings in evaluating Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Scolaro v. D.C. Bd. of Elecs. & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) ("A court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case.").

[4] Ex. B, Senate Democrats, *Transcript: President Trump Holds a Cabinet Meeting at Camp David, 7.31.26*, at 16, https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-holds-a-cabinet-meeting-at-camp-david-73126.

[5] Ex. C, Thom Tillis, X (Jul. 31, 2026), https://x.com/SenThomTillis/status/2083210673819881724.

For instance, one January 6 defendant told a reporter that "all J6ers will apply for restitution." Compl. ¶106. Enrique Tarrio, the Proud Boys leader sentenced to twenty-two years for seditious conspiracy over the January 6 insurrection, said he intends to apply to the Fund for $2 to $5 million in compensation. *Id.* ¶105. A lawyer who has represented hundreds of January 6 defendants stated that "he believes approximately 400 of his clients will be able to stake a claim with the [F]und."[6]

## III. The Instant Litigation, Other Related Cases, and Defendants' Inconsistent Representations Regarding the Status of the Anti-Weaponization Fund.

Plaintiffs brought the instant suit on June 1, 2026, alleging that the Anti-Weaponization Fund violates the Administrative Procedure Act ("APA") and numerous constitutional provisions, and is *ultra vires*. Compl. ¶¶158-245. The day after Plaintiffs filed suit, Defendant Blanche appeared at a subcommittee hearing in the House of Representatives and stated the Fund was "not moving forward."[7] In that same hearing, however, Defendant Blanche refused to commit to rescinding Fund in writing.[8] And, on June 3, President Trump called the Fund a "beautiful thing" and stated that he did not know whether the Fund was dead or on hold.[9]

On June 10, this Court held a hearing on the plaintiffs' request for a temporary restraining order ("TRO") in *Citizens for Responsibility & Ethics v. DOJ* (hereinafter "*CREW*"), a case that has been related to the instant suit. *See Citizens for Resp. & Ethics v. DOJ*, No. 26-cv-01789-RJL, ECF No. 17 (June 10, 2026) (hereinafter "TRO Hr'g Tr."). Ultimately, the Court denied the *CREW* plaintiffs' TRO request because they had not demonstrated a "likelihood of establishing subject

---

[6] Ex. D, Laura Romero & Peter Charalambous, *Trump allies, Jan. 6 defendants lining up to apply for $1.7 billion 'Anti-Weaponization Fund'*, ABC News (May 21, 2026), https://abcnews.com/US/trump-allies-jan-6-defendants-lining-apply-17/story?id=133202234.
[7] Ex. E, Raquel Coronell Uribe, *Todd Blanche says DOJ 'not moving forward' with 'anti-weaponization' fund*, NBC News (Jun. 2, 2026), https://www.nbcnews.com/politics/trump-administration/todd-blanche-doj-anti-weaponization-fund-rcna348154.
[8] *Id.*
[9] *See supra* note 3.

matter jurisdiction." TRO Hr'g Tr. at 19:14-17. The Court explained that it was "entitled to credit" the government's representations "both in its filings and through statements by the Acting Attorney General [Defendant Blanche] before Congress, that the challenged fund is . . . not moving forward[.]" *Id.* at 19:25-20:6. Based on these representations, the Court concluded that the *CREW* plaintiffs had not carried their burden of showing the case was not moot. *Id.* at 19:14-25. The Court subsequently relied on similar reasoning to deny the *CREW* plaintiffs' request for a preliminary injunction on mootness and, alternatively, ripeness, grounds. *See, e.g.*, Memorandum Op., *Citizens for Resp. & Ethics v. DOJ*, No. 1:26-cv-01789-RJL, ECF No. 20 (D.D.C. June 23, 2026). During these proceedings, however, the Court issued a stern warning that the DOJ should not "play possum with this Court." TRO Hr'g. Tr., at 20:12.

Since the Court's rulings, Defendants have indeed "play[ed] possum." On June 11, the day after this Court's TRO hearing, *The Atlantic* reported that "eight people" familiar with the Anti-Weaponization Fund, including "current and former Justice Department officials, current and former members of Congress, a defense attorney, and political operatives close to the administration" all indicated that the "idea [of compensating the January 6 insurrectionists] has not actually been scrapped."[10] The government has similarly declined to repudiate the Fund in litigation. For example, in a case involving the Fund in the Eastern District of Virginia against these same Defendants, the court issued a TRO, enjoined the defendants from taking any action to create or operate the Fund, and ordered the defendants to file a declaration that the Fund was not moving forward "to avoid any further litigation." *See* Order on Motion for TRO, *Floyd v. DOJ*, No. 1:26-cv-01399-LMB, ECF No. 85 (E.D. Va. Jun. 12, 2026). The defendants refused the Court's

[10] Ex. F, Sarah Fitzpatrick, *Trump Isn't Giving Up on His Slush Fund*, The Atlantic (Jun. 11, 2026), https://www.theatlantic.com/politics/2026/06/trump-anti-weaponization-fund/687500/.

request. *See* Def.'s Notice of Filing, *Floyd v. DOJ*, No. 1:26-cv-01399-LMB, ECF No. 93 (E.D. Va. Jun. 19, 2026). Similarly, in the *Trump v. IRS* litigation, the government has entered an appearance in the Trump plaintiffs and their counsel's Eleventh Circuit appeal and argued that the court should grant a stay pending appeal, in part, because the Trump plaintiffs and their counsel are likely to succeed on their claim that the district court did not have authority to review the Settlement Agreement creating the Fund. *See Trump v. Thirty-Five Former Fed. Judges*, No. 26-12692, ECF Nos. 9 & 10 (11th Cir. Aug. 11 & 12, 2026). Just last week, the government also noticed its own appeal in the case. *Trump v. IRS*, No.1:26-cv-20609, ECF No. 129 (S.D. Fla. Sept. 11, 2026).

Defendants' public statements have similarly provided little clarity regarding the status of the Fund. On July 15, at a Senate hearing on his nomination to become Attorney General, Defendant Blanche again told Congress that the Fund was not moving forward.[11] In his written responses to questions from the Senate, however, Defendant Blanche explicitly refused to rule out the possibility that the DOJ would pay money to the January 6 insurrectionists.[12] And he did not provide any substantive response to a question that asked whether any DOJ officials had participated in discussions with the January 6 insurrectionists about settling their purported claims against the United States.[13]

As a result, not everyone was convinced that the Anti-Weaponization Fund was defunct. Senators Thom Tillis and John Cornyn threatened to withhold their votes for Defendant Blanche's

---

[11] Ex. G, The Nomination of the Honorable Todd Blanche to be Attorney General of the United States, Hearing Before the United States Senate Comm. On the Judiciary, at 50:17-19 (Jul. 15, 2026), available at https://www.justice.gov/ag/media/1455261/dl?inline.
[12] *See* Ex. H, Senator Dick Durbin, Written Questions for Todd Blanche (Jul. 17, 2026), at 2, https://www.judiciary.senate.gov/imo/media/doc/blanche_-_qfrs.pdf.
[13] *Id.* at 2-3.

nomination unless he issued a written confirmation that the Fund would not move forward.[14] In response, President Trump lashed out at the two Senators and threatened to simply withdraw Defendant Blanche's nomination and keep him as Acting Attorney General rather than comply with their demand.[15] The President's conduct, Senator Tillis explained, "made it clear . . . that the so-called Anti-Weaponization Fund is still alive."[16] Eventually, and only in the face of an existential threat to his prospects of becoming Attorney General, Defendant Blanche issued a written order purporting to rescind the Fund. *See* Exhibit C to Def.'s Mot. to Dismiss, ECF No. 36-4 (hereinafter the "Rescission Order").

Even after the Rescission Order was issued, however, President Trump continued to articulate his desire to compensate the January 6 insurrectionists. For example, on August 3, the day after Defendant Blanche issued the Rescission Order, President Trump stated: "These people were treated horribly and this fund could have given them some solace . . . . I thought it would be very fair for people that spent years in prison, people that were treated so badly for, in many cases, people that did nothing wrong."[17] The same day President Trump made this statement, Defendants moved to dismiss Plaintiffs' Complaint.

**LEGAL STANDARD**

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of

---

[14] Ex. I, Lalee Ibssa, *Todd Blanche's AG prospects uncertain as 2 key GOP votes hold out*, ABC News (Jul. 27, 2026), https://abcnews.com/Politics/todd-blanches-ag-prospects-uncertain-2-key-gop/story?id=135135864.

