**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MICHAEL M. GORDON and MICHAEL J. ROMANO,**

Plaintiffs,

v.

**TODD BLANCHE**, *in his official capacity as Acting Attorney General of the United States*, **STANLEY E. WOODWARD**, *in his official capacity as the Associate Attorney General of the United States*, **SCOTT BESSENT**, *in his official capacity as Secretary of the Treasury of the United States*, **FRANK BISIGNANO**, *in his official capacity as the Chief Executive Officer of the Internal Revenue Service*, **THE UNITED STATES DEPARTMENT OF JUSTICE**, **THE UNITED STATES DEPARTMENT OF THE TREASURY**, and **THE INTERNAL REVENUE SERVICE**,

Defendants.

Case No. 1:26-cv-01907-RJL

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


Introduction ... 1

Argument ... 2

I. PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE ... 2

A. This Case is, Beyond Any Reasonable Doubt, Moot ... 2

B. Plaintiffs Lack Article III Standing ... 8

C. The Case is Unripe ... 13

II. PLAINTIFFS' APA CLAIMS ARE DEFICIENT ... 14

A. Plaintiffs' APA Claims Must Fail Because There Has Been No Final Agency Action ... 14

B. Notice-and-Comment Would Not Have Applied In Any Event ... 19

C. The Fund Would Survive Arbitrary-and-Capricious Review ... 22

III. ANY REMAINING STATUTORY OR CONSTITUTIONAL CLAIM SHOULD BE DISMISSED ... 23

Conclusion ... 25

## INTRODUCTION

Nothing in Plaintiffs' brief warrants this Court to revisit its conclusion in a related case that challenges the Anti-Weaponization Fund are likely moot and also not ripe. Since the issue was last before this Court, the Attorney General's statements have been made under oath, made consistently, and been affirmed by his subsequent actions. This case is moot.

Aside from mootness, Plaintiffs' theory of Article III standing is not viable—it reflects the hope that a judgment of this Court will alter public opinion about the controversial actions they took while working as DOJ prosecutors. But that hope is seriously misguided. Plaintiffs' alleged reputational injury is also disconnected from the operative agency action they challenged in this case; none of the Fund's governing documents mentioned Plaintiffs by name. *See* Dkt. 1-2 ("Settlement Agreement"); Dkt. 1-3 ("May 18 Order"). On these facts, where no Fund even existed in the first place and no claims were submitted or considered (much less paid) any link between Plaintiffs' reputations—their personal safety, or their business expectations—is a paper tiger of Plaintiffs' own making. Their claims are unripe for the same reason.

Plaintiffs' claims suffer from several additional defects. For example, they allege no final agency action. They bring an Appointments Clause claim while conceding there has been no appointment. They assert First Amendment and Equal Protection harms based on claimant-viewpoint discrimination even though they have not stated they will assert any claims themselves. Ultimately, these claims all seek advisory opinions because the Fund will not go forward.

The Complaint should be dismissed with prejudice.

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE.

Plaintiffs' claims cannot go forward under Article III of the Constitution. The claims are, beyond a shadow of a doubt, moot. They have also always been unripe. And in any event, Plaintiffs have not adequately alleged Article III standing.

#### A. This Case is, Beyond Any Reasonable Doubt, Moot.

In a related case, this Court—twice—already concluded that claims challenging the Fund are moot, first when it denied a TRO, and then again when it denied a preliminary injunction and APA stay. *CREW v. DOJ*, No. 1:26-cv-1789, Dkt. 20 at 6–12 (D.D.C. June 23, 2026). In reaching those conclusions, the Court relied primarily on two categories of representations: (1) Attorney General Blanche's statements to the House Appropriations Committee during an oversight hearing that "[w]e are not moving forward with the Fund, period," and that the Fund "was not moving forward ever," *id.* at 3, and (2) the Government's representations in its briefs that such claims were moot in light of the Attorney General's statements. *Id.* at 9. The Court described the June representations as "unequivocal" and "weighty" because they were made to Congress and "under threat of contempt." *Id.* at 10. The Court also considered these representations in light of the "'presumption of regularity' that attaches to the official acts of public officers, which requires courts to presume, 'in the absence of clear evidence to the contrary . . . that they have properly discharged their official duties.'" *Id.* at 9 (quoting *People for the Ethical Treatment of Animals v. USDA*, 918 F.3d 151, 157 (D.C. Cir. 2019)).