[15] Ex. J, Donald J. Trump, Truth Social (Aug. 1, 2026), https://truthsocial.com/@realDonaldTrump/posts/117020029291674756.

[16] *See supra* note 5.

[17] Ex. K, Alexander Mallin & Allison Pecorin, *Key Republicans say they'll support Blanche for AG after he rescinds 'Anti-Weaponization Fund'*, ABC News (Aug. 3, 2026), https://abcnews.com/US/blanche-rescinds-trumps-anti-weaponization-fund-amid-ag/story?id=135315931.

subject matter jurisdiction, and Rule 12(b)(6) for failure to state a claim. In ruling on a motion under Rule 12(b)(1), the court "assume[s] the truth of all material factual allegations in the complaint and construes the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). Under Rule 12(b)(6), the court must also construe the complaint in favor of the plaintiff. *Hettinga v. United States*, 677 F.3d 471, 476 (2012). "To survive a motion to dismiss [for failure to state a claim], a complaint must have facial plausibility, meaning it must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up).

## ARGUMENT

The Court should deny Defendants' motion to dismiss in its entirety. First, the case is justiciable because Plaintiffs have standing, the case is not moot, and the case is ripe. Second, Plaintiffs have adequately alleged APA claims because the creation of the Anti-Weaponization Fund constitutes final agency action and Defendants actions were not in accordance with, in excess of, and contrary to, several statutes and constitutional provisions, their actions were arbitrary and capricious, and they did not engage in notice-and-comment rulemaking prior to creating the Fund. Finally, Plaintiffs have plausibly alleged freestanding constitutional and *ultra vires* claims.

### I. The Case is Justiciable.

Defendants' three justiciability arguments fail. First, Plaintiffs have standing because the creation of the Anti-Weaponization Fund causes them Article III injury in the form of reputational harm, and a declaration that the Fund is illegal will redress such harm. Second, the case is not moot because Defendants have not met their burden of showing voluntary cessation of the Fund and, even if they did, the Settlement Agreement and the Order are still causing Plaintiffs reputational

harm. Third, the case is ripe because it presents pure legal questions for which there is no need for further factual development and declining to adjudicate the case will cause Plaintiffs hardship.

**A. Plaintiffs Have Standing.**

Plaintiffs have standing to challenge Defendants' creation of the Anti-Weaponization Fund. To establish standing, a plaintiff must show an injury in fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," a "causal connection between the injury and the conduct complained of," and that the injury likely will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Here, contrary to Defendants' characterization, Plaintiffs are not mere "ideological objectors" to the creation of the Anti-Weaponization Fund. Mot. at 23. Instead, because of their unique position as former prosecutors in the Capitol Siege Section, the creation of the Fund causes them reputational harm, which is "chief" among the intangible harms that are sufficiently concrete for Article III purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413. 425 (2021). Indeed, the Supreme Court and the D.C. Circuit have specifically recognized that reputational injury can provide a basis for standing. *See Meese v. Keene*, 481 U.S. 465, 473 (1987); *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001). And, where, as here, "reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge that action." *Foretich v. United States*, 351 F.3d 1198, 1213 (D.C. Cir. 2003).

For example, in *Meese*, the Supreme Court held that a politician and film distributor had standing to challenge a federal statute classifying foreign films he wished to exhibit as "political propaganda." 481 U.S. at 472-77. The Court found that the plaintiff had standing since the evidence demonstrated the potential for his personal, political, and professional reputation to suffer and for

his ability to obtain re-election and to practice his profession to be impaired. *Id.* at 473. Likewise, in *McBryde,* the D.C. Circuit relied on *Meese* to uphold the district court's finding that a federal judge had standing to challenge a public reprimand issued by the Judicial Council rebuking him for misconduct. 264 F.3d at 56–57. The court held that the reprimand constituted an "official characterization of an apparently upstanding federal judge as having engaged . . . in a pattern of abusive behavior that was prejudicial to the effective and expeditious administration of the business of the courts," and therefore it inflicted direct injury to the judge's reputation. *Id.* (cleaned up).

So too here. Defendants' establishment of the Anti-Weaponization Fund turns Plaintiffs' public service into an official stain. It orders "a systematic process to hear and redress claims" by the January 6 insurrectionists prosecuted by Plaintiffs, Settlement Agreement ¶III.C, and thereby labels Plaintiffs as having used "the levers of government power to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons," *id.* ¶II.C. The Fund sends the message that the United States government needed to take the exceedingly rare step of setting up a mechanism to compensate and apologize for Plaintiffs' alleged misdeeds. *Compare, e.g.*, P.L. 100-383 (Aug. 10, 1988) (Act of Congress to provide reparations for violating rights of Japanese Americans and Aleuts during World War II); P.L.117-139 (June 7, 2022) (Act of Congress providing compensation to those who developed certain serious illnesses following exposure to radiation from the nuclear weapons program).

This message is incredibly damaging to Plaintiffs' reputation. In their former roles, Plaintiffs were vested with the public trust and were held to stringent ethics standards and policies. Compl. ¶¶129-37. They exercised their duties and responsibilities with diligence and, in so doing, they built reputations as fair-minded and responsible lawyers. Compl. ¶135; Declaration of

Michael M. Gordon ¶8 (hereinafter "Gordon Decl."); Declaration of Michael J. Romano ¶¶12, 28 (hereinafter "Romano Decl."). Those reputations were known in their communities and across the country. For example, both Plaintiffs have been identified as members of the Capitol Siege Section in public news articles and other public-facing documents. Compl. ¶¶123-24; Gordon Decl. ¶17; Romano Decl. ¶20. Moreover, Mr. Romano recently testified before Congress regarding his work at the Capitol Siege Section. Compl. ¶125; Romano Decl. ¶¶26-30. And, currently, Plaintiffs' firm biographies identify them as members of the Capitol Siege Section. Gordon Decl. ¶18; Romano Decl. ¶21. Thus, Plaintiffs have plausibly alleged that they established public reputations as ethical and responsible prosecutors and that the very establishment of the Fund "cripples the functioning and damage[s]" their reputations "in their respective communities and in the nation." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 139 (1951).

Plaintiffs have also adequately alleged that the Fund has significant repercussions on their "future professional endeavors." Compl. ¶152. As a result of the accusation that they weaponized the justice system, Mr. Gordon was fired by the DOJ and Mr. Romano was forced to resign. *Id.* ¶146-50; Gordon Decl. ¶12-16; Romano Decl. ¶¶13-18. Now, Plaintiffs have concrete basis to believe they are viewed as controversial hires by prospective employers. Gordon Decl. ¶22; Romano Decl. ¶¶32-33. They are also unlikely to be able to return to the DOJ. Gordon Decl. ¶23; Romano Decl. ¶33. And, opposing adversaries are likely to wield the "weaponization" accusations against them, hindering their ability to zealously represent their clients and perform their professional responsibilities. Gordon Decl. ¶24; Romano Decl. ¶35.

Similarly, Plaintiffs have sufficiently alleged that Fund has significant repercussions in their personal lives. Indeed, Mr. Romano was already the target of online abuse from the January 6 insurrectionists. Compl. ¶153; Romano Decl. ¶¶22-25. For instance, insurrectionists and their

supporters found Mr. Romano's LinkedIn photo and edited it to read "Domestic Enemy." Compl. ¶153; Romano Decl. ¶23. And one particular supporter of the January 6 insurrectionists has targeted Mr. Romano online on several occasions, most recently in February 2026. Compl. ¶¶155-56; Romano Decl. ¶25. Mr. Gordon has similarly been "doxxed" by insurrectionists and their supporters on at least two occasions and received threatening communications. Gordon Decl. ¶19. By amplifying the lie that Plaintiffs misused their official positions, the Anti-Weaponization Fund perpetuates the security threats against Plaintiffs. As a result, Mr. Gordon has taken steps to ensure his personal security, including removing his address and personal identifying information from publicly accessible sources. Compl. ¶156; Gordon Decl. ¶20.