The Attorney General's statements to the House Appropriations Committee, and the representations made to this Court based on those statements, were all made in early- to mid-June. It is now September. Between then and now, the Government's several additional representations have resoundingly conveyed a single message—the Fund is not moving forward. So if any presumption of regularity attached then, it should attach with even more force now. After this Court credited the Government's representations, the Attorney General testified under oath that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States at 1:26:42–49. He made the same representation in written answers to Senators' Questions for the Record. *See, e.g.*, Questions for the Record, The Nomination of the Honorable Todd Blanche to be Attorney General of the United States, at 14 (July 17, 2026). As Plaintiffs concede, the Attorney General has now also rescinded the May 18 Order in writing. Opp. 17; Dkt. 36-5 ("Rescission Order"). And even more recently, in public statements to a group of reporters, the Attorney General stated: "The President said in the cabinet meeting that it's dead … I keep on saying this over and over again, but I'm happy to say it one more time. I have testified under oath that it's dead. I have testified in front of the House, where I wasn't under oath, where I said it was dead … I'm not sure how I can further say that the Anti-Weaponization Fund doesn't exist." *The DOJ anti-weaponization fund doesn't exist*, FOX NEWS, at 00:02–44 (Aug. 12, 2026). Likewise, in briefs filed in two additional federal district courts, the

Department has repeatedly stated the same. Motion to Dismiss, Dkt. 147 in Case No. 1:26-cv-01399-LMB-IDD (E.D. Va. Aug. 21, 2026) ("the Anti-Weaponization Fund . . . will not go forward."); *see also* Reply in Support of Motion to Dismiss, Dkt. 16 in Case No. 3:26-cv-03283-CAB-DDL (S.D. Cal. Aug. 28, 2026) ("There is not going to be a fund—at all.").

Plaintiffs litany of media articles they incorporate to the docket are unavailing. Indeed, the TruthSocial post they reference acknowledges no Fund is going forward, as the post expressed support for an "Anti-Weaponization Bill," which necessarily would require an act of Congress. Opp. Ex. J. And the President's August 3 statement that the "fund *could have* given" claimants "some solace," was obviously an acknowledgment that the Fund was not going forward. Opp. 10 (emphasis added). Those representations do not contradict, but rather are consistent with, the cascade of statements the Government has made insisting that there will be no Fund. And to the extent the Opposition relies on news articles crediting anonymous officials' statements that a Fund was moving forward, this Court has already indicated that such media reports do not "undercut the weighty and unequivocal statements that the Government has made to this Court—as officers of the Court and under threat of contempt—and before Congress." *CREW*, Dkt. 20 at 9–10.

Plaintiffs cannot will away the fact that the Government's additional representations only strengthened a pattern that this Court recognized in its initial rulings in *CREW*. *See* Opp. 17 (characterizing the Government's conduct as consisting of "bare representations that the Fund will not go forward after another district court

issued a TRO"). And as this Court already recognized, the reason why the Government originally declined to rescind the Fund in writing, the Government took the position that it was not necessary in the absence of a justiciable controversy. *CREW*, Dkt. 20 at 8 (relying on well-established D.C. Circuit precedent). Of course, any objection that the Fund has not been rescinded in writing is now moot itself, since it has been rescinded in writing.

Nor are Plaintiffs entitled to move the goalposts by vaguely complaining that the written recission is not sufficient or that government officials have expressed support for compensating individuals targeted by improper prosecution in appropriate cases. *See* Opp. 9, 21. Plaintiffs' claim challenges a specific action—the creation of the Fund—and that is no longer happening. Compl., Prayer for Relief.

Plaintiffs, ironically, appear to want the Fund to go forward just to keep this case alive. So they argue that the Attorney General's rescission of the Fund "is ineffective," because "President Trump could try to enforce the Settlement Agreement." Opp. 21–22. For starters, that argument contradicts Plaintiffs' contention that the Fund is illegal. It is "a bedrock principle of contract law" that "[c]ontracts are void when they announce illegal terms." *Goodrich as trustee of Robert D. Goodrich revocable trust v. Bank of Am. N.A.*, 136 F.4th 347, 356 (D.C. Cir. 2025) (citing Restatement (Second) of Contracts § 178). Regardless, such a lawsuit would amount to a claim for specific performance, and courts may not order such relief against the federal government. *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 63 (D.D.C. 2025) ("[T]he Tucker Act provides money damages as

the exclusive remedy for contractual actions against the federal government, foreclosing courts from ordering specific performance."); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68, 971 (D.C. Cir. 1982) (explaining that there is a "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract" in "an action against the United States"); *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) (same). In any event, the nature of the contemplated specific performance Plaintiff envisions would be akin to a writ of mandamus directed at the Attorney General. That would conflict with the vast body of case law suggesting that mandamus of cabinet officials is an extraordinary remedy reserved for the rarest of cases. *E.g.*, *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

Relatedly, the appellate proceedings in *Trump v. IRS* have absolutely no bearing on the mootness of Plaintiffs' claims. The Judge's Order in the Florida matter did not purport to invalidate any part of the Settlement Agreement. *See Trump v. IRS*, 2026 WL 2015525, at *21 n.63 (S.D. Fla. July 13, 2026) ("[W]hether a private agreement between the Parties … is valid and enforceable or is a depredation of the Judgment Fund and an illegal conferral of immunity *is not before* this Court." (emphasis added)). So appealing it has no bearing on the Settlement Agreement or the no-existent Fund.