Contrary to Defendants' contention, it is not mere speculation that the Anti-Weaponization Fund was created at least in part to compensate the January 6 insurrectionists and, thereby, denigrate Plaintiffs for their work on the prosecutions. *See* Mot. at 23-25. President Trump has stated that the January 6 insurrectionists "should be reimbursed for a crooked government." *See supra* notes 3 & 4. He has declared that the prosecution of the January 6 defendants constituted "the weaponization of the Department of Justice, and we can't let this happen in our country," Compl. ¶59, that the January 6 insurrectionists were "hostages," *id.* ¶¶61-63, that the insurrectionists had been "persecuted so unfairly," *id.* ¶57, and he has explicitly named the January 6 defendants as an example of those who were victims of "unprecedented, third-world weaponization of prosecutorial power to upend the democratic process," *id.* ¶74. Elected officials have understood that the Fund will compensate the insurrectionists. *See supra* note 5. And the insurrectionists themselves know they will benefit from the Anti-Weaponization Fund. *See, e.g.*, Compl. ¶¶105-06; *supra* note 6. Finally, Defendant Blanche has repeatedly declined to state that the January 6 insurrectionists will not be compensated. *See supra* notes 7 & 11. Indeed, even in

their motion to dismiss, Defendants never state the January 6 insurrectionists will not receive compensation.

For these reasons, Defendants' reliance on *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) is misplaced. *See* Mot. at 20-22. There, pro-life doctors and associations lacked standing to sue the FDA for its regulations regarding mifepristone because the doctors and associations themselves did not prescribe mifepristone and did not establish a "predictable chain of events leading from" such regulation to "the[ir] asserted injury." *Alliance for Hippocratic Medicine*, 602 U.S. at 385-86. Here, however, Plaintiffs have identified such a chain of events: the Fund, created by Defendants, brands them as unethical prosecutors and, as a direct result, their "personal . . . and professional reputation[s] suffer" and their ability to "practice [their] profession [is] impaired." *Meese*, 481 U.S. at 473. Thus, this case is nothing like *Alliance for Hippocratic Medicine* or any other case where the plaintiff failed to allege a causal chain between a government action and their injury.

Finally, "because the damage to [Plaintiffs'] reputations is caused by the challenged action," redress by the Court is possible. *Foretich*, 351 F.3d at 1214. "A declaratory judgment that the government's actions were unlawful will . . . provide meaningful relief" because it will remove the imprimatur of government authority from an act that denounces Plaintiffs as having acted unethically and abusively. *Id*. (citing *Keene*, 481 U.S. at 477); *see also McBryde*, 264 F.3d at 57 ("Were [the plaintiff] to prevail on the merits it would be within our power to declare unlawful the defendants' issuance of stigmatizing reports and thereby to relieve . . . much of the resulting injury."); *Doe v. U.S. Air Force*, 812 F.2d 738, 740 (D.C. Cir. 1987) ("We think that a declaratory judgment that the materials and information were obtained [from the plaintiff] by violating the Constitution would constitute relief."); *S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 524

(D.C. Cir. 1977) (finding the plaintiff's assertion "that its good name and reputation have been damaged" to be an injury "capable of direct redress" through the requested declaratory and injunctive relief). As such, Plaintiffs have adequately alleged standing.

**B. The Case is Not Moot.**

Defendants' actions have not mooted the case. Where, as here, a defendant purports to voluntarily cease the challenged activity after litigation is commenced (and indeed, a TRO is issued), the case remains live unless the defendant can "bear[] the formidable burden of showing that it is absolutely clear" that it will not engage in the "allegedly wrongful behavior" again. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). To satisfy its burden, the defendant must show that (1) "there is no reasonable expectation that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016).

Here, Defendants fail the test because they offer only their bare representations that the Anti-Weaponization Fund will not go forward after another district court issued a TRO. Mot. at 19-20 (citing Defendant Blanche's statements at his nomination hearing that "there is no fund" and the Fund is "not moving forward"); Rescission Order ¶A ("[T]he Anti-Weaponization Fund . . . is rescinded."). Rescinding a government action after a litigation setback is insufficient to carry Defendants' burden of showing that there is "no reasonable expectation" that they "will return to [their] old ways." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up). "What matters is not whether a defendant repudiates its past actions, but what repudiation can prove about its future conduct." *Id.* at 244.

In numerous cases, the Supreme Court has held the rescission of a challenged policy by a government defendant does not satisfy the voluntary cessation doctrine. For example, in *City of*

*Mesquite v. Aladdin's Castle, Inc.*, the Supreme Court held that a challenge to a city ordinance was not moot because the "city's repeal of the objectionable language [in an ordinance] would not preclude it from reenacting precisely the same provision." 455 U.S. 283, 289 (1982)*; see also Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661-62 (1993) (same). In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, Missouri's rescission of a policy prohibiting religious organizations from receiving certain grants did not moot the case. 582 U.S. 449, 457 n.1 (2017). The same was true in *West Virginia v. EPA*, where the Court held the EPA's statements that it did not intend to enforce the Clean Power Plan were insufficient to establish mootness. 597 U.S. 697, 719-20 (2022). In none of these cases was the rescission of the challenged action sufficient to show that the defendant would not resume the action "if th[e] litigation [was ultimately] resolved in its favor." *Parents Involved in Comm. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 719 (2007).

Nor can Defendants rely on the presumption of regularity to get them over the line. Mot. at 19-20. As the Supreme Court has recently explained, the defendant has a "formidable burden" under the voluntary cessation doctrine to establish that it will not "resume its challenged conduct . . . at some more propitious moment," and that burden "holds for governmental defendants no less than private ones." *Fikre*, 601 U.S. at 241-43. In *Fikre* and the cases noted above, courts required more than just the government's say-so. Indeed, "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952).

The voluntary cessation doctrine "is grounded in concerns that a party may be manipulating the judicial process through the false pretense of singlehandedly ending a dispute" and, therefore,

"the prospect of manipulation gives [the court] reason to doubt the party's claim that it will not resume the challenged activities once the court dismisses the challenge." *Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n.*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (cleaned up). This animating legal principle is incompatible with a presumption that the government's statements are, on their own, sufficient to establish mootness. Thus, courts must not take "formally announced changes to official governmental policy" at their word, and must examine whether such announcements "are not mere litigation posturing." *People for Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 157 (D.C. Cir. 2019) (cleaned up). Here, that means Defendants must show that "it is absolutely clear that the" Anti-Weaponization Fund "could not reasonably be expected to recur," *Laidlaw*, 528 U.S. at 189, and the Court may not simply accept Defendants' purported rescission of the Fund and their bare representations that it will not move forward as conclusive evidence of this fact.

Even if Defendants could rely on the presumption of regularity here, there is "clear evidence" to rebut the presumption. *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024). While this Court previously determined at the preliminary injunction posture in *CREW* that the case was moot, in part, by relying on the presumption of regularity, Memorandum Op., *Citizens for Resp. & Ethics v. DOJ*, No. 26-cv-01789-RJL, ECF No. 20 (June 23, 2026), that preliminary ruling does not prevent this Court from taking a "fresh look" with the benefit of full briefing. *See Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974). And, upon a fresh look, there is good reason not to apply the presumption. First, the timing of the rescission—after the Anti-Weaponization Fund was challenged in several cases and one court issued temporary relief precluding the government from moving forward with the Fund—counsels against applying the presumption of regularity. *See Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (case

was not moot where actions constituting purported cessation occurred after the Supreme Court granted certiorari); *cf. Nat'l Council of Nonprofits v. OMB*, --- F.4th ----, 2026 WL 2451517, at *7 (D.C. Cir. Aug. 21, 2026) (timing was "pivotal" for purposes of voluntary cessation because it showed that the government rescinded the challenged policy at a time when it had no knowledge of the plaintiffs' suit).

Second, there is a "disconnect" between Defendants' purported rescission of the Fund and other actions that suggest the rescission is merely a pretext for purposes of litigation. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (court need not "ignore the disconnect between the decision made and the explanation given" when reviewing agency action). For instance, Defendants have defended the legality of the Anti-Weaponization Fund, the Settlement Agreement, and the Order in this forum and others, undermining any assumption that they will not simply return to the conduct at "some more propitious moment." *Fikre*, 601 U.S. at 243; *see Parents Involved*, 551 U.S. at 719 (case was not moot, in part, because the school district continued to "vigorously defend" the constitutionality of the challenged policy even after it was rescinded). In the *Trump v. IRS* litigation, the DOJ has appealed the district court's sanctions order and lodged an appearance in the appeal by the Trump plaintiffs and their counsel to argue that the district court did not have the "authority" to "address, criticize, review, or limit (even indirectly) the Settlement Agreement in any way." *Trump v. Thirty-Five Former Fed. Judges*, No. 26-12692, ECF No. 10, at 18 (11th Cir. Aug. 12, 2026); *Trump v. IRS*, No.1:26-cv-20609, ECF No. 129 (S.D. Fla. Sept. 11, 2026). And, in the Eastern District of Virginia, Defendants refused to submit a written declaration that the Fund would not move forward, and they continue to vigorously defend the Fund's legality in that case. *See* Def.'s Notice of Filing, *Floyd v. DOJ*, No. 1:26-cv-01399-LMB, ECF No. 93 (E.D. Va. Jun. 19, 2026). The government's robust defense of the Fund, the Settlement Agreement,

and the Order indicates that their claim that the Fund is not moving forward is insincere—or else the government would not continue to defend these actions.