In another attempt to keep the case alive—despite having obtained the relief originally sought—Plaintiffs take issue with the fact that the Settlement Agreement and Order are still posted on the DOJ website, because the continued availability of

those documents harms their reputation on an ongoing basis. Opp. 22–23. Of course, as Plaintiffs' own Opposition acknowledges, the Order they complain of was rescinded, and that Rescission Order is itself available on the DOJ website. The Rescission Order rendered the May Order "of no force or effect." Rescission Order.

Plaintiffs' attempt to analogize to *McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of Judicial Conference of United States*, 264 F.3d 52 (D.C. Cir. 2001), is unavailing. As explained below, Point I.B., *infra*, that case involved the continued availability of a public reprimand notice specifically naming the plaintiff, a former federal judge who had been sanctioned. And in that very case, the court explained, "In this circuit, when injury to reputation is alleged as a secondary effect of an otherwise moot action, we have required that 'some tangible, concrete effect' remain, susceptible to judicial correction." *McBryde*, 264 F.3d at 57. A corollary is that, "[a]t some point, … claims of reputational injury can be too vague and unsubstantiated to preserve a case from mootness." *Id.*

Here, the "legally relevant injury" "is only the incremental effect" of the continued availability of the Settlement and now-rescinded Order on the website, but it is unclear how those materials—which do not mention Plaintiffs by name or even explicitly mention January 6 at all—will pose any real harm. *See id.* at 57–58. In fact, in their Complaint, Plaintiffs alleged no incremental harm from the continued availability of the Settlement Agreement or Order on the DOJ's website. Rather, they alleged a preexisting reputational injury based on actions and that predated the Fund—like President Trump's unreviewable exercise of his clemency power—and

then an incremental injury based on *their predictions about how the Fund would have operated.* Compl. ¶ 145. But because the Fund is not going forward, that incremental injury has already been redressed.

Finally, the fact that political negotiations arose from the interplay between the plan to establish a Fund and the Attorney General's confirmation proceedings—and even more importantly, the fact that those political negotiations were seen through to a concrete conclusion—only further underscores that this case is properly characterized as moot. "[W]hen a high-profile dispute is "hashed out in the hurly-burly, the give and-take of the political process between the legislative and executive," that is reason for the dispute to "not end[] up in court." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (internal quotation marks omitted). And while Plaintiffs point to concerns originally raised by Senators Cornyn and Tillis, Opp. 6, 9–10, they conveniently leave out the important detail that both of those Senators eventually confirmed that in their understanding, the Fund was not going forward, and voted *to confirm* Todd Blanche as Attorney General of the United States.

**B. Plaintiffs Lack Article III Standing.**

As Plaintiffs' opposition confirms, there are several fatal problems with their theory of standing, which in some instances relies on arguments bordering on the bizarre and absurd.[1] First, other than the Attorney General's Rescission Order—

[1] For example, Plaintiffs claim that, as a result of the Fund, their ability to litigate effectively on behalf of clients will be negatively affected, as "opposing adversaries are likely to wield the 'weaponization' accusations against them, hindering their ability to zealously represent their clients and perform their professional responsibilities." Opp. 14 (quoting Gordon Decl. ¶24; Romano Decl. ¶35). It is unclear

which cites this case caption—none of the relevant Fund documents mention Plaintiffs by name, posing injury-in-fact and traceability problems. Second, Plaintiffs rely almost entirely on pre-Fund events to support injuries they claim are caused by the Fund, posing additional traceability problems. Finally, it is far from clear how any judgment of this Court would alleviate the wide-ranging personal and professional harms they claim to be experiencing, posing an independent redressability problem.