The government's public statements and actions also indicate the rescission is a pretext. Since Defendant Blanche first stated that the Fund was not moving forward, President Trump, those around him, and even Defendants themselves have consistently undermined those assertions by casting doubt on Defendant Blanche's statements and articulating their intent to compensate the January 6 insurrectionists. *See supra* Statement of Facts, Section III. Defendant Blanche has refused to rule out the possibility that the DOJ will compensate the January 6 insurrectionists. *See supra* note 12. And, Defendant Blanche only issued the Rescission Order when it became clear that his failure to do so would jeopardize his chance at becoming Attorney General. The day after Defendant Blanche issued the Rescission Order, President Trump again undermined Defendant Blanche's representations by reiterating his support for compensating the insurrectionists. *See supra* note 17. These developments—several of which post-date this Court's order in the *CREW* case—show that the court must not rely on the Defendants' rescission on paper.

Even worse, Defendants' belated rescission of the Fund is ineffective. *True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) (defendants must "establish cessation, not near cessation"). The Settlement Agreement and the Order are an integrated document. *See* Settlement Agreement, ¶IV.A ("An accompanying order of the Attorney General . . . shall establish funding and any other relevant requirements, rules, conditions, terms, and waivers, which shall be treated as incorporated herein."); *id.* ¶VII ("This Settlement Agreement, including the accompanying orders by the Attorney General, constitutes the entire agreement of the Parties[.]"). And the Settlement Agreement specifically states that the integrated document can only be modified by written agreement of both parties in the *Trump v. IRS* litigation. *Id.* ¶VIII. Thus, Defendant Blanche's

unilateral rescission of the Order is prohibited by the Settlement Agreement's express terms. Nor have Defendants provided any indication that President Trump, their purported adversary in the Southern District of Florida, has acquiesced in writing to any modifications of the Settlement Agreement and the Order. In fact, in his testimony before the Senate, Defendant Blanche admitted that President Trump could try to enforce the Settlement Agreement. *See supra* note 11 at 51:19-23. Defendants' purported unilateral rescission of the Order, therefore, has dubious legal effect.

Finally, Defendants' inability to unilaterally rescind the Anti-Weaponization Fund also means that they have not "completely and irrevocably eradicated the effects of the alleged violation." *Aref*, 833 F.3d at 251. Consider the D.C. Circuit's decision in *McBryde*. There, the judge challenged several sanctions imposed by the Judicial Council, including the public reprimand, a one-year suspension of the assignment of new cases, and a three-year suspension of the judge's ability to preside over cases involving the lawyers who participated in the investigation of the judge. *McBryde*, 264 F.3d at 54-55. The D.C. Circuit held that the judge's challenges to the one-year and three-year suspensions, respectively, were moot because those actions had expired. *Id.* However, the judge's challenge to the public reprimand was not moot because the reprimand continued to be posted on the Fifth Circuit's website, it was "part of the historical record" and it, therefore, still had a continuing effect on the judge's reputation. *Id.* at 57.

Like *McBryde*, the Settlement Agreement and the Order continue to inflict harm on Plaintiffs even if the Fund never becomes fully operational. That is because Plaintiffs' harm is not solely prospective; rather, the failure to eradicate the lingering effects of the Settlement Agreement and the Order causes Plaintiffs ongoing reputational harm because both documents allege that Plaintiffs engaged in wrongdoing for which a compensation mechanism is necessary. As in *McBryde*, both the Settlement Agreement and the Order remain publicly available on the DOJ's

website.[18] And, as explained above, the DOJ has taken the affirmative step of defending the Settlement Agreement and the Order in the Eleventh Circuit and other forums. *See, e.g.*, *Trump v. Thirty-Five Former Fed. Judges*, No. 26-12692, ECF No. 10, at 18 (11th Cir. Aug. 12, 2026). Thus, the government continues to defend, and seeks to vindicate, the Fund's founding documents, all of which mark Plaintiffs' work as prosecutors as unethical and worthy of a formal apology from the United States government. *See Foretich*, 351 F.3d at 1213 (ongoing reputational harm from an "unexpired and unretracted" government action is a cognizable injury). The Settlement Agreement and the Order are, therefore, akin to the reprimand in *McBryde* and inflict ongoing harm on Plaintiffs no matter the purported operational status of the Fund.

**C. The Case is Ripe.**

Lastly, the case is ripe. When evaluating ripeness, courts consider: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Both prongs support the conclusion that Plaintiffs' claims are ripe for adjudication.

First, the issues raised by Plaintiffs are fit for judicial decision. In that inquiry, courts examine "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Clean Air Implementation Project (CAIP) v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (cleaned up). Here, Plaintiffs' claims are "purely legal" and, therefore, "presumptively reviewable." *Nat'l Ass'n of Home Builders v. U.S. Army Corps. of Engineers*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (cleaned up); *see also Atlantic States Leg. Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) ("Claims that

[18] *See* Settlement Agreement, https://www.justice.gov/opa/media/1441201/dl?inline; Order, https://www.justice.gov/opa/media/1441086/dl.

an agency's action is arbitrary and capricious or contrary to law present purely legal issues.").

Contrary to Defendants' argument, Plaintiffs' claims do not depend on any future events or contingencies. *See* Mot. at 17 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)). Plaintiffs challenge the DOJ's decision—memorialized in the Settlement Agreement and the Order—to establish the Fund. Defendants attack a straw man by deeming the challenge to be about subsequent decisions by the Fund to award relief to particular claimants. Whether Members have been appointed, claims procedures have been established, claimants have submitted money, or even whether the Fund will go forward at all, Mot. at 17, are irrelevant to Plaintiffs' claims. The Court can still adjudicate whether the Fund was lawfully created in the first place, and whether the Settlement Agreement and the Order have any legal basis. *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."); *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282 ("[W]e cannot accept the Corps' argument that the appellants' purely legal challenge is unfit for review . . . . because their applicability to a given activity remains within the Corps' discretion."). Thus, there is no need for "further factual development . . . to clarify the issues" raised by Plaintiffs. *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999) (cleaned up).

Second, for similar reasons, declining to adjudicate the case will cause Plaintiffs hardship. As explained, *supra* Argument Section I.A., the existence of the Settlement Agreement, the Order, and the Anti-Weaponization Fund have caused Plaintiffs "immediate, direct, and significant" reputational harm by branding Plaintiffs as unethical prosecutors. *State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d 474, 479-80 (D.C. Cir. 1986); *see also* Compl. ¶¶ 119-57 (detailing the harms suffered by Plaintiffs). These harms—and the resulting personal and professional repercussions—

are ongoing because the Settlement Agreement and the Order remain part of the public record. On the other hand, there is "no institutional interest . . . support[ing] postponement" because Plaintiffs' claims present purely legal issues for which factual development is unnecessary. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1283; *see also Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990) ("Where . . . there are no significant agency or judicial interests militating in favor of delay, lack of hardship cannot tip the balance against judicial review." (cleaned up)). As such, Plaintiffs' claims are ripe for judicial review.

## II. Plaintiffs Have Plausibly Alleged Claims Under the APA.

The Anti-Weaponization Fund violates the APA because (1) the creation of the Fund is "final agency action[s]" subject to APA review, (2) the Fund is not in accordance with, and in excess of, Defendants' statutory authority, (3) the Fund is not in accordance with, and contrary to, multiple constitutional provisions, (4) Defendants' actions were arbitrary and capricious, and (5) Defendants did not follow the procedure required by law because they failed to provide any opportunity for notice and comment.

### A. The Creation of the Anti-Weaponization Fund Constitutes Final Agency Action.

The creation of the Anti-Weaponization Fund is reviewable because it constitutes "final agency action" under the APA. 5 U.S.C. § 704. To be final, an agency action "must 'mark the consummation of the agency's decisionmaking process'" and it "'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Here, again, both elements of this test support the conclusion that the creation of the Fund is final and reviewable.