Plaintiffs are not mentioned anywhere in any of the relevant Fund documents—not in the Settlement Agreement, the May 18 Order, or any other related document. So they cannot claim any concrete reputational injury based on those documents. "Standing cannot be 'inferred argumentatively' but rather 'must affirmatively appear in the record.'" *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) (quoting *Spencer v. Kenma*, 523 U.S. 1, 10–11 (1998)). As explained in Defendants' Motion, the only way to establish a link between 1) Plaintiffs' reputations or their personal safety and 2) the Fund, is to engage in several layers of speculation. That defeats the existence of a concrete injury. *Trump v. California*, No. 26A124, 609 U.S. ---, slip. op. at 4–5 (2026) (explaining that an "unduly long 'chain of inferences'" defeats the assertion of a "supposedly concrete

---

how this would ever happen in practice. Such hypothetical "opposing adversaries" presumably would be expected to observe professional norms, including declining to lob personal or ad hominem attacks against opposing counsel. And if Plaintiffs' unlikely scenario ever came to pass, presumably Plaintiffs would be able to adequately respond, including raising concerns about the legal relevance of any such attacks.

injury" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414–15 n.5 (2013)); *see also id.* at 7–8.[2]

*Advanced Management*, 211 F.3d 633, is instructive. There, the FAA reopened a bid proceeding because of negligent misrepresentations made by the originally-selected contractor in its application. *Id.* at 636–37. In an issue of *Federal Contracts Reports*, an article relaying the FAA's decision to reopen the bid proceeding "quoted a remark of counsel for [a competing bidder] that the order 'vindicates the basic principle that you can't lie to the government to get a contract.'" *Id.* at 636. The originally-selected contractor petitioned for review of the FAA's decision, but in the meantime it had re-bid and won the contract again in the new bidding process. *Id.* at 635. Still, the contractor sought review of the original decision to reopen the first bidding proceeding because it believed "the FAA branded it a 'fraud' and a 'liar'" in that decision. *Id.* at 636. But the D.C. Circuit rejected the validity of the contractor's alleged reputational injury, because "all that affirmatively appear[ed]" in the record was the contractor's "vast exaggeration of the FAA's findings," which did not include any finding of intent to defraud, and the court also declined to impute to the government the quoted statement made by the competing company's counsel. *Id.* The

[2] This is thus nothing like the "express reprimand" of former Judge McBryde, who was specifically identified by name in a public notice on the Fifth Circuit's website after a judicial misconduct investigation revealed that he acted inappropriately towards colleagues and lawyers appearing before him throughout the course of this career. *McBryde*, 264 F.3d at 57–68 & 56 n.2; *see also* Report of the Special Committee of the Fifth Circuit Judicial Council Regarding Complaints Against, and the Investigation into the Conduct of, Judge John H. McBryde at 150–51 (Dec. 4, 1997). Plaintiffs' reliance on *McBryde* (Opp. 13) is unpersuasive for that reason.

court also explained that "Article III courts do not ordinarily have jurisdiction to issue … 'Writs of Erasure' to administrative agencies" to "cleanse" their statements of "material distressing" to those who disagree with them. *Id.* On these bases, the D.C. Circuit also rejected the contractor's reliance on *Meese v. Keene*, 481 U.S. 465 (1987), a case Plaintiffs attempt to rely on heavily, here. Opp. 12–13, 16. This case is on all fours. To support their claim of reputational harm, Plaintiffs must read content into the Settlement Agreement and May 18 Order which is simply not there.

Furthermore, any claimed injury from "accusation[s] that [Plaintiffs] weaponized the justice system," Opp. 14, is, by definition, not "traceable" to the Fund, because every purported accusation Plaintiffs identify occurred before any Fund was ever announced. *See California v. Trump*, 613 F. Supp. 3d 231, 246 (D.D.C. 2020) (injuries can establish Article III jurisdiction only if they are "fairly traceable to the *specific act or conduct*" alleged to be unlawful (emphasis added)). For example, Plaintiffs point to the fact that they were terminated from their positions or resigned. Opp. 14. But that happened at least a year before any plan to establish the Fund was announced. *See* Gordon Decl. ¶ 12; Romano Decl. ¶ 18. The same is true of the so-called "significant repercussions in their personal lives," all of which predate any announcement about any Fund. Opp. 14–15. In fact, the opposition even concedes that the "most recent" event of this sort occurred in February 2026—months before the Fund was announced. Opp. 15. The allegedly unlawful act Plaintiffs challenge is the establishment of the *Fund*, not 1) their dismissal from DOJ, 2) the hodgepodge of public statements they claim besmirch their reputations, or 3) the online criticism

they may have received from unidentified third parties. The Court should reject Plaintiffs' attempts to elide the differences between these events; Plaintiffs may not move the goalposts with respect to the operative action they claim is unlawful.