First, the creation of the Fund represents the consummation of the DOJ's decision-making process. The APA expressly defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551. Defendants suggest that there is no final agency decision until the *Fund* decides to award relief, Mot. at 26 (emphasis added), but that misses the mark. Plaintiffs challenge the DOJ's action, which is the creation of the Fund, and that action is final. For example, the Settlement Agreement states that the settlement and the creation of the Fund is intended to "FOREVER" and "FINALLY" settle the *Trump v. IRS* litigation. Settlement Agreement ¶II.D. Pursuant to the Settlement Agreement, the DOJ issued the Order that, in no uncertain terms, establishes the Fund. Subsequent decisions by the Fund's members—to establish formal processes or to pay out individual claims, *see* Mot. at 26,—are irrelevant to Plaintiffs' claims against Defendants. And, in any event, the "possibility" that an agency decision may be revised, revisited, or modified "does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Engr's v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *see also Robert F. Kennedy Hum. Rights v. Dep't of State*, 2026 WL 820811, at *17 (D.C. Cir. Mar. 25, 2026) (neither the "nonbinding character" of agency action "nor its susceptibility to subsequent modification defeats consummation" where the action was "executed, publicly disclosed, and promptly implemented").

Second, the creation of the Anti-Weaponization Fund is a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Safari Club*, 842 F.3d at 1289 (cleaned up). "[W]hether an agency action has direct and appreciable legal consequences is a pragmatic inquiry." *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (cleaned up). Under that pragmatic inquiry, the Settlement Agreement and the Order clearly have "direct and appreciable" legal consequences, *id.* at 635 (cleaned up), where,

among other things, they: (1) establish funding for the Fund, Settlement Agreement ¶IV.A; Order ¶C, (2) empower the Fund to determine its own procedures for adjudicating claims, Settlement Agreement ¶IV.C; (3) provide the Fund with the "power to issue formal apologies" and monetary relief, *id.* ¶IV.D; (4) establish audit procedures for claims submitted to the Fund, *id.* ¶IV.F; (5) identify the date on which the Fund will be terminated, *id.* ¶IV.G; and (6) state the criteria for claimants seeking compensation from the Fund, *id.* ¶¶ V.A-G. These rules are not simply "advisory," but rather they "alter the legal regime" as least as it relates to the Fund's claimants. *Bennett*, 520 U.S. at 178.

Put differently, the Settlement Agreement and the Order "command[]," "require[]," "order[]," and "dictate[]" certain actions. *Appalachian Power Co.*, 208 F.3d at 1023. For instance, the Settlement Agreement repeatedly uses the word "shall," including when it states that the Attorney General "shall establish funding and any other relevant requirements" for the Fund "within 30 days," Settlement Agreement ¶IV.A, and that the Fund "shall have the power to issue formal apologies [and] monetary relief," *id.* ¶IV.D. Because the Settlement Agreement and the Order contain directives with legal consequences, they are final agency actions subject to judicial review.

Finally, Defendants' analogy to several grant making cases is inapposite. Mot. at 27-28. All of those cases involved situations in which the agency had not yet decided how and whether to use certain Congressionally-appropriated funds. *See Karst Env't Educ. & Prot. Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (Department of Housing and Urban Development had not taken any action on grant application at the time motion to dismiss was filed and had not "obligated" the money when reply brief was filed); *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 831 (11th Cir. 2026) ("The agency has taken no action to fund the

project." (cleaned up)); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (holding that "Congress's appropriation of" money to the EPA for a specific project "does not constitute a final agency action" until the EPA decides to disburse the funds to the project). By contrast, here, Defendants *have* made the decision to use funds in a specific, concrete, and unlawful way: to create the Anti-Weaponization Fund. The Court need not wait for the next step—when money is awarded or disbursed to individual claimants from the Fund—to review the DOJ's decision to create the Fund itself.

### B. The Creation of the Anti-Weaponization Fund is Not in Accordance With, and in Excess of, Defendants' Statutory Authority.

Defendants have little to say about the merits of Plaintiffs' claims. They offer virtually no argument against Plaintiffs' claim that the Anti-Weaponization Fund violates the APA because it is not in accordance with, and in excess of, the statutes governing the payment of compromise settlements by the federal government. *See* 5 U.S.C. §§ 706(2)(A), (C). Indeed, there is no statute that provides Defendants with the authority to settle a collusive lawsuit via the creation of a $1.776 billion fund designed to compensate claimants who were not involved in the underlying lawsuit.

The authorities on which Defendants purport to rely in the Settlement Agreement provide no legal basis for their conduct. They cite the Judgment Fund statute, 31 U.S.C § 1304, *see* Order ¶G, which provides that the DOJ may enter "compromise settlements" when "(1) payment is not otherwise provided for; (2) payment is certified by the Secretary of the Treasury; and (3) the judgment, award, or settlement is payable" pursuant to other statutory provisions. As relevant to the third condition, 28 U.S.C. § 2414 provides for the payment of "compromise settlements . . . for defense of imminent litigation or suits against the United States." *See also* 31 C.F.R. § 256.1(a) (Judgment Fund is only available for "settlement of claims arising under actual or imminent litigation").

Sections 1304 and 2414 do not provide any basis for the Anti-Weaponization Fund. First, these statutes provide no support for Defendants to create a fund that would make payments to third parties—whose hypothetical claims have nothing whatsoever to do with the *Trump v. IRS* lawsuit. Second, because the very lawsuit that sparked the settlement was collusive and therefore could not be heard in a federal court, the Judgment Fund is not available. A collusive settlement over which no court has jurisdiction is not "actual or imminent litigation." 31 C.F.R. § 256.1(a). As the Government Accountability Office ("GAO") explains, the statement in § 2414 "for defense of imminent litigation or suits against the United States" requires that "[t]he agency . . . be confronted with a genuine disagreement or impasse . . . . There must be a legitimate dispute over either liability or amount." U.S. Gov't Accountability Off., GAO-08-978SP, 3 *Principles of Federal Appropriations Law* 14-34 & 14-35 (3d ed. 2008). After all, "the Judgment Fund is limited to litigative awards, meaning awards that were or could have been made in a court." Vivian S. Chu & Brian T. Yeh, *The Judgment Fund: History, Administration, and Common Usage*, Cong. Research Serv., R42835 at 6 (2013). Article III of the Constitution, however, makes plain that the judicial power extends only to "the right to determine actual controversies arising between adverse litigants," *Muskrat v. United States*, 219 U.S. 346, 361 (1911), and not to collusive lawsuits, *Flast v. Cohen*, 392 U.S. 83, 100 (1968) (describing adverseness as prohibiting suits that are "friendly," "feigned," or "collusive"). President Trump's lawsuit was clearly collusive; indeed, the court in the Southern District of Florida has determined as much. *See, e.g.*, *Trump v. IRS*, No. 1:26-cv-20609, --- F. Supp. 3d ----, 2026 WL 2015525 (S.D. Fla. Jul. 13, 2026). Thus, the President and his family's claims against the IRS and Treasury were not legitimate disputes that Defendants had authority to settle through the establishment of the Anti-Weaponization Fund.

Defendants do not dispute the collusive nature of the *Trump v. IRS* lawsuit, nor do they dispute that the would-be beneficiaries of the Fund are unrelated to the *Trump v. IRS* lawsuit. Instead, their only response is that the Settlement Agreement says the Fund would only grant relief to claimants "asserting at least one legal claim" and that the Fund would assess the "strength of the claim." Mot. at 29. But that is an argument about the hypothetical justification for a particular claim on a standalone basis; it is not a justification for the issuance of the Settlement Agreement and the Order that created the Fund via a collusive settlement.

Nor is Defendants' argument sufficient to justify the Fund. The regulations interpreting the Treasury's authority to pay compromise settlements state that "amounts owed under compromise agreements negotiated by [the DOJ] in settlement of claims arising under actual or imminent litigation are normally paid from the Judgment Fund, *if a judgment on the merits would be payable from the Judgment Fund*." 31 C.F.R. § 256.1(a) (emphasis added). Here, however, under the terms of the Settlement Agreement and the Order, individual claimants will submit claims for Judgment Fund money to the Anti-Weaponization Fund, and the Fund, rather than the DOJ, will determine whether, and how much, such third parties should receive. Further, these third-party claimants are able to receive money from the Judgment Fund without first obtaining a judgment against or entering a settlement with the United States, in contravention of the limits on the payment of compromise settlements.