But even if the Court were to excuse this sleight of hand, another traceability problem would be exposed: Article III does not open the courthouse doors to individuals who have caused their own injury. Plaintiffs concede in both their Complaint and their Opposition that they have taken affirmative steps to tie their own names to January 6. That materially undermines Plaintiffs' attempt to draw a line between their injuries and the Fund, rather than their own self-promotional activity. Plaintiff Gordon, for example, states on his law firm bio that, "Following the riot at the U.S. Capitol on January 6, 2021, Mr. Gordon was selected to help the U.S. Attorney's Office for the District of Columbia prosecute cases stemming from the riot. As Senior Trial Counsel for the Capitol Siege Section, he led the prosecutions and conducted the trials against many of the most notorious January 6 defendants, serving as DOJ's closer in its highest-profile cases and achieving a perfect conviction record." Mike Gordon, Kelley Uustal Trial Attorneys, https://kelleyuustal.com/attorney-bio/mike-gordon/.

Plaintiffs' own decisions to advertise their work as Capitol Siege prosecutors in their firm biographies thus only complicates their ability to adequately allege traceability. *See Garland v. Orlans, PC*, 999 F.3d 432, 441 (6th Cir. 2021) ("Self-inflicted injuries fail under th[e traceability] prong because they are, by definition, not traceable to anyone but the plaintiff.") (internal quotation marks and alterations

omitted). *Id.* If Plaintiffs wish to lean into their experience pursuing controversial prosecutions, Opp. 14–15, they must take the bitter with the sweet, and they cannot reasonably expect to avoid the natural consequences of their own actions. Finally, for the same reasons the majority of Plaintiffs' injuries are not traceable to the Fund, the judgment Plaintiffs seek would not redress those asserted injuries.

**C. The Case Is Unripe.**

Plaintiffs insist that their "claims do not depend on any future events or contingencies," going so far as to say that "whether the Fund will go forward at all" is "irrelevant to [their] claims." Opp. 24. That is absurd. "Whether the Fund will go forward at all" is the entire point of their claims. Compl., Prayer for Relief at A.–E. The fact that they make this argument only underscores that they know their claims are moot. It also confirms that these claims expressly depend on *future* contingencies.

Plaintiffs spill significant ink complaining that the Fund *would have been used* to compensate so-called "January 6 insurrectionists." Opp. 15–16; *see also id.* at 13 (hypothesizing that the Fund, if it existed, would have accepted claims "by the January 6 insurrectionists prosecuted by Plaintiffs"); Compl. ¶ 121 ("Defendants have illegally created the Anti-Weaponization Fund to pay the January 6 insurrectionists."); *id.* ¶ 143 ("[T]he January 6 insurrectionists have applied, and will assuredly continue to apply, to the Fund."); *id.* ¶ 145 ("Imminent actions by Defendants—including paying out money to insurrectionists and issuing formal apologies—will visit additional and more acute harms on Plaintiffs beyond what already experienced."). Those statements are speculation, pure and simple. No Fund

was ever operational, no procedures were ever determined, and no Members have ever been appointed. No claims have been, nor will be, formally submitted or adjudicated. Plaintiffs' allegations reveal an unripe claim for the same reason they fail to assert a concrete injury-in-fact. Courts do not simply credit a plaintiff's attempt to tell the future. *Trump v. California*, 609 U.S. ---, slip. op. at 4–5, 7–8.

"To say the least, this case presents the paradigmatic example of a dispute with 'significant uncertainty' about whether the challenged framework will be implemented at all, and if so, in what form, on what timeline, and with what concrete consequences to the parties!" *CREW*, Dkt. 20 at 13–14.

## II. PLAINTIFFS' APA CLAIMS ARE DEFICIENT.

Because the jurisdictional issues are dispositive of this matter—and require the Court to dismiss this case for lack of jurisdiction—the Court need not reach the substantive issues presented. Nevertheless, should the Court reach and consider these issues, the Court should conclude that the Complaint fails the Rule 12(b)(6) standard on the substance and should dismiss for these reasons as well.

### A. Plaintiffs' APA Claims All Fail Because There Has Been No Final Agency Action.

Because Plaintiffs have presented no "final agency action" for the Court to review, they cannot obtain APA review, and all of their APA claims must fail as a result. Plaintiffs complain about two documents: the Settlement Agreement and the now-rescinded May Order. So the Court must consider whether those instruments amount to final agency action. And the question is whether they "'mark the consummation of the agency's decision-making process'" and whether they have

caused "'rights or obligations [to be] determined, or from which legal consequences will flow.'" *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The answer to both those questions is no.