Defendants' reference to the settlement in *Keepseagle* does not help them. Mot. at 29-30 (citing *Keepseagle* to justify the Anti-Weaponization Fund on various grounds). *Keepseagle*, was a court-reviewed class action settlement in a long-litigated case. As the *Trump v. IRS* court explained: "In *Keepseagle*, the parties—including the Department of Agriculture represented by the DOJ—engaged in a decade-long litigation regarding alleged discrimination perpetrated against

thousands of Native American framers and ranchers who had been illegally denied farm loans and access to benefit programs." *Trump*, 2026 WL 2015525, at *13. Before the settlement was finalized, the parties "propounded notice to putative class members regarding a proposed class settlement; defined the mechanisms of class claims for recovery; and participated in an hours-long fairness proceeding, where every person who attended was heard." *Id.* Here, however, "the DOJ chose to bypass notice, adversarial advocacy, legal analysis, and court review altogether to go straight to creating" the Fund "for non-parties with no pending claims against the United States." *Id.* at *13 n.40. Neither *Keepseagle* nor any other case provides an analogy to the unlawful creation of the Fund. For all these reasons, the establishment of the Fund is in not in accordance with, and in excess of, any statutory authority.

### C. The Creation of the Anti-Weaponization Fund is Not in Accordance With, and Contrary to, Several Constitutional Provisions.

Besides rehashing their mootness arguments, Defendants also offer little to no response to Plaintiffs' claims that the creation of the Anti-Weaponization Fund violates several Constitutional provisions and principles. *See* 5 U.S.C. §§ 706(A), (B) (providing that a court may set aside an agency action where it is "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity"). These include (1) the Spending and Appropriations Clauses, (2) the Appointments Clause, (3) separation of powers principles, (4) the First Amendment, (5) the Fifth Amendment's equal protection guarantee, and (6) the Fourteenth Amendment. Plaintiffs address each in turn.

#### 1. The Spending and Appropriations Clauses

*First*, the creation of the Anti-Weaponization Fund violates the Spending Clause and the Appropriations Clause. The Spending Clause gives Congress the "Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United

States." U.S. Cont. art. I, § 8, cl. 1. The Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. These provisions reflect the founding principle that Congress, rather than the Executive, has the "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (cleaned up). Indeed, by giving the legislature exclusive authority over spending and appropriations, the Framers sought "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of [g]overnment agents or the individual pleas of litigants." *OPM v. Richmond*, 496 U.S. 414, 428 (1990).

Defendants have completely usurped Congress's power here. They have taken money appropriated under the Judgment Fund, 31 U.S.C. § 1304, and used it for purposes that have no relation to the purported, statutorily authorized use of that money. Such use of Congressional appropriations without any statutory authorization violates the Constitution. *See Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress."); *Reeside v. Walker*, 52 U.S. 272, 291 (1850) ("It is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress.").

**2. The Appointments Clause**

*Second*, the Anti-Weaponization Fund violates the Appointments Clause, which requires that officers of the United States either be appointed by the President with the advice and consent of the Senate or that Congress vest the "appointment [of officers] 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759-60 (2025) (quoting Art. II, § 2, cl. 2). Neither has occurred here; instead, the Settlement

Agreement provides that the five members of the Fund shall be appointed by the Attorney General, Settlement Agreement ¶IV.A, and Congress has not vested the Attorney General with such appointment powers.

There is no doubt that the members of the Fund are officers subject to the Appointment Clause's limitations. Officers exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (cleaned up). Here, the Fund members are to be the ultimate arbiters of whether to pay funds to individuals claiming grievances against the federal government, and the Fund members' apparently unfettered power spans both procedure, *see* Settlement Agreement at ¶IV.C ("Fund shall have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims."), and substance, *see id.* ¶IV.D ("Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies."). In fact, the decisions made by members of the Fund are not reviewable at all. *See id.* ¶VI.B ("[T]here shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by" the Fund).

Thus, the Fund members will "make[] decisions and issue[] directives" on "weighty" matters like when, and how, the government should provide recompense and monetary relief for alleged wrongs committed by government officials. *New Mexico v. Musk*, 824 F. Supp. 3d 80, 102-03 (D.D.C. 2026) (holding an individual was an officer subject to the Appointment Clause when he had great control over, among other things, the use of money appropriated by Congress). They are, therefore, at the very least, akin to a postmaster first class, *Myers v. United States*, 272 U.S. 52 (1926), the clerk of the district court, *Ex Parte Hennen*, 38 U.S. 225 (1839), the special trial

judges on the Tax Court, *Freytag v. Commissioner*, 501 U.S. 868 (1991), and the administrative law judges at the SEC, *Lucia*, 585 U.S. at 243, all of whom have been found to be officers of the United States subject to the Appointments Clause's limitations.

Defendants' attempt to analogize the Fund members to special masters fails. *See* Mot. at 31 (arguing the Fund members are like special masters because they are hired on a "temporary episodic basis," their "positions are not established by law," and their "duties and functions are not delineated in a statute" (citing *Freytag*, 501 U.S. at 881)). When Article III judges appoint special masters under Rule 53, they retain significant discretion and control over the special master's decisions. *See* Fed. R. Civ. P. 53(f) (identifying the actions a court may take with respect to the special master's decisions, including "adopt[ing], modify[ing]," and "wholly or partly reject[ing] or revers[ing]" the special master's "order[s], report[s], [and recommendations]"). By contrast, here, the Fund members' decisions are wholly unreviewable by Article III judge or otherwise. Settlement Agreement ¶VI.B.

And, when special masters do have responsibilities akin to those of the Fund members—such as evaluating and paying claims on behalf of the government—their appointment is vested in an Executive officer or court of law in accordance with the Appointments Clause. *See, e.g.*, 34 U.S.C. § 20144(b)(1)(A)(i) (providing that the Attorney General shall appoint a special master to administer a compensation fund for victims of state sponsored terrorism); 42 U.S.C. § 300aa-12(a), (c) (providing that special masters appointed by the judges of the Court of Federal Claims shall have jurisdiction in proceedings pursuant to the National Vaccine Injury Compensation Program); Pub. L. No. 107-42, tit. IV, § 404, 115 Stat. 230, 237 (2001) (codified at 49 U.S.C. § 40101 note) (providing that the Attorney General shall appoint a special master to oversee the compensation fund for victims of the September 11 terrorist attacks). Here, Congress has not even statutorily

created the Anti-Weaponization Fund, let alone authorized the Attorney General to appoint Fund members.

Finally, Defendants' argument that there can be no Appointments Clause violation because the Fund members have not yet been appointed is also unavailing. A structural violation of the Constitution—such as an Appointments Clause violation—creates a "here-and-now injury on affected third parties" like Plaintiffs. *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (cleaned up). Moreover, the Appointments Clause states that federal offices "shall be established by Law." Art. II, § 2, cl. 2; *see also Trump v. United States*, 603 U.S. 593, 643 (Thomas, J., concurring). As explained above, Congress has not enacted any law creating the Fund. Thus, the constitutional violation is not simply the failure to abide by the Appointments Clause's procedures for appointing officers; rather, it is also the creation of a federal office out of whole cloth without any Congressional statute.

**3. The Separation of Powers**

*Third*, for similar reasons, the creation of the Anti-Weaponization Fund also violates the constitutional separation-of-powers. The Constitution vests "[a]ll legislative Powers . . . in [the] Congress of the United States." U.S. Const. art. I, § 1. It is axiomatic that the Executive may not exercise legislative power, including the powers to create and fund agencies, set rules for the operation of those agencies, *see, e.g.*, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010), and spend money, *see Cincinnati Soap*, 301 U.S. at 321. Here, as explained above, Defendants have created a sub-agency—the Anti-Weaponization Fund—and given that agency, and its officers, the authority to spend billions of dollars without any Congressional statute, approval, or oversight. *See* Art. II, § 2, cl. 2 (federal offices must be

"established by Law"). Thus, Defendants have improperly usurped the powers given exclusively to Congress in the Constitution.

**4. The First Amendment**

*Fourth*, the Anti-Weaponization Fund violates the First Amendment. By its terms, the Fund makes clear that it is only intended to compensate those who were harmed by Democratic administrations for their right-leaning speech and conduct. *See, e.g.*, Settlement Agreement ¶II.C (defining "Lawfare and Weaponization" to only include alleged harms caused by "Democrat[s]"). Indeed, Defendants and President Trump have consistently harped on examples of alleged weaponization solely by Democratic administrations. *See, e.g.*, *id.* ("Other well-known examples of Lawfare and Weaponization including the Biden Administration's abuse of the FACE Act, the Biden Administration's wrongful labeling of certain parent's domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria."). Through their actions and statements, Defendants have made clear that the Fund is not open to those who were harmed by Republican administrations because of their purported left-leaning speech. Therefore, contrary to Defendants' bare assertion to the contrary, Mot. at 31, the Fund does not apply to both Democrats and Republicans.