The Settlement Agreement cannot reasonably be read as the consummation of agency decision-making with respect to the creation of the Fund. At best, the Settlement Agreement determined how the Fund could be created in the future, and it conditioned the existence of the Fund on several future implementing actions. Settlement Agreement at 2. First, "within 30 days of the Effective Date," the Attorney General would issue an "accompanying order" which would "establish funding and any other relevant requirements, rules, conditions, terms, and waivers." *Id.* Second, within "30 days of the Effective Date, the Attorney General" would "issue an order appointing the Members, including the Chair of The Anti-Weaponization Fund," with one member "chosen in consultation with congressional leadership." *Id.*[3] Third, there would be no quorum without at least three Members. *Id.* Fourth, the Fund's Members would have had "the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," including but not limited to "reasonable steps to protect private personal and financial information" and "controls and systems to avoid fraudulent claims." *Id.* at 2–4. The planned Fund would also have to be designed to operate "consistent with law," with "the validity of [remaining] provisions

---

[3] Relatedly, the Settlement Agreement describes the Fund as "consisting of" its Members. Settlement Agreement at 2. So without Members, there could be no Fund.

. . . not . . . impaired" if any provision were "found by a court to be invalid or unenforceable." *Id.* at 4–5. Plaintiffs' implausible reading of the Settlement Agreement, Opp. 26–27, cannot change the fact that the agreement left too much to be determined in the future to reasonably be considered a consummation of agency decision making.[4] Nor did the Attorney General's (now-rescinded) May Order supply the missing pieces. That order—enjoined before it was implemented and now withdrawn—would have allowed the drawn-out process of establishing the Fund to begin, but it did not itself establish any "rules, conditions, terms, [or] waivers," and it did not appoint any Members, much less a Chair.[5] Plaintiffs' selective reading of these documents ignores the fact that they at most outline a policy activity that would exist in the future. Opp. 25–26.

Likewise, the idea that these actions reflect a decision "by which rights or obligations have been determined," Opp. 26, conflicts with binding Supreme Court precedent. *See Trump v. California*, 609 U.S. ---, slip. op. at 4 (explaining that "an internal directive from the President to a subordinate" imposed "no obligations" on regulated parties); *see also id.* at 7 (explaining that the President's directive to a

[4] The language of the Settlement Agreement proves that the agreement itself could not create the Fund.

[5] Likewise, a website notice published by DOJ referred to the Fund as an entity that would come into being at some point in the future, saying it "*will consist* of five members appointed by the Attorney General (AG)," with one member who "*will be chosen* in consultation with Congressional leadership," with funding that "*will come* from the judgment fund." Press Release 26-512, Justice Department Announces Weaponization Fund, available at https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund (May 19, 2026).

subordinate "to issue a notice of proposed rulemaking" was merely an order "to initiate the process of proposing a rule that might bind" regulated parties "in the future," so it did not itself "impose[] [any] legal requirements on" any regulated party). Indeed, the Fund would have been voluntary, and no rights or obligations would have been determined until it was set up, claims were accepted, evaluated, and potentially resolved through apology and payment. And the only individuals whose rights would have been affected are those who would have given up alternative remedial means for valid legal claims by opting to apply to the Fund.

The D.C. Circuit has also held in analogous situations that challenged agency action was not "final" under the APA. In *Delaware Valley Regional Center LLC v. Department of Homeland Security*, USCIS published statements within its Q&A and Policy Manual to specify that immigrants seeking to demonstrate their eligibility for infrastructure project visas must file an application. 106 F.4th 1195, 1205 (D.C. Cir. 2024) ("USCIS stated only that it requires regional centers and visa applicants to submit forms that demonstrate their eligibility for a new benefit. Thus, the statements in the Q&A and the Policy Manual…do not constitute 'final agency action.'") (quoting *Catawba Cnty. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009)). The plaintiffs in *Delaware Valley* sought eligibility for a newly created pool of EB-5 visas for investors. As in this case, the challenged statements in *Delaware Valley Regional Center* were about how the agency explained it would administer the first step of a drawn-out process. There was no definitive eligibility decision. Plaintiffs there attempted to "infer from USCIS's statements in the Q&A and the Policy Manual that

the agency ha[d] categorically excluded" them "from consideration," but the D.C. Circuit rejected that argument, explaining that they had "not established that USCIS has adopted that interpretation." *Id.* at 1205. "[R]ather than anticipate that their applications will be rejected based on an unfavorable interpretation," the prospective applicants had to "file application[s]" first, and they would have had "the opportunity to litigate the issues they raise[d]" at that point. *Id.* at 1206. But before that, there was no final agency action. *Id.* Likewise here, Plaintiffs' claims about the Fund depend on their premature judgment about how the Fund would have operated. But those predictions could only have been tested through actual operation of the Fund. If the Fund had gone forward and operated in exactly the way Plaintiffs predicted it would have, Plaintiffs would have had the opportunity to press their claims on a nonspeculative record.