The distinction drawn by the Fund is clearly content-based and subject to "the most exacting scrutiny." *Mahoney v. Babbitt*, 105 F.3d 1452, 1455 (D.C. Cir. 1997) (cleaned up). Even worse, the Fund's distinction constitutes presumptively unconstitutional viewpoint discrimination because the Fund does not simply target "subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *id.* at 830 ("[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional[.]"); *see also Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 82-83 (D.D.C.

2026) ("The government may not use its authority—including its purse strings—to suppress viewpoints that it dislikes."). That is, the Fund "denies access to . . . speaker[s] solely to suppress the point of view [they] espouse[.]" *A.N.S.W.E.R. Coalition v. Kempthorne*, 537 F. Supp. 2d 183, 195-96 (D.D.C. 2008) (cleaned up). Furthermore, there is no possible compelling governmental interest justifying Defendants' conduct here.

Nor is this a situation in which the government is simply "selectively fund[ing] a program" without "seek[ing] to leverage funding to regulate speech outside the contours of the program." *See* Mot. at 31 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) and *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013)). *Rust* involved "limit[s] [on] the ability of Title X fund recipients to engage in abortion-related activities," 500 U.S. at 177-78, and *Alliance for Open Society* involved statutory provisions that forbid the provision of funds to nongovernmental organizations that did "not have a policy explicitly opposing prostitution and sex trafficking," 570 U.S. at 208 (cleaned up). In both cases, the government purported to use "private speakers to transmit specific information pertaining to its own program." *Rosenberger*, 515 U.S. at 833. As the Supreme Court explained, when the government engages in such conduct, it "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee."[19] *Id.*

However, with respect to the Fund, the government is not choosing activities or messages to subsidize in order to communicate its own policies. *See Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (*Rust*'s reasoning does not apply when the government "program was designed to facilitate private speech, not to promote a governmental message."). Instead, the Fund

[19] In any event, the Supreme Court found that the restriction in *Alliance for Open Society* was unconstitutional. *See* 570 U.S. at 221.

is intended to provide prospective benefits to a broad class of private claimants. In this context, when the government creates a generally available funding program, it must remain viewpoint neutral. *See Rosenberger*, 515 U.S. at 834 ("[W]e reaffirmed the requirement of viewpoint neutrality in the [g]overnment's provision of financial benefits[.]"); *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (government may not "use the power of the [s]tate to punish or suppress disfavored expression").

Take, for example, the recent decision in *National Public Radio*. There, National Public Radio ("NPR") and Public Broadcasting Service ("PBS") challenged an Executive Order ending their federal funding across all agencies and programs. *Nat'l Pub. Radio*, 827 F. Supp. 3d at 58. This Court explained that while the government could "fund its own speech and may fund government programs that promoted specific perspectives on issues of public importance," it may not use its funding power to punish speech it does not like. *Id.* at 59. And, it concluded that the Executive Order "crosse[d] that line" because it did "not define or regulate the content of government speech or ensure compliance with a federal program," or "set neutral and germane criteria that appl[ied] to all applicants for a federal grant program;" rather, it "single[d] out two speakers and, on the basis of their speech, bar[red] them from all federally funded programs." *Id.* The same is true here: Defendants have singled out Plaintiffs and other similarly situated private individuals and denied them a benefit based solely on their speech. *See United States v. Am. Library Ass'n*, 539 U.S. 194, 210 (2003) ("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit."(cleaned up)). Thus, the Anti-Weaponization Fund violates the First Amendment.

**5. The Fifth Amendment**

*Fifth*, and for similar reasons, the Anti-Weaponization Fund violates the guarantee of equal protection. The Fifth Amendment's Due Process Clause prohibits the denial of equal protection of the laws by federal government actors. *See Weinberger v. Weisenfeld*, 420 U.S. 636, 638 n.2 (1972) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."). The federal government, therefore, must treat "all persons similarly situated . . . alike." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Here, however, the federal government has chosen to distribute billions of dollars in federal funds to one group (those allegedly harmed because of their right-leaning speech by Democratic officials) and not another (those harmed by Republican officials for their purported left-leaning speech). There is no basis for this distinction—indeed, it is simply motivated by Defendants' political animus. *See City of Cleburne*, 473 U.S. at 447 ("[A] bare desire to harm a politically unpopular group [is] not [a] legitimate state interest." (cleaned up)).[20]

**6. The Fourteenth Amendment**

*Sixth*, the creation of the Anti-Weaponization Fund violates the Fourteenth Amendment, which prohibits "the United States . . . [from] assum[ing] or [pay]ing any debt or obligation incurred in aid of insurrection or rebellion against the United States." U.S. Const. amend. XIV, §

[20] *See also City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 74 (D.D.C. 2026) (federal government violated Fifth Amendment when it "made grant-termination decisions primarily—if not exclusively—based on whether the awardee resided in a state whose citizens voted for President Trump in 2024"); *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the Fifth Amendment's guarantee of equal protection under the law, however, settling personal vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government or an American President.").

4. Here, the events on January 6 were an "insurrection." *See* Compl. ¶38 (and sources cited therein). And, as explained elsewhere herein, President Trump, and others have explicitly claimed that the Fund is intended to pay for the "debt[s]" incurred by the January 6 insurrectionists, including their attorneys' fees. *See, e.g.*, *id.* ¶104 ("This is reimbursing people that were horribly treated, horribly treated . . . They have been weaponized. They have been, in some cases, imprisoned wrongly. *They paid legal fees that they didn't have [to pay]. They have gone bankrupt. Their lives have been destroyed*." (emphasis added)). Thus, Plaintiffs have alleged more than a mere "possibility," Mot. at 32, that the insurrectionists will benefit from the Fund, in violation of the Fourteenth Amendment.

**D. The Creation of the Anti-Weaponization Fund Was Arbitrary and Capricious.**

The creation of the Anti-Weaponization Fund is also arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A). To the extent Defendants suggest that the creation of the Fund is not subject to arbitrary and capricious review because it was achieved through the "settlement of litigation," they are wrong. *See* Mot. at 32. Plaintiffs are not challenging the discretionary decisions to settle any particular case. Instead, they are challenging the creation of the Fund itself—which, as explained above, is a final agency action subject to APA review.

On the merits, Defendants have not "articulate[d] a satisfactory explanation for [their] action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The DOJ has long been aware of the limitations on the use of compromise settlements to make payments to third parties via the Judgment Fund. The Justice Manual § 4-3.400 requires that any compromise entered by the DOJ be "specifically limited to the immediate subject matter of the claim which was in fact

compromised." Moreover, the Justice Manual requires all third-party payments in a settlement to "have a strong connection to the underlying violation or violations of federal law at issue." *Id.* § 1-17.000. Yet Defendants ignored those limitations here.

The DOJ's failure to follow its own rules is arbitrary and capricious. The creation of the Anti-Weaponization Fund was entirely irrational where the claims in the *Trump v. IRS* litigation were meritless, the parties were not adverse, and the beneficiaries of the Fund are not connected in any way to the underlying litigation. Moreover, beyond the farcical justification of alleged "weaponization" by "Democrat" officials—an accusation that is untrue and harms Plaintiffs—Defendants have not offered any explanation as to why the Fund is necessary. As just one example, the sum of money allotted to the Fund—$1.776 billion—is obviously fabricated and completely unrelated to any rational calculation of the United States' liability to any potential claimants. Even taking Defendants' "weaponization" assertions at face value, the DOJ has not provided any explanation as to why such assertions made it necessary to deviate from its own rules and policies regarding compromise settlements. *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) ("Under [the change in position doctrine], agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." (cleaned up)). As such, the creation of the Fund was arbitrary and capricious.

**E. Defendants Did Not Follow the APA's Notice and Comment Requirements.**

The Anti-Weaponization Fund was created "without observance of procedure required by law" because Defendants did not engage in notice and comment rulemaking before creating the Fund. 5 U.S.C. § 706(2)(D); *see* 5 U.S.C. § 553 (identifying the rulemaking requirements, including notice and comment). The creation of the Fund is subject to notice and comment

rulemaking because it is "generally applicable" and has "future effect." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332-33 (D.C. Cir. 2017). Defendants' establishment of a $1.776 billion dollar compensation fund for "weaponization" claims is not a "case-specific individual determination[,]" but rather a "broad application[] of . . . general principles." *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017). And, by definition, the creation of the Fund and the operation of its rules have prospective application, at least with respect to the claimants who will apply for Fund monies. *See Safari Club*, 878 F.3d at 333 ("Rules generally have only 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions.").