In another analogous decision, the D.C. Circuit held that an MOU between the IRS and DHS "outlining procedures that will govern requests … for addresses of persons subject to criminal investigation," was not a reviewable final agency action. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1224, 1235–36 (D.C. Cir. 2026). The D.C. Circuit made clear that finality depends on "the actual legal effect (or lack thereof) of the agency action," as well as the agency's own "characterization of the guidance" and "whether the agency has applied the guidance as if it were binding." *Centro*, 167 F.4th at 1236. The Court explained that IRS "never characterized" the MOU "as a rule," nor did it rely "on the MOU to justify its actions," and the "MOU merely outline[d] the process through which ICE can request

addresses from IRS." *Id.* As explained above, the challenged documents—which is the most important place for the Court to look to assess DOJ's characterizations of the Fund—referred to the program as something that would only only exist in the future. And it is beyond reasonable dispute that no government actor "has applied the guidance as if it were binding on regulated parties." *Id.*

**B. Notice-and-Comment Would Not Have Applied In Any Event.**

Even if there were a final agency action for the Court to review here (there is not), notice-and-comment rulemaking would not have been required. Notice-and-comment rulemaking is required only for legislative rules. "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). In contrast, "agency action that merely explains how … it will exercise its broad enforcement discretion … is a general statement of policy." *Id.* at 252. Much like in the final agency action context, what matters is "the actual legal effect (or lack thereof) … on regulated entities." *McCarthy*, 758 F.3d at 252. The D.C. Circuit has also explained that "the agency's characterization of" the action in question is a key factor courts should use to determine "what makes something a legislative rule." *Id.* at 251–52.

These considerations—which Plaintiffs ignore in their opposition—confirm that the challenged actions do not constitute a legislative rule. Here, there are no regulated entities at all. As explained above, participation in the Fund would have

been entirely voluntary. Even in the hypothetical where the Fund was fully operational, it would not have required anyone to do anything. *Cf. Nat'l Ass'n of Reg. Utility Comm'rs v. FCC*, 746 F.2d 1492, 1495 (D.C. Cir. 1984) (describing the FCC's "authority to control entry into and exit from" the telecommunications industry, as well as "require just and reasonable rates").

From the very beginning, the Government characterized the Fund in terms of a plan that would have been implemented more concretely in the future. The Settlement Agreement provided that "The Anti Weaponization Fund [would have had] the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," Settlement Agreement at 2, and the May Order did nothing concrete on that topic. *See McCarthy*, 758 F.3d at 252–53 (explaining that a "Final Notice" issued by the EPA was not a legislative rule where "the document [was] devoid of relevant commands," notwithstanding the fact that the document "signal[ed] likely future permit denials by EPA" (emphasis added)); *see also id.* ("[I]f so, those permit denials can be challenged at that time."). No legal consequences with any bearing on Plaintiff flowed from the challenged documents.

*Gill v. United States Department of Justice*, 913 F.3d 1179 (9th Cir. 2019), is instructive. There, the federal government "sought to standardize the sharing of terrorism-related information through the adoption of a 'Functional Standard'" of suspicious activity potentially suggesting terrorism. *Id.* at 1182–83. The Ninth Circuit concluded that the decision to establish a new "Functional Standard" was "exempt from the notice and comment requirement" because while the Standard

"aid[ed] agencies in determining whether an individual is engaged in suspicious activity, … the final decision to disseminate a [Suspicious Activity Report] rest[ed] in the analyst's discretion." *Id.* at 1187. In other words, the "significant discretion retained by agencies and their analysts in determining whether to disseminate information compel[led the] decision that the Functional Standard is not a legislative rule." *Id.* The Ninth Circuit relied on the Fifth Circuit's similarly instructive decision in *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995). In *Shalala*, the FDA promulgated a policy setting forth nine factors to help the agency determine whether to initiate an enforcement action against a pharmacy engaged in drug manufacturing. 56 F.3d at 593. The court concluded that the policy did not require notice-and-comment before it was promulgated, because the policy left relevant agency decisionmakers considerable discretion, "based on their own judgment," to "decide whether the pharmacy in question" would have been subject to the enforcement policy. *Id.* at 601.

Like the foundational policies in these cases, the Fund's commissioners—who, to be clear, were never appointed—would have exercised considerable discretion, guided by the broad factors listed in the *Trump v. IRS* Settlement Agreement. That none of those eventualities came to pass just confirms dismissal is proper.

Throughout their opposition Plaintiffs mischaracterize the contents of the May 18 Order and Settlement Agreement, stating that such documents "creat[ed] . . . the Fund," as well as "rules [with] prospective application." *E.g.*, Opp. 42. But whether an agency has issued a legislative rule is determined by the contents of the agency's

action, rather than any self-serving label. *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019)). No party may manufacture the applicability or non-applicability of notice-and-comment through the mislabeling of agency action. *Allina*, 587 U.S. at 575. There was never a Fund, and no rules governing the operation of the Fund were ever established.

**C. The Fund Would Survive Arbitrary-and-Capricious Review.**

The arbitrary-and-capricious standard is deferential. Applying that standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *S. Airways Express, LLC v. DOT*, 159 F.4th 50, 59 (D.C. Cir. 2025). Plaintiffs' own opposition confirms that standard is met here, even though they may disagree with the policy choice taken. On their own recounting of the facts, the Fund was announced to provide redress for those targeted by government abuse resembling, for instance, "abuse of the FACE Act," the "wrongful labeling of certain parents [as] domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria." Opp. 36 (quoting Settlement Agreement at 1). A duly-elected Presidential administration has the right to determine that respect for the democratic will requires establishing a process allowing the Government to atone for its past wrongs. Because the Fund was based on and modeled after previous settlement funds established by the government, it was not arbitrary or capricious. *See Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015); *Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-2502

(D.D.C.); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179, Dkt. No. 1098 (E.D. La. Feb. 2, 2011).

For the same reasons the Fund is not arbitrary or capricious, Plaintiff's *ultra vires* claims must fail. Plaintiffs' attempt to use this "Hail Mary pass"—requesting judicial intervention to challenge an action that has clear historical precedent—fails to meet the high bar for an ultra vires claim. *See* Dkt. 45, Memorandum Opinion denying Preliminary Injunction at 10, in *Tohono O'Odham Nation v. Mullin, et al.*, Case No. 1:26-cv-2127 (D.D.C. Aug. 14, 2026) (Leon, J.). "As I have said before, 'ultra vires review is a high bar'—it is the ultimate 'Hail Mary pass.'" *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 104 (D.D.C. 2026) (Leon, J.) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)).

## III. ANY REMAINING STATUTORY OR CONSTITUTIONAL CLAIM SHOULD BE DISMISSED.

The Court should reject Plaintiffs' request (Opp. 28–39) for advisory opinions on several weighty issues of constitutional and federal statutory law given that they have already received the relief sought in their Complaint. In addition, the following key deficiencies confirm dismissal is proper for several claims.

***First Amendment and Equal Protection Claims.*** Plaintiffs make no attempt to explain how they can assert First Amendment and Equal Protection claims premised on claimant viewpoint discrimination, where they have admitted they would not have applied to the Fund had it moved forward. Opp. 24 ("[W]hether the Fund will go forward at all . . . [is] irrelevant to Plaintiffs' claims."); *see also* Gordon Decl. ¶¶ 26–27 (averring "I would seek any remedy available" through an

"avenue for those improperly targeted by President Trump and his allies," just not through the Fund challenged here); *see generally* Romano Decl. ¶ 36 (stating "I would have submitted comments" through a notice and comment process, but declining to state that he would have applied to the Fund). Regardless, according to the Settlement Agreement, the Fund would not have discriminated on the basis of claimants' viewpoints, nor would it have screened out claims alleging improper weaponization of government by Republican government officials.

***Insurrection Claim.*** Plaintiffs cannot assert a claim that the Fund violates the prohibition on paying debts or obligations "incurred in aid of insurrection or rebellion against the United States" without speculating about who would have obtained relief had the Fund gone forward. And the Settlement Agreement, which Plaintiffs incorporate by reference, suggests that the Fund would have been required to operate "consistent with law," with "the validity of [remaining] provisions .... not … impaired" if any provision were "found by a court to be invalid or unenforceable." Settlement Agreement at 4–5; *see also Montgomery v. Comey*, 300 F. Supp. 3d 158, 168 (D.D.C. 2018) (dismissing claims premised on allegedly unlawful surveillance where the Court would otherwise have been required to disbelieve government's representations that data collection program would be conducted in accordance with relevant federal statutory requirements) (Leon, J.).

***Appointments Clause Claim.*** Logic dictates that an Appointments Clause claim requires an allegation of an unlawful appointment, despite Plaintiffs' strained

argument to the contrary. *See* Opp. 32–33. Plaintiffs do not dispute that no Member was ever appointed to the Fund.

## CONCLUSION

For the reasons stated above, the Court should dismiss this case with prejudice, pursuant to Rule 12(b)(1) and 12(b)(6).

Date: September 21, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

*/s/* ANDREW J. BLOCK
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
Henrique Carneiro
*Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

**Certificate of Service**

I hereby certify that on September 21, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

*/s/ Andrew J. Block*
Andrew J. Block