Defendants incorrectly characterize Plaintiffs' claim as conclusory, Mot. at 29, ignoring numerous paragraphs in the Complaint tracing the basis for the lack of notice and comment claim. That includes allegations about the circumstances that led to the creation of the Fund, Compl. ¶¶83-100, and the details of the Fund, *id.* ¶¶101-118, such as the Fund's definition of "Lawfare and Weaponization," *id.* ¶102, the Order's direction of a payment of $1,776,000,000 to the Fund, *id.* ¶108, the composition of the Fund's members, *id.* ¶112, the duration of their membership, *id.*, the procedures for appointing and removing the Fund's members, *id.* ¶¶113-14, the Fund's powers to "issue apologies and monetary relief as well as to receive and request evidence from or in consultation with other federal agencies," *id.* ¶115, and the powers of Fund members to determine the process for receiving claims, *id.* ¶116. The Complaint provides more than sufficient detail about the Fund, its creation, and its operation, from which this Court can conclude that it is plausible that the Fund is a generally applicable agency action with prospective effect. Thus, Plaintiffs have adequately alleged that the creation of the Fund is a rule subject to notice and comment rulemaking, and Defendants do not contend that they engaged in any part of the notice and comment process here. Plaintiffs' notice and comment claims must survive Defendants' motion to dismiss.

### III. Plaintiffs Have Plausibly Alleged Freestanding Constitutional and *Ultra Vires* Claims.

Lastly, Plaintiffs have adequately plead freestanding constitutional claims based on the Appropriations Clause, the Appointments Clause, and the separation of powers, as well as an *ultra vires* claim. The Court has inherent equitable authority to enjoin Defendants' unconstitutional actions. For example, in *Free Enterprise Fund*, the Supreme Court found no basis for the government's suggestion that Appointments Clause and separation-of-powers challenges contained no direct basis for relief. 561 U.S. at 491 n.2 (collecting cases); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing the "power of federal courts of equity to enjoin unlawful executive action" subject to statutory limits).

The D.C. Circuit's recent decision in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) does not alter that authority here. *See* Mot. at 33. In *Global Health Council*, the plaintiffs alleged that the President violated the Constitution when he impounded funds without complying with the Impoundment Control Act ("ICA"), the Anti-Deficiency Act, and the 2024 Appropriations Act. 153 F.4th at 10-11, 13. The D.C. Circuit held that the plaintiffs could not maintain freestanding constitutional claims because these "constitutional claim[s] [were] predicated on . . . violations," of the identified statutes. *Id.* at 17; *see also id.* at 15 ("[The] alleged statutory violations must be the predicate acts for the constitutional claim because without an appropriations statute there could be no proper impoundment."). Unlike in *Global Health Council*, Plaintiffs' freestanding constitutional and *ultra vires* claims are not based on statutory violations, which are separately alleged via the APA. Rather, these freestanding claims exist even if the Court disagrees with Plaintiffs on the APA excess-of-statutory-authority claims because Plaintiffs have separately, and adequately, alleged that Defendants acted contrary to constitutional principles and in the complete *absence* of any statutory authority that allows them to settle a collusive lawsuit by creating a new

agency, stock that agency with officers, and give the agency $1.776 billion to dole out. *See Global Health Council*, 153 F.4th at 13 (recognizing that a freestanding constitutional claim may stand where the Executive acts in the complete absence of authority); *see also League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 71-72 (D.D.C. 2025) (*Global Health Council* did not apply when the plaintiffs' "core separation-of-powers argument" was "not that the President failed to discharge statutory duties or strayed from procedures required by statute").

Plaintiffs reference certain statutes, such as the Judgment Fund statute and 28 U.S.C. § 2414, to illustrate Defendants' lack of statutory authority. *See* Order ¶G (identifying both statutes). But Plaintiffs' constitutional and *ultra vires* claims are not predicated on a violation of those statutes; their claims are that Defendants have acted completely outside of any authorization those statutes could purport to provide for Defendants' actions. *See, e.g.*, Compl. ¶188 ("[N]o statutory provision . . . authorizes Defendants to create the Anti-Weaponization Fund"); *id.* ¶232 ("The creation [of the Fund] violates the Appropriations Clause because Defendants are spending money from the Treasury without any Congressional authorization"); *id.* ¶239 ("The creation [of the Fund] violates the separation of powers because Defendants have . . . given the [Fund] authority to spend vast sums of money without any Congressional appropriation."). In other words, violations of the Judgment Fund statute and § 2414 are not the "predicate acts" for Plaintiffs' constitutional and *ultra vires* claims. *Global Health Council*, 153 F.4th at 15. Therefore, *Global Health Council* does not apply here.

Finally, even if the Court concludes that Plaintiffs' claims are based on statutory violations, Plaintiffs' freestanding Appointments Clause claim survives because *Global Health Council* does not reach claims based on a structural constitutional defect. *See* 153 F.4th at 14-15; *Free Enterprise Fund*, 561 U.S. at 491 n.2 (reviewing a separation of powers claim based on for-cause limitations

imposed on the removal of Board members); *Collins v. Yellen*, 594 U.S. 220, 250 (2021) (reviewing for-cause restriction on President's removal authority). The Appointments Clause claim here is a structural challenge; there is no predicate statutory violation because there is simply no statute to reference. Defendants have, instead, violated the plain provisions of the Appointments Clause by creating an office (the Fund) and providing for the appointment of officers (the Fund members) without following the requirements of the Appointments Clause.[21]

Plaintiffs' *ultra vires* claim also survives even if this Court concludes it is based on statutory violations. The *Global Health Council* court explicitly stated that *ultra vires* "review remains available to test . . . action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." 153 F.4th at 17 n.14. And, at the very least, Plaintiffs have plausibly alleged that Defendants' actions are a "clear departure" from their "statutory mandate[s]" and "blatantly lawless." *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022). By completely usurping Congress' power of the purse, Defendants have "exercise[d] immense power without any grant of statutory authority whatsoever." *Musk*, 824 F. Supp. 3d at 105 (cleaned up); *see id.* at 104 (plaintiffs adequately alleged an *ultra vires* claim where they alleged that the defendants were "directing agency officials to terminate grants, cancel payments, cut funding, and shutter agencies . . . without lawful authority"). Thus, there is no basis to dismiss Plaintiffs' freestanding constitutional and *ultra vires* claims.

## CONCLUSION

For all these reasons, the Court should deny Defendants' motion to dismiss.

---

[21] Indeed, Defendants do not contend that Plaintiffs' Appointments Clause challenge is barred by *Global Health Council*. Mot. at 33.

Dated: September 14, 2026

Respectfully submitted,

/s/ Conor Bradley

Matthew J. Platkin*
mplatkin@platkinllp.com
Angela Cai
acai@platkinllp.com
Ravi Ramanathan
rramanathan@platkinllp.com
Aaron E. Haier*
ahaier@platkinllp.com
Conor Bradley*
cbradley@platkinllp.com
**Platkin LLP**
One Gateway Center
Suite 1150
Newark, NJ 07102
Tel: (973) 561-1951

Nathaniel A.G. Zelinsky (DC Bar #1724093)
nzelinsky@washingtonlitigationgroup.org
Kyle R. Freeny (DC Bar #1684764)
kfreeny@washingtonlitigationgroup.org
James I. Pearce (DC Bar #90042280)
jpearce@washingtonlitigationgroup.org
**Washington Litigation Group**
1717 K Street, NW, Suite 1120
Washington, DC 20006
Tel: (202) 521-8750

Timothy J. Heaphy (DC Bar #444881)
theaphy@hshw.com
Fiona Carroll (DC Bar #90009677)
fcarroll@hshw.com
Lindsay Hemminger (DC Bar # 90017880)
lhemminger@hshw.com
**Heaphy, Smith, Harbach & Windom LLP**
1701 Pennsylvania Ave
Suite 200
Washington, DC 20006
Tel: (202) 739-8475

Norman L. Eisen (D.C. Bar #435051)
Norman@democracydefenders.org
Lindsay W. Zimliki (D.C. Bar #475890)
Lindsay@democracydefenders.org
Jacob Kovacs-Goodman (D.C. Bar #90032363)
Jacob@democracydefenders.org
**Democracy Defenders Fund**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958

*admitted *pro hac vice